UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. HUGH DUCKWORTH, ) | |
| ) | Case No. |
| Plaintiff ) | |
| v. ) | |
| ) | |
| R3 EDUCATION INC., f/k/a ) | JURY TRIAL DEMANDED |
| EIC HOLDING, INC., f/k/a ) | |
| EIC ACQUISITION CORPORATION, ) | |
| STEVEN C. RODGER, and ) | |
| TERRY J. MOYA, ) | |
| ) | |
| Defendants ) | |

## COMPLAINT

Dr. Hugh Duckworth, by and through his attorney, brings this Complaint against R3 Education Inc. (f/k/a EIC Holding, Inc., f/k/a EIC Acquisition Corporation), Steven C. Rodger, and Terry J. Moya (collectively, the "Defendants").  Dr. Duckworth is a medical surgeon and previously was employed by R3 Education Inc. as Executive Dean of Saba University School of Medicine and Associate Dean of Basic Sciences of Medical University of the Americas and Saba University School of Medicine.  In connection with his employment, Dr. Duckworth is a party to a Securityholders Agreement and a Stock Option Agreement.  The Defendants wrongfully terminated Dr. Duckworth's employment on July 14, 2014, and wrongfully categorized such termination as "with cause" thereby depriving Dr. Duckworth of certain rights under the Securityholders Agreement and Stock Option Agreement.  This is an action for breach of contract and breach of the implied covenant of good faith and fair dealing resulting from the Defendants' wrongful conduct.  This is also an action for violations of the Americans with

1

Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq., and the Massachusetts Antidiscrimination Statute, M.G.L. c. 151B.

## PARTIES

1. Plaintiff Dr. Hugh Duckworth is an individual who currently resides in Glenview, Illinois.

2. Defendant R3 Education Inc. (f/k/a EIC Holding, Inc., f/k/a EIC Acquisition Corporation) ("R3" or the "Company") is, upon information and belief, a Delaware corporation with a principal place of business in Devens, Massachusetts.

3. Defendant Steven C. Rodger is, upon information and belief, an individual who resides in Massachusetts.

4. Defendant Terry J. Moya is, upon information and belief, an individual who resides in Massachusetts.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

6. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because such claims are so related to Plaintiff's federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

7. This Court has personal jurisdiction over R3 because, upon information and belief, it maintains a principal place of business in Devens, Massachusetts.

8. This Court has personal jurisdiction over Steven C. Rodger and Terry J. Moya because, upon information and belief, they reside in Massachusetts.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), (2), and 1391(c) because Defendants are deemed to reside in this District because they are subject to personal jurisdiction here and because a substantial part of the events or omissions giving rise to the claims occurred within this District.

## FACTUAL ALLEGATIONS

10. Upon information and belief, R3 is a holding company that owns three medical schools: St. Matthews University School of Medicine ("St. Mathews"), Medical University of the Americas ("MUA") and Saba School of Medicine ("Saba").

11. Upon information and belief, Steven C. Rodger is R3's Chief Executive Officer.

12. Upon information and belief, Terry J. Moya is R3's Chief Financial Officer.

13. Dr. Duckworth is a medical surgeon and previously was employed by R3 Education Inc. as Executive Dean of Saba and Associate Dean of Basic Sciences of MUA and Saba.

14. Dr. Duckworth became a party to a Securityholders Agreement among the Company and its securityholders dated as of April 3, 2007 (the "Securityholders Agreement") by executing a Joinder to Securityholders Agreement dated December 10, 2008.

15. The Securityholders Agreement provides: "upon the occurrence of a Call Event affecting a Management Stockholder, the Company shall have the right to purchase from such Management Stockholder, and upon exercise of that right such Management Stockholder shall sell to the Company (a "Call"), all, but not less than all, of the Shares held by such Management Stockholder at the Purchase Price and during the Exercise Period applicable thereto as described opposite the Call Event in Schedule 2 hereto."

16. The Securityholders Agreement defines "Call Event" as "the first to occur of any of the Triggering Events affecting such Management Stockholder as set forth in Part II of Schedule 2 hereto."

17. The Securityholders Agreement defines "Triggering Event" with respect to a Management Stockholder as "the termination of his or her employment relationship with the Company or any successor entity or other entity controlled by the Company, for any reason. Every Triggering Event shall fall within one (and only one) of the following categories: (A) a termination for Cause, (B) a termination without Cause, (C) a resignation by such Management Stockholder (other than upon Retirement), (D) such Management Stockholder's death, (E) such Management Stockholder's Retirement, or (F) such Management Stockholder experiences a Permanent Disability."

18. Schedule 2 of the Securityholders Agreement sets forth the Purchase Price for the various Triggering Events. In particular, for a Termination with Cause, the Purchase Price is the "Lower of Initial Value and Book Value"; whereas, for a Termination without Cause, the Purchase Price is "Stipulated Value."

19. The Securityholders Agreement defines "Cause" to include "repeated insobriety or any use of illegal drugs while rendering services as an employee."

20. Dr. Duckworth is also a party to a Stock Option Agreement by and between Dr. Duckworth and the Company dated as of December 1, 2008 (the "Stock Option Agreement").

21. The Stock Option Agreement provides: "The Company hereby grants to the Optionee [Dr. Duckworth] as of the date hereof (the "Grant Date"), subject to the terms and conditions set forth, an option (the "Option") to purchase 255 shares of the Company's common stock, par value $.001 per share (the "Stock"), at the purchase price of $100 per share (the

"Purchase Price"), which price represents not less than the fair market value of each share on the date hereof."

22. The Stock Option Agreement also provides: "If the Optionee's employment with the Company or any subsidiary is terminated by the Company or such subsidiary for Cause (as defined in the Securityholders Agreement), then this Option shall thereupon be forfeited. If the Optionee's employment with the Company or any subsidiary is terminated by the Company or such subsidiary without Cause or is terminated by the Optionee, then, subject to paragraph (a), this Option may be exercised by the Optionee until the later of (i) twelve months after the date of the termination of Optionee's employment (provided, that Optionee acknowledges that the Option may not qualify as an ISO unless the Option is exercised within three months after such termination date) and (ii) if the Company becomes a reporting company under the Exchange Act before the date specified in clause (i), twelve months after it becomes a reporting company, but not later than the expiration date specified in paragraph (c)."

23. Over the course of Dr. Duckworth's impressive twenty-five year career, he has held the following esteemed positions: Chief Surgical Resident for Methodist Hospital in Memphis, Tennessee; Chief of Surgery and Chairman of the Operating Room/Anesthesia Committee and Chief of Staff and Chairman of the Quality Assurance Committee and the Medical Executive Committee for the Henry County Medical Center in Paris, Tennessee; Emergency Room Physician for Medical Health Care Systems in Memphis, Tennessee; Medical Malpractice Chart Review for River City Consulting; Technical Services Consultant/Specialist for Saint Jude Medical Inc.; Associate Professor of Medicine and Chairman and Course Director of the Preclinical Medicine Department, Assistant Dean of Academic Affairs, and Associate Dean of Academic Affairs at Saba University School of Medicine in Saba, Netherlands Antilles.

24. Dr. Duckworth played an instrumental role in helping R3 get recognition from various accrediting groups such as NVAO (Dutch accreditor for colleges of higher learning) and ACCM (the Accreditation Commission on Colleges of Medicine, recognized by the U.S. Department of Education).

25. Such accreditations permitted R3 to qualify for United States Stafford loans for their students, thereby significantly increasing R3's worth.

26. Dr. Duckworth's employment with R3 was terminated by a letter dated July 14, 2014.

27. Defendant Moya signed the July 14, 2014 letter on behalf of the Company.

28. The Company's July 14, 2014 letter to Dr. Duckworth states "[t]he termination is for cause, in accordance with Paragraph 8 of the terms and conditions of our letter agreement ("Letter Agreement") dated July 1, 2013 (Re: Agreement Concerning Continued Employment)."

29. Defendant Rodger signed the July 1, 2013 letter on behalf of the Company.

30. The Company's July 14, 2014 letter does not expressly identify the purported "for cause" allegedly justifying termination; however, Paragraph 8 of the July 1, 2013 letter provides "[t]hroughout your continued employment with the Company, you will be subject to termination at will, i.e., at any time and for any reason, or for cause, including but not limited to your repeated insobriety prior to the date of this letter."

31. The July 14, 2014 letter and July 1, 2013 letter do not identify any alleged instances of "insobriety" or detail any examples of how such purported instances of insobriety interfered with Dr. Duckworth's job performance nor do they detail any "repeated insobriety or any use of illegal drugs while rendering services as an employee" as would be required to satisfy the "Cause" requirement under the Securityholders Agreement and Stock Option Agreement.

32. The letters do, however, make clear that the Company regarded Dr. Duckworth as an alcoholic. For instance, the July 1, 2013 letter commanded Dr. Duckworth to "immediately seek appropriate professional help for your substance abuse problem." Indeed, the July 1, 2013 letter sought to require Dr. Duckworth to "permit your treatment provider(s) to disclose to the Company information concerning your compliance with and progress in that treatment . . . ."

33. The Company's failure to specifically identify any alleged instances of "insobriety" or to detail how such purported instances of insobriety interfered with Dr. Duckworth's job performance demonstrates its discriminatory intent.

34. The July 1, 2013 letter purports to deprive Dr. Duckworth of his stock option rights under the Stock Option Agreement. In particular, the July 1, 2013 letter provides: "With respect to your participation in any employee stock option plans of the Company or any related or affiliated entity, you agree to forfeit all employee stock options that, as of the date of this letter, are unvested or are vested but not exercised."

35. The July 1, 2013 letter threatened Dr. Duckworth with immediate termination if he refused to accept its terms and conditions. In particular, the July 1, 2013 letter states: "The offer to continue your employment on these terms and conditions will remain open until 5:00 p.m. on July 28, 2013. If the offer is not accepted by that time, the offer will expire and you will be terminated for cause effective immediately."

36. Although Dr. Duckworth disputed the unidentified "repeated insobriety while rendering services as an employee" referenced in the July 1, 2013 letter, Defendant Rodger assured Dr. Duckworth that he would keep his job so long as he signed the July 1, 2013 letter.

37. By threatening Dr. Duckworth with immediate termination if he refused to sign the July 1, 2013 letter, and promising Dr. Duckworth that he would keep his job so long as he

7

signed the letter, the Company unlawfully coerced Dr. Duckworth into signing the July 1, 2013 letter. Thus, the July 1, 2013 letter was entered into under duress, or is otherwise unconscionable, and is therefore unenforceable against Dr. Duckworth.

38. The July 1, 2013 letter does not constitute a binding contract, and is otherwise unenforceable, because it lacked consideration.

39. The Stock Option Agreement allowed Dr. Duckworth "to purchase 255 shares of the Company's common stock . . . at the purchase of price of $100 per share . . . which price represents not less than the fair market value of each share on the date hereof."

40. As of August 28, 2014, the par value of shares in the Company was valued at $350.00 per share according to the publicly available information on file with the Massachusetts Secretary of State's Office. Thus, had the Company not unlawfully deprived Dr. Duckworth of his stock option rights by terminating his employment "for Cause" (rather than "without Cause") on July 14, 2014, Dr. Duckworth would have been entitled to exercise options at a minimum profit of $250.00 per share.

41. The July 14, 2014 letter seeks to deprive Dr. Duckworth of his rights under the Securityholders Agreement. In particular, the Company seeks to deprive Dr. Duckworth of the "Stipulated Value" of his shares of common stock.

42. By characterizing Dr. Duckworth's "Triggering Event" as "termination with cause", rather than "termination without cause", the Company wrongly seeks to pay Dr. Duckworth the lower of the "Initial Value" and "Book Value" rather than the "Stipulated Value" in relation to his forced sale of stock back to the Company.

43. In particular, the July 14, 2014 letter states: "Pursuant to the exercise of those options, you hold 319 shares of common stock of the Company (the "Stock"). Pursuant to

Section 12 c. and Schedule 2 of the Securityholders Agreement, the purchase price payable by the Company for the stock is $0.001 per share, which is the lower of the "Initial Value" and "Book Value" of the Stock (as such terms are defined in the Securityholders Agreement).  Initial Value, for purposes of Section 12 of the Securityholders Agreement, is $0.001 per share, representing the amount you paid for each share of Stock upon exercise of the options.  Accordingly, the total purchase price payable by the Company for your Stock is $0.319 or $0.32 (rounded)."

44. The Securityholders Agreement defines "Stipulated Value" as "the quotient obtained by dividing (A) the difference obtained by subtracting (I) Funded Debt of the Company as of the date Stipulated Value shall be determined, from (II) the product of the Company's Adjusted EBITDA for the 12-month period ending on such date times five (5), by (B) the number of Shares outstanding or deemed outstanding on such date."

45. Additional information is required to determine the "Stipulated Value" as defined in the Securityholders Agreement.  However, using the Company's par value of $350.00 per share as a proxy results in a valuation of $111,650.00 for the 319 shares of common stock that the Company purports to buy back from Dr. Duckworth.  This is, of course, far more than the $0.32 the Company purports to pay Dr. Duckworth for these shares.

46. The Company also acted unlawfully in terminating Dr. Duckworth's employment on the basis that it regarded him as an alcoholic.

47. The Company also acted unlawfully by discriminatorily enforcing the Company's policy prohibiting alcohol consumption during Company events.

48. The Company generally encouraged a "party atmosphere."

49. Other employees, including the top management of the Company, have been intoxicated at Company events and have not been discharged or otherwise subjected to adverse employment action. For example, Mr. Roger and Dr. Yarwood demonstrated intoxication and acted inappropriately during Company sponsored events, without adverse consequences.

50. Dr. Duckworth was extremely upset by the termination and the manner in which it was conducted. There was no good reason to abruptly terminate his employment after years of excellent service to the Company.

## CLAIMS

### COUNT I
(Breach of Contract – Securityholders Agreement)

51. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

52. Under the terms of the Securityholders Agreement, R3 was contractually obligated to pay Dr. Duckworth the "Stipulated Value" for his shares of stock upon a termination without cause.

53. Dr. Duckworth was terminated without cause.

54. R3 breached its contractual obligations on July 14, 2014 by wrongfully categorizing Dr. Duckworth's termination as for cause.

55. R3 breached its contractual obligation by paying Dr. Duckworth the "Initial Value" of the stock, rather than the "Stipulated Value."

56. Dr. Duckworth has been damaged, in an amount to be determined at trial, as a direct and proximate cause of R3's breach of contract.

## COUNT II
(Breach of the Implied Covenant of Good Faith and Fair Dealing – Securityholders Agreement)

57. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

58. The implied covenant of good faith and fair dealing prohibits acts by one party that deprive another of the fruits of the bargain.

59. Implied within the Securityholders Agreement is the obligation for R3 to make the "for cause" termination in good faith.

60. R3's actions were motivated by an improper purpose reflecting bad faith.

61. On July 14, 2014 R3 deprived Dr. Duckworth of his contractual right to obtain the "Stipulated Value" of his shares by wrongfully categorizing Dr. Duckworth's termination as "for cause" rather than "without cause."

62. R3 breached the implied covenant of good faith and fair dealing by wrongfully categorizing Dr. Duckworth's termination as "for cause" rather than "without cause."

63. Dr. Duckworth has been damaged, in an amount to be determined at trial, as a direct and proximate cause of R3's breach of the implied covenant of good faith and fair dealing.

## COUNT III
(Breach of Contract – Stock Option Agreement)

64. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

65. Under the terms of the Stock Option Agreement, Dr. Duckworth had the option to purchase shares of the Company's common stock at the purchase price of $100 per share.

66. R3 breached its contractual obligations to Dr. Duckworth on July 14, 2014 by depriving Dr. Duckworth of his stock option rights under the Stock Option Agreement by wrongfully categorizing Dr. Duckworth's termination as "for cause" rather than "without cause."

67. Dr. Duckworth has been damaged, in an amount to be determined at trial, as a direct and proximate cause of R3's breach of contract.

## COUNT IV
(Breach of the Implied Covenant of Good Faith and Fair Dealing – Stock Option Agreement)

68. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

69. The implied covenant of good faith and fair dealing prohibits acts by one party that deprive another of the fruits of the bargain.

70. Implied within the Stock Option Agreement is the obligation for R3 not to seek to deprive Dr. Duckworth of his stock option rights without cause.

71. R3's actions were motivated by an improper purpose reflecting bad faith.

72. R3 breached the implied covenant of good faith and fair dealing on July 14, 2014 by depriving Dr. Duckworth of his stock option rights under the Stock Option Agreement by wrongfully categorizing Dr. Duckworth's termination as "for cause" rather than "without cause."

73. Dr. Duckworth has been damaged, in an amount to be determined at trial, as a direct and proximate cause of R3's breach of the implied covenant of good faith and fair dealing.

## COUNT V
(Breach of July 1, 2013 Letter)

74. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

75. The July 1, 2013 letter promised Dr. Duckworth continued employment with the Company subject to the terms and conditions set forth in the letter.[1]

76. R3 breached the July 1, 2013 letter on July 14, 2014 by terminating Dr. Duckworth's employment.

77. Dr. Duckworth has been damaged, in an amount to be determined at trial, as a direct and proximate cause of R3's breach of the July 1, 2013 letter.

## COUNT VI
### (Breach of the Implied Covenant of Good Faith and Fair Dealing – July 1, 2013 Letter)

78. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

79. The implied covenant of good faith and fair dealing prohibits acts by one party that deprive another of the fruits of the bargain.

80. Implied within the July 1, 2013 letter is the obligation for R3 to continue Dr. Duckworth's employment in good faith.

81. R3's actions were motivated by an improper purpose reflecting bad faith.

82. R3 breached the implied covenant of good faith and fair dealing on July 14, 2014 by terminating Dr. Duckworth's employment in bad faith.

83. Dr. Duckworth has been damaged, in an amount to be determined at trial, as a direct and proximate cause of R3's breach of the implied covenant of good faith and fair dealing.

---

[1] Dr. Duckworth maintains that the July 1, 2013 letter does not constitute an enforceable contract because it lacked consideration. Moreover, the July 1, 2013 letter was entered into under duress, or is otherwise unconscionable, and is therefore unenforceable against Dr. Duckworth. Nevertheless, Dr. Duckworth pleads Count V and Count VI in the alternative.

## COUNT VII
(Violation of the ADA – Wrongful Termination on Account of Perceived Disability)

84. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

85. Defendants regarded Dr. Duckworth as an alcoholic, thus making him disabled within the meaning of the ADA.

86. Dr. Duckworth was qualified to perform the essential functions of the job for which R3 paid him.

87. Dr. Duckworth suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination.

88. Defendants' proffered reason for firing Dr. Duckworth was a pretext for unlawful discrimination.

89. Defendants fired Dr. Duckworth because it regarded him as an alcoholic, not because he violated a company rule or policy.

90. Plaintiff has been damaged, in an amount to be determined at trial, as a direct and proximate cause of the violations of the ADA by Defendants.

## COUNT VIII
(Violation of the ADA – Discriminatory Enforcement of Disciplinary Policy)

91. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

92. Defendants regarded Dr. Duckworth as an alcoholic, thus making him disabled within the meaning of the ADA.

93. Other R3 employees, including the top management of the Company, have been intoxicated at Company events and have not been discharged or otherwise subjected to adverse employment actions. For example, Mr. Roger and Dr. Yarwood demonstrated intoxication and acted inappropriately during Company sponsored events, without adverse consequences.

94. Defendants enforced its disciplinary policy in a discriminatory manner by firing Dr. Duckworth, who was perceived to be disabled, for purported prohibited conduct for which others were not fired.

95. Defendants treated Dr. Duckworth differently from other employees who engaged in similar prohibited conduct.

96. Plaintiff has been damaged, in an amount to be determined at trial, as a direct and proximate cause of the violations of the ADA by Defendants.

## COUNT IX
(Violation of the Massachusetts Antidiscrimination Statute –
Wrongful Termination on Account of Perceived Handicap)

97. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

98. Defendants regarded Dr. Duckworth as an alcoholic, thus making him handicapped within the meaning of the Massachusetts Antidiscrimination Statute.

99. Dr. Duckworth was qualified to perform the essential functions of the job for which R3 paid him.

100. Dr. Duckworth suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination.

101. Defendants' proffered reason for firing Dr. Duckworth was a pretext for unlawful discrimination.

102. Defendants fired Dr. Duckworth because it regarded him as an alcoholic, not because he violated a company rule or policy.

103. Plaintiff has been damaged, in an amount to be determined at trial, as a direct and proximate cause of the violations of the Massachusetts Antidiscrimination Statute by Defendants.

## COUNT X
(Violation of the Massachusetts Antidiscrimination Statute – Discriminatory Enforcement of Disciplinary Policy)

104. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

105. Defendants regarded Dr. Duckworth as an alcoholic, thus making him handicapped within the meaning of the Massachusetts Antidiscrimination Statute.

106. Other R3 employees, including the top management of the Company, have been intoxicated at Company events and have not been discharged or otherwise subjected to adverse employment actions. For example, Mr. Roger and Dr. Yarwood demonstrated intoxication and acted inappropriately during Company sponsored events, without adverse consequences.

107. Defendants enforced its disciplinary policy in a discriminatory manner by firing Dr. Duckworth, who was perceived to be handicapped, for purported prohibited conduct for which others were not fired.

108. Defendants treated Dr. Duckworth differently from other employees who engaged in similar prohibited conduct.

109. Plaintiff has been damaged, in an amount to be determined at trial, as a direct and proximate cause of the violations of the Massachusetts Antidiscrimination Statute by Defendants.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendants, as follows:

1. Awarding Plaintiff compensatory damages in an amount to be determined at trial;

2. Awarding Plaintiff actual damages in an amount to be determined at trial;

3. Awarding Plaintiff incidental damages in an amount to be determined at trial;

4. Awarding Plaintiff consequential damages in an amount to be determined at trial;

5. Awarding Plaintiff back pay damages in an amount to be determined at trial;

6. Awarding Plaintiff front pay damages in an amount to be determined at trial;

7. Awarding Plaintiff emotional distress damages in an amount to be determined at trial;

8. Awarding Plaintiff punitive damages in an amount to be determined at trial;

9. Awarding Plaintiff reasonable litigation expenses and attorney's fees;

10. Awarding Plaintiff pre- and post-judgment interest; and

11. Granting Plaintiff such other relief as the Court deems just and proper.

Dated: 6.23.17

Respectfully Submitted,

DR. HUGH DUCKWORTH,

By his attorney,

/s/ *Simon B. Mann*_____
Simon B. Mann (BBO # 665301)
Mann Law Firm, P.C.
1071 Worcester Rd, Ste 42
Framingham, MA 01701
(508) 270-0500
simon@sbmannlaw.com