UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. HUGH DUCKWORTH,                                )<br>                                                                       )<br>            Plaintiff,                                              )<br>                                                                       )<br>v.                                                                    )<br>                                                                       )<br>R3 EDUCATION, INC., f/k/a                     )<br>EIC HOLDING, INC., f/k/a,                        )<br>EIC ACQUISITION CORPORATION,       )<br>STEVEN C. RODGER, and                          )<br>TERRY J. MOYA                                          )<br>                                                                       )<br>            Defendants.                                       )<br>                                                                       ) | Case No. 1:17-cv-11169-FDS |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**RELEVANT FACTS**

**A.     The Parties**

Defendant R3 Education, Inc. ("R3") is a holding company, which owns three medical schools: St. Matthews University School of Medicine ("St. Matthews"), Medical University of the Americas ("MUA") and Saba University School of Medicine ("Saba"). Compl. ¶ 10. R3's principal place of business is in Devens, Massachusetts. *Id.* ¶ 2.

R3 employed the Plaintiff, Dr. Hugh Duckworth, as the Executive Dean of Saba and the Associate Dean of Basic Sciences of MUA and Saba. *Id.* ¶ 13.

Defendant Steven C. Rodger is R3's Chief Executive Officer. *Id.* ¶ 11. Defendant Terry J. Moya is R3's Chief Financial Officer. *Id.* ¶ 12.

B.     **The Securityholders and Stock Option Agreements**

R3 and Duckworth were parties to two related agreements in connection with his employment by R3 – a Securityholders Agreement, attached as Exhibit A,[1] and a Stock Option Agreement, attached as Exhibit B,[2] both of which Duckworth references in his Complaint. *Id.* ¶¶ 14, 20. The Stock Option Agreement is "subject to the terms and provisions of [the Securityholders Agreement]." Ex. B, at 1. Duckworth became a party to the Securityholders Agreement by executing a Joinder to the Securityholders Agreement dated December 10, 2008, attached as Exhibit C.

The Securityholders Agreement gave R3 the right to purchase from "Management Stockholders" such as Duckworth all of the stockholder's "Shares" in the company at a certain "Purchase Price" upon the occurrence of a "Triggering Event." Compl. ¶ 15. Termination of the Management Stockholder's employment relationship with R3 is one such Triggering Event. *Id.* ¶ 16. If the Management Stockholder is terminated for "Cause," the Purchase Price is the "Lower of Initial Value and Book Value." *Id.* ¶ 18. If he is terminated without Cause, the Purchase Price is the "Stipulated Value." *Id.* The Securityholders Agreement defines "Cause" to include "repeated insobriety or any use of illegal drugs while rendering services as an employee." *Id.* ¶ 19.

The Stock Option Agreement allowed "Optionees" such as Duckworth the option to purchase 255 shares of R3's common stock, par value $.001 per share, at the purchase price of $100 per share. *Id.* ¶ 21. However, this option would be forfeited if the Optionee's employment with R3 or any subsidiary were terminated for Cause as defined in the Securityholders

---

[1] The Securityholders Agreement is attached with its three amendments. Ex. A.

[2] The Stock Option Agreement is attached with the related Stock Plan. Ex. B.

Agreement.  *Id.* ¶ 22.  If the Optionee were terminated without Cause, the Optionee would have one year after termination to exercise the option.  *Id.*[3]

### C. Duckworth Violates R3's Policy Against Being Intoxicated on the Job

R3 has an unambiguous, written policy, attached as Exhibit D, which prohibits employees from "reporting to work or being under the influence of alcohol while performing one's job assignment," and which provides that "[a]ny violation of this policy will result in disciplinary action up to and including immediate termination."  Duckworth references R3's alcohol policy in his Complaint.  Compl. ¶ 47.

Duckworth does not contest that he was visibly intoxicated on multiple occasions while performing services for R3.  He conceded as much when he entered into a letter agreement dated July 1, 2013, discussed just below, which Duckworth references in his Complaint, *id.* ¶¶ 28-38, 75-77, 79-83, and which is attached as Exhibit E.

Duckworth's Complaint also concedes that he violated the policy.  His argument is that he was discriminated against because other employees also violated the policy but, unlike him, they were not terminated as a result.  Compl. ¶¶ 30-33, 46-49.

### D. Duckworth Accepts R3's Offer Not to Fire Him Immediately and to Provide Him Significant Benefits in Exchange for a Release.

As Duckworth acknowledged in the July 1, 2013 agreement, R3 could have terminated him immediately for cause due to his repeated insobriety on the job.  Ex. E at 2, ¶ 8; R3 Alcohol Policy, Ex. D.  Instead, R3 offered to place Duckworth on paid leave – at a reduced, but still generous salary – provided that he (a) acknowledged his repeated insobriety on the job, (b) acknowledged that he was subject to termination at any time, including as a result of his past insobriety on the job, (c) released R3 and its employees from any and all claims arising out of or

---

[3] Different deadlines to exercise would apply in other circumstances not relevant here – *e.g.*, if R3 had become a reporting company under the Securities and Exchange Act of 1934.  *Id.*

relating in any way to Duckworth's employment, including any claims under federal or state law concerning discrimination on the basis of disability, and (d) agreed to forfeit all employee stock options, which were unvested or vested but not exercised.  Ex. E at 1-2, ¶¶ 5-9.  R3's offer was memorialized in the July 1, 2013 agreement.  *Id.*  The agreement specifically provided that "Nothing in this agreement constitutes a guarantee of continued employment, regardless of your compliance with the terms and conditions set forth herein."  *Id.* at 2, ¶ 8.  Instead, Duckworth would be "subject to termination at will, i.e., at any time and for any reason or no reason, or for cause . . . ."  *Id.*  By signing the agreement, Duckworth acknowledged that he had "carefully read" it and its contents, that R3 recommended the he be advised by an attorney before signing it, and that he was entering into the agreement "voluntarily, fully intending to be bound by its terms."  *Id.* at 2-3, ¶ 10.  Duckworth was given twenty-one days "to consider the meaning and effect of th[e] agreement" before signing it.  *Id.* at 3, ¶ 10.  The agreement also contains an integration clause, which provides that the agreement supersedes all prior or contemporaneous representations or agreements with respect to the matters addressed in the letter agreement, *id.* ¶ 11, and further states that it may not be modified except in writing signed by each party, *id.* ¶ 12.

### E. One Year Later, R3 Terminates Duckworth for Cause

On July 14, 2014, having generously maintained Duckworth on paid leave for a full year, R3 terminated Duckworth's employment for cause pursuant to paragraph 8 of the July 1, 2013 Agreement.  Compl. ¶¶ 26, 28.  R3 sent Duckworth a letter dated July 14, 2014 notifying him of his termination (the "July 14, 2014 Letter"), which Duckworth references in his Complaint, *id.*, and which is attached here as Ex. F.  Duckworth does not dispute that he received the benefits of the July 1, 2013 Agreement during the year that it was in effect.

## DUCKWORTH'S COMPLAINT

After timely filing a complaint of discrimination with the Massachusetts Commission Against Discrimination, and then withdrawing that complaint, Duckworth filed his Complaint in this case on June 23, 2017 (Dkt. No. 1). The Complaint purports to assert ten claims, which fall into two categories: breach of his employment agreements (Counts I-VI) and unlawful discrimination on the basis of a perceived disability, specifically alcoholism (Counts VII-X). Compl. ¶¶ 52-109.

Counts I-VI allege that R3 breached the Securityholders Agreement, the Stock Option Agreement, and the July 1, 2013 Agreement, as well as the covenant of good faith and fair dealing implied in each agreement. *Id*. ¶¶ 52-83. Duckworth contends that R3 breached the Securityholders Agreement and Stock Option Agreement by "wrongfully categorizing [his] termination as for cause." *Id.* ¶¶ 54, 61, 66, 72. He claims that the July 1, 2013 Agreement is not enforceable because it lacked consideration and because he signed it under "duress." *Id.* ¶¶ 37-38. Assuming *arguendo* that the July 1, 2013 Agreement was enforceable, Duckworth claims that the termination of his employment constituted a breach of that agreement. *Id.* ¶ 76 & n.1.

Counts VII-X allege that Defendants regarded Duckworth as being an alcoholic and that they terminated his employment on that basis in violation of the Americans with Disabilities Act (ADA) and Massachusetts General Laws, Chapter 151B. *Id.* ¶¶ 85, 89, 92, 94, 102, 105, 107. Duckworth also alleges that R3 enforced its policy prohibiting alcohol consumption during "Company events" in a discriminatory manner, i.e., that he was punished more severely for his conduct than other employees who were intoxicated during "Company sponsored events." *Id.* ¶¶ 47-49. He contends that his discrimination claims are not barred by the release in the July 1, 2013 Agreement for the reasons noted above – that the Agreement lacked consideration and was

signed under "duress." *Id.* ¶¶ 37, 38.

## STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-moving party. *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 383 (1st Cir. 2011); *Aybar v. Crispin-Reyes,* 118 F.3d 10, 13 (1st Cir. 1997).  However, a plaintiff may not rest on unsupported, conclusory statements or "threadbare recitals of the elements of a cause of action." *Doe v. Williston Northampton Sch.*, 766 F. Supp. 2d 310, 312 (D. Mass. 2011) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To survive a motion to dismiss, a complaint must set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotations and citation omitted).  "[T]he court must determine whether the . . . factual content allows a reasonable inference that the defendant is liable for the misconduct alleged." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013) (quoting *Twombly*, 550 U.S. at 570) (internal quotations and citation omitted).  A complaint also "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" which calls for more than a "sheer possibility" that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).

In considering a motion to dismiss, the Court may evaluate documents outside the complaint, including documents the authenticity of which are not disputed by the parties; official public records; documents central to the plaintiff's claim; and documents sufficiently referred to in the complaint. *Keigney-Rodriguez v. President & Fellows of Harvard Coll.*, No. 1:17-cv-10501-ADB, 2017 WL 3388163, at *2 (D. Mass. Aug. 7, 2017) (Burroughs, D.J.) (citing *Hogan*

*v. E. Enters./Bos. Gas*, 165 F. Supp. 2d 55, 58 (D. Mass. 2001); *see also Foley v. Wells Fargo Bank*, 772 F.3d 63, 74 (1st Cir. 2014) ("[W]hen 'a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged),' then the court can review it upon a motion to dismiss."); *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 34 (1st Cir. 2001) (district court properly considered settlement agreement when ruling on motion to dismiss because existence of defendant's potential liability depended directly on whether claims had been released under settlement agreement and plaintiff did not dispute settlement agreement's authenticity).

A motion to dismiss is a proper forum for adjudication of an affirmative defense, such as the defense that claims are barred by a release. *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 16 (1st Cir. 2003).

**ARGUMENT**

**I.     DUCKWORTH'S CLAIMS ALL ARE BARRED BY A VALID RELEASE.**

Duckworth's claims all should be dismissed because he signed a binding agreement releasing R3 and its employees from any and all claims, including but not limited to those "arising out of or relating in any way" to his employment, and including any claims under federal or state law concerning discrimination on the basis of disability. July 1, 2013 Agreement, Ex. E at 2, ¶ 9. In consideration for this release, R3 continued to employ Duckworth for one year at a reduced, but still generous salary. *Id.* at 1. Duckworth thus is barred from bringing his claims for breach of contract and disability discrimination because they all arise out of his employment with R3.

    **A.     The Discrimination Claims are Barred by the Release.**

It is well settled that an employee's release of claims against his employer in exchange

for benefits is permissible under the ADA and Massachusetts Chapter 151B. *Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d 9, 11-12 (1st Cir. 1997) ("Such releases provide a means of voluntary resolution of potential and actual legal disputes, and mete out a type of industrial justice."); *see also Rivera-Olmo v. State Ins. Fund Corp. (SIFC)*, 250 F. App'x 365, 367 (1st Cir. 2007) (unpub. decision) (involving ADA claims); *Duval v. Callaway Golf Ball Operations, Inc.*, 501 F. Supp. 2d 254, 263 (D. Mass. 2007) (involving Chapter 151B claims). Where an employee has executed a valid release of employment discrimination claims, any such claims asserted in a future lawsuit are properly dismissed. *Rivera-Olmo*, 250 F. App'x at 366; *Stonkus v. Brockton Sch. Dep't*, 322 F.3d 97, 102 (1st Cir. 2003); *Keigney-Rodriguez*, 2017 WL 3388163, at *4.

Such a release is valid when an employee knowingly and voluntarily consents to it. *Rivera-Olmo*, 250 F. App'x at 367.[4] The First Circuit analyzes the following six factors in determining the validity of a release:

> (1) the employee's "education and business sophistication"; (2) the roles of the employer and employee in determining the terms of the release; (3) "the clarity of the agreement"; (4) the amount of time given to the employee to review the agreement; (5) whether the employee received independent advice (particularly the advice of counsel); and (6) the consideration paid in exchange for the release.

*O'Shea through O'Shea v. UPS Ret. Plan*, 837 F.3d 67, 77 (1st Cir. 2016) (citing *Morais v. Cent. Beverage Corp. Union Employees' Supplemental Ret. Plan*, 167 F.3d 709, 713 & n.6 (1st Cir. 1999)); *Duval*, 501 F. Supp. 2d at 263; *see also Rivera-Flores*, 112 F.3d at 12 n.4 (citing *Finz v. Schlesinger*, 957 F.2d 78, 82 (2d Cir. 1992)).

---

[4] Where the employee asserts that he was disabled at the time of the release, such a release is valid if the employee "had the capacity to execute [it] knowingly and voluntarily." *Rivera-Flores*, 112 F.3d at 12-13. As in *Rivera-Flores*, Duckworth does not allege that he was incapable of giving voluntary and knowing consent at the time he signed the release. *Id.* at 13.

Here, all six factors demonstrate that Duckworth entered into the July 1, 2013 Agreement knowingly and voluntarily.  First, Duckworth by his own account is highly educated and sophisticated: he describes himself as a "medical surgeon" who held various "esteemed positions," including important leadership positions at R3's medical schools, over the course of his "twenty-five year career."  Compl. ¶¶ 13, 23.  He thus had sufficient education and business sophistication to understand the agreement.  *See Bevington v. Comverse Tech., Inc.*, 796 F. Supp. 2d 257, 262 (D. Mass. 2011) (individual with engineering degree who made $110,000 per year in a professional role was sophisticated enough to understand terms of a severance agreement which included a release and relinquishment of certain rights relating to stock options).

Second, Duckworth had the opportunity to negotiate the terms of the release.  He was given twenty-one days to consider it and advised to seek legal counsel before signing it.  July 1, 2013 Agreement, Ex. E at 2-3 ¶ 10.

Third, the agreement could not be more clear.  It states that in plain, unequivocal language that by signing the Agreement, Duckworth would "release and discharge[]" the company "from all claims or liabilities of any kind, whether known . . . or unknown, including but not limited to any claims arising out of or relating in any way to [his] employment with the Company," *id.* at 2, ¶ 9, in exchange for continued employment with an annual salary of $110,000 during a leave of absence that would involve performance of a limited subset of duties upon request, *id.* at 1-2, ¶¶ 3, 5.  It also clearly states that it is not a guarantee of continued employment, regardless of Duckworth's compliance with its terms, since Duckworth's employment with R3 was at will and R3 could have terminated him immediately for cause due to his repeated insobriety on the job.  *Id.* at 2, ¶ 8.

Fourth, as noted above, Duckworth was given twenty-one days in which to review the Agreement, *id.* at 3, ¶ 10, which this Court has held is sufficient time to consider a release of this type. *Keigney-Rodriguez*, 2017 WL 3388163, at *3.

Fifth, as noted above, Duckworth was encouraged to consult with an attorney of his choosing before signing the Agreement. July 1, 2013 Agreement, Ex. E at 3, ¶ 10.

Finally, the sixth factor also weighs in favor of validity because the agreement is supported by adequate – indeed generous – consideration, including R3's agreement not to terminate Duckworth immediately but instead to place him on a paid leave at a significant salary. *Id.* at 1.

The release of discrimination claims is entirely valid not only as to R3 but also as to the individual defendants, Rodger and Moya, R3's CEO and CFO. The release by its plain terms included all claims against R3 and its employees or agents. *Id.* at 2, ¶ 9.[5]

### B. The Release Also Bars the Contract Claims.

By signing the July 1, 2013 Agreement, Duckworth released R3 from all claims of any kind, including those related to his employment. Ex. E at 2, ¶ 9. He also specifically agreed to forfeit all employee stock options, vested or unvested. *Id.* at 2, ¶ 6. Duckworth also agreed that the July 1, 2013 Agreement would supersede and cancel all prior agreements with respect to the matters addressed in the Agreement, including his participation in employee stock option plans. *Id*. at 3, ¶ 11.

The same six-factor analysis for the validity of a release applies to an employee's release of contract claims, including those related to stock option agreements. *E.g.*, *Bevington*, 796 F. Supp. 2d at 261. Because Duckworth's release was knowing and voluntary, for the reasons

---

[5] The ADA claims against Rodger and Moya also fail because the ADA does not allow for individual liability. *See, e.g.*, *Lemire v. Silva*, 104 F. Supp. 2d 80, 92 (D. Mass. 2000) (collecting cases).

discussed above, all of his contract claims also must be dismissed.  *See id.* at 261-63, 265; *Stonkus*, 322 F.3d at 103.

### C. Duckworth Did Not Sign the July 1, 2013 Agreement Under "Duress."

Duckworth claims that the July 1, 2013 Agreement is not enforceable because he signed it under "duress."  Compl. ¶ 37.  "A party claiming economic duress bears a heavy burden." *Capizzi v. F.D.I.C.*, No. 90-12775-S, 1993 WL 723477, at *2 (D. Mass. Mar. 9, 1993) (attached as Exhibit G).  To sustain a claim of economic duress, a party must show "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." *Ismert & Associates, Inc. v. New England Mut. Life Ins. Co.*, 801 F.2d 536, 544 (1st Cir. 1986) (quoting *Int'l Underwater Contractors, Inc. v. New England Tel. & Tel.*, 8 Mass. App. Ct. 340, 342 (1979) (quotations omitted).

> Merely taking advantage of another's financial difficulty is not duress.  Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion … .  The assertion of duress must be proved by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities.

*Int'l Underwater Contractors, Inc.*, 8 Mass. App. Ct. at 342; *see also, e.g.*, *Vasapolli v. Rostoff*, 39 F.3d 27, 34 (1st Cir. 1994) (high-pressure atmosphere of closings, lack of sufficient time to examine closing documents, and prospect of losing deposits did not constitute duress).

Duckworth alleges that the threat of immediate termination of his employment with R3 unlawfully coerced him into signing the July 1, 2013 Agreement.  Compl. ¶ 37.  It is well settled, however, that a choice between immediate loss of employment and a release of claims against the employer in exchange for benefits does not constitute duress. *Connor v. Gen. Elec. Co.*, No. 942074, 1996 WL 1186879, at *3 (Mass. Super. Ct. Apr. 1, 1996) (attached as Exhibit H); *see*

*e.g.*, *McTernan vs. Haley & Aldrich, Inc.*, No. 945905, 1995 WL 1146823, at *3 (Mass. Super. Ct. Sept. 25, 1995) (attached as Exhibit I) (citing *Int'l Underwater Contractors, Inc.*, 8 Mass. App. Ct. at 342) (employee's release of claims against employer was valid and not entered into under duress where choice was between (1) resignation, severance pay, and release and (2) immediate termination, even though employee "felt pressured and compelled to sign the letter of resignation because without the three months [sic] pay he would have been unable to provide for his family or pay his bills"). An employee's dependence on a salary to earn a living is "in the nature of necessities, and is not the result of wrongful or oppressive conduct by the defendants." *Connor*, 1996 WL 1186879, at *3 (employee's release was valid where employer offered a choice between voluntary resignation with a release of all claims against employer and immediate termination and did not promise employee that he would be employed for a specific period of time if he signed the release). Thus, Duckworth has not alleged facts sufficient to support a claim that he was under economic duress when he signed the July 1, 2013 Agreement.

Moreover, even assuming there was some merit to Duckworth's "duress" argument, which there is not, he waived the argument by not timely making it and instead accepting the Agreement's benefits. *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir. 1989); *Duval v. Callaway Golf Ball Operations, Inc.*, 501 F. Supp. 2d 254, 264 (D. Mass. 2007); *see also, e.g.*, *Keigney-Rodriguez*, 2017 WL 3388163, at *4 (dismissing ADA claims where plaintiff received benefits of separation agreement containing release of claims against former employer and waited nine months before making a claim of duress).

An agreement entered into under duress is voidable, not void. *In re Boston Shipyard Corp.*, 886 F.2d at 455. To repudiate an agreement on the ground that it was made under duress, a party must complain promptly of the coercive statements that he claims had forced him into the

contract or he waives the right to do so.  *Id.* (citing *Di Rose v. PK Mgmt. Corp.*, 691 F.2d 628, 633–34 (2d Cir. 1982)).  "If the coerced party does not contest within a reasonable time the document allegedly executed under duress, the contract or release may be ratified and affirmed." *Id.* (citing *Teamsters Local No. 25 v. Penn Transp. Corp.*, 359 F.Supp. 344, 349 (D. Mass. 1973) (where contractor waited over a year and a half to repudiate services agreement on basis of duress, during which time he continued to work and accepted payment under the agreement, the contractor ratified the agreement and waived any claim of duress); *see also, Vasapolli v. Rostoff,* 39 F.3d 27, 35 n. 5 (1st Cir. 1994); *Dorn v. Astra USA*, 975 F. Supp. 388, 393-94 (D. Mass. 1997), *implicitly overruled on other grounds by Andresen v. Diorio*, 349 F.3d 8, 17 (1st Cir. 2003) (employees who waited between eleven and thirty-four months to repudiate settlement contracts containing releases of claims against employer on grounds of duress, during which time they accepted benefits including severance pay, had waived their right to assert that defense).

Ratification of an agreement allegedly entered into under duress thus may occur in several ways: "first, by intentionally accepting benefits under the contract; second, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; and third, by recognizing its validity . . . by acting upon it, performing under it, or affirmatively acknowledging it."  *In re Boston Shipyard Corp.*, 886 F.2d at 455 (citing *United States v. McBride,* 571 F.Supp. 596, 613 (S.D. Tex. 1983)); *Keigney-Rodriguez*, 2017 WL 3388163, at \*4.  Here, Duckworth did nothing to challenge the validity of the July 1, 2013 Agreement until he filed this litigation – ***four years*** later.  Moreover, during the year that Duckworth was on paid leave, he accepted the benefits of the July 1, 2013 Agreement, specifically $110,000 in salary for a reduced workload.

The "duress" argument thus fails for multiple reasons.

### D.   The Agreement is Supported by Valid Consideration

Duckworth contends the release is not supported by valid consideration, Compl. ¶ 38, but that claim is without merit on its face.  As noted above, pursuant to the July 1, 2013 Agreement, R3 continued to employ Duckworth for one year at a reduced, but still generous salary, which was appropriate for a reduced workload.  It is well settled that where the parties reach an agreement to modify the terms of an employment contract, the employee's continued performance of his work duties for a reduced salary is sufficient to satisfy the consideration requirement.  *Gishen v. Dura Corp.*, 362 Mass. 177, 182-83 (1972); *see Marine Contractors Co. v. Hurley*, 365 Mass. 280, 286 (1974) ("The requirement of consideration is satisfied if there is either a benefit to the promiser or a detriment to the promisee."); *see also, e.g.*, *Cochran vs. Quest Software*, No. 00-11856-DPW, 2002 WL 199824829, at *5-8 (D. Mass. Aug. 19, 2002) (attached as Exhibit J) ("Since [plaintiff] was not entitled to either continued employment or his unvested stock options, [plaintiff] received the continued opportunity to earn salary and to move towards vesting of his options as valuable consideration in support of the modification [of his employment agreement]."); *Tomer v. Hollister Associates, Inc.*, No. 06–P–994, 70 Mass. App. Ct. 1104, 2007 WL 2908268, at *4 (Oct. 5, 2007) (Rule 1:28 unpub. decision) (attached as Exhibit K) (reduced salary constituted valid consideration for employment agreement for at will employee).

### E.   Duckworth's Reliance Argument Fails as a Matter of Law.

Duckworth also alleges that he relied on a purported oral promise that he would "keep his job so long as he signed."  Compl. ¶ 36.  That argument is contrary to the unambiguous language of the Agreement itself, which made clear that Duckworth was **not** guaranteed continued employment with R3 even if he complied with the terms of the agreement, i.e., he was an at will

- 14 -

employee.  July 1, 2013 Agreement, Ex. E at 2, ¶ 8.  The agreement also contained an integration clause, which provided that the agreement superseded all prior or contemporaneous representations or agreements, *id.* at 3, ¶ 11, and the agreement provided that any amendment must be in a writing signed by both parties, *id.* ¶ 12.  *Sax v. DiPrete*, 639 F. Supp. 2d 165, 171 (D. Mass. 2009) ("The integration rule … is a complete bar to the use of parole evidence to insert a term into a contract that the parties neither bargained for nor agreed to include.").

## II.   THE COMPLAINT FAILS TO STATE A CLAIM ON OTHER GROUNDS.

Even if Duckworth's claims were not barred by the release, they all fail to state a claim on other grounds as well.

### A.   The Discrimination Claims

#### 1.   The Complaint does not allege that Duckworth was regarded as being substantially limited in a major life activity.

Duckworth's primary claim of discrimination is that R3 regarded him as being an alcoholic and that it terminated his employment on that basis in violation of the ADA and Chapter 151B.  To state a claim of discrimination on this basis, Duckworth must allege that he was regarded as being substantially limited in a major life activity.  *See City of New Bedford v. Mass. Comm'n Against Discrimination*, 440 Mass. 450, 462, 464-66 (Mass. 2003).  The Complaint does not do so.

For example, with respect to the major life activity of working, the Complaint contains no allegation that R3 considered Duckworth to be unable to perform a broad range of jobs.  *Id.* at 464-466.  To the contrary, in the July 1, 2013 Agreement, R3 stated that Duckworth would "maintain the titles of Associate Dean of Basic Sciences of Medical University of the Americas and St. Matthew's University School of Medicine," and that "[i]n those positions, you will perform such duties as requested by [Rodger] or a designee from time to time."  July 1, 2013

Agreement, Ex. E, at 1, ¶ 2. The July 1, 2013 Agreement thus confirms that while Duckworth had acted inappropriately by being visibly intoxicated on the job, R3 believed that he remained capable of working.

Absent any factual allegations that R3 regarded Duckworth as being substantially limited in one or more major life activities, Duckworth's purported claims of unlawful discrimination fail to state a claim upon relief can be granted.

### 2. Duckworth was not a qualified handicapped person.

Even assuming Duckworth had properly alleged that he was regarded as being disabled, which he has not done, Duckworth has not adequately alleged that he is a "qualified handicapped person." A person who is disabled or regarded as disabled is protected from discrimination under the ADA and Chapter 151B if they are "otherwise qualified" for employment. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 175 (1st Cir. 2003). It is well established that "a handicapped employee who engages in conduct significantly inimical to the interests of his employer and in violation of the employer's rules is not an 'otherwise qualified' person . . . ." *Garrity v. United Airlines*, 421 Mass. 55, 63 (1995) (upholding summary judgment for employer who terminated employee for insobriety on the job) ("Nothing in c. 151B suggests a legislative intent that a lower standard of qualifying conduct should apply to handicapped employees than applies to those without handicap." ); *Sullivan v. Neiman Marcus Grp., Inc.*, 358 F.3d 110, 115-16 (1st Cir. 2004) (citing 42 U.S.C. § 12114(c)) ("The ADA explicitly allows an employer to 'hold an employee who ... is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the ... alcoholism of such employee.'") .

Duckworth does not dispute that he was visibly intoxicated on the job. Nor does he dispute that R3 had an unambiguous, written policy forbidding just such conduct. R3 thus was

entirely within its rights to terminate his employment for cause. *See Mammone v. President & Fellows of Harvard Coll.*, 446 Mass. 657, 667 (2006) ("*Garrity* [*supra*] confirmed the commonsense notion that an employee is not 'qualified' for a particular job – i.e., cannot perform the essential functions of that job, even with reasonable accommodation – if he or she takes part in 'egregious misconduct' in the workplace"); *see also Evans v. Fed. Express Corp.*, 133 F.3d 137, 140 (1st Cir. 1998) (collecting cases upholding the "discharge of alcoholics based on their misconduct").

### B.     The Contract Claims

Duckworth's contract claims also fail because the Complaint fails adequately to allege each essential element of these claims.

Duckworth asserts that R3 breached both the Securityholders Agreement and the Stock Option Agreement by improperly classifying his termination as for cause. Compl. ¶¶ 54, 61, 66, 72. As a result of this classification, R3 paid Duckworth the "Initial Value" of the stock, rather than the "Stipulated Value," and "depriv[ed]" him of his stock option rights. *Id.* ¶¶ 55, 61, 66, 72. Duckworth concedes that the Securityholders Agreement and Stock Option Agreement define termination for "Cause" to include "repeated insobriety or any use of illegal drugs while rendering services as an employee." *Id.* ¶¶ 19, 22. However, nowhere in the Complaint does Duckworth dispute that he was repeatedly intoxicated on the job. In fact, in signing the July 1, 2013 Agreement, Duckworth acknowledged that he had engaged in repeated insobriety while performing his duties as an employee of R3. July 1, 2013 Agreement, Ex. E at 1. Instead, Duckworth complains that R3 fostered a "party atmosphere" and that other employees of R3 also "demonstrated intoxication" during "Company events." *Id.* ¶ 49. Assuming those facts were true, which Defendants deny, they support the view that R3 should have terminated others in

addition to Duckworth, but they do not support a claim that R3 breached any contract by terminating Duckworth.

Simply put, accepting Duckworth's own allegations as true, his conduct fell directly within the definition of "Cause" in the Securityholders Agreement and Stock Option Agreement. As a matter of law, R3 did not breach either contract by classifying his termination as for "Cause."

## CONCLUSION

Defendants' motion to dismiss should be allowed.

R3 EDUCATION, INC., ET AL.,

/s/ Daryl J. Lapp

_____

Daryl J. Lapp (BBO #554980)
  daryl.lapp@lockelord.com
Katherine A. Guarino (BBO #681848)
  katherine.guarino@lockelord.com
LOCKE LORD LLP
111 Huntington Avenue
Boston, MA 02199
617-239-0100

August 25, 2017

## Certificate of Service

I certify pursuant to Local Rule 5.2(b) that on August 25, 2017, this document was filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the Court to the Registered Participants identified in the Notice of Electronic Filing.

/s/ Daryl J. Lapp

_____

Daryl J. Lapp

AM 66876466.8