# Exhibit A

**Securityholders Agreement (this "Agreement") dated as of April 3, 2007, by and among EIC Acquisition Corp., a Delaware corporation (the "Company"), and the Securityholders of the Company identified on Schedule 1 hereto as amended from time to time.**

A.     As of the date hereof, Equinox EIC Partners LLC, a Delaware limited liability company ("**Equinox Partners**") holds all of the outstanding shares of common stock of the Company.

B.     Among the members of Equinox Partners is Equinox Capital III, L.P., a Delaware limited partnership ("**Equinox III**", and together with Equinox Partners, the "**Equinox Stockholders**").

C.     As a consequence of the transactions contemplated by those certain Purchase Agreements, each dated as of February 14, 2007, the Company holds all of the issued and outstanding membership interests of Educational International Consultants, LLC ("**EIC LLC**") and all of the issued and outstanding stock of EIC International Corp. ("**EIC International**"), which in turn holds all of the issued and outstanding shares of (i) MUA Management Company, Ltd. ("**MUA Management**") which in turn holds all or substantially all of the issued and outstanding stock of Medical University of the Americas Limited ("**MUA**") and all of the issued and outstanding stock of MUA Properties, Ltd. ("**MUAP**") and (ii) Saba University Management Company B.V. ("**Saba Management**") which in turn holds all of the issued and outstanding stock of Roundhill Project Holding Company N.V. ("**Round Hill**") and Saba Drop Down B.V. (which, following name-change, will be known as Saba University School of Medicine B.V.) ("**Saba**").

D.     The Company has created a Stock Option Plan pursuant to which the Company will issue from time to time to employees, consultants and others having business dealings with the Company and its subsidiaries (collectively, "**Optionholders**") options ("**Options**") to purchase shares of the Company's common stock..

E.     The Equinox Stockholders and the Company desire to provide for continuity in the management and policies of the Company by establishing certain rights, obligations and restrictions among the parties and future holders of the Company's common stock with respect to the transfer and other disposition of the Company's capital securities, all upon the terms and subject to the conditions set forth in this Agreement.

In consideration of the mutual covenants contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1.     <u>**Additional Definitions**</u>

a.     <u>**Adjusted EBITDA**</u> means the Company's consolidated earnings (excluding extraordinary gains and losses) before interest, depreciation, amortization and taxes, all as determined in accordance with generally accepted accounting principles in good faith by the Company's Board of Directors in consultation with the Company's independent public accountants.

b.     <u>**Book Value**</u> for each outstanding Share means an amount equal to the quotient obtained by dividing (A) the consolidated book value of the assets of the Company and

its subsidiaries, plus the exercise price of all Convertible Securities that are at such time convertible or exercisable, other than Convertible Securities for which the exercise or conversion price shall be equal to or greater than the Book Value of the Shares to which they relate (determined without giving effect to the exercise or conversion of such Convertible Securities), less the consolidated liabilities of the Company and its subsidiaries, and less the liquidation preference of any outstanding shares of preferred stock of the Company, by (B) the number of outstanding Shares as of such date. Shares outstanding shall be determined as if fully diluted by all outstanding Convertible Securities that are at such time convertible or exercisable, other than Convertible Securities for which the exercise price or conversion price shall have been equal to or greater than the Book Value of the Shares with respect to which they relate (determined without giving effect to the exercise or conversion of such Convertible Securities).

     c.    **Call Event** and **Option Event**, with respect to a Management Stockholder, mean the first to occur of any of the Triggering Events affecting such Management Stockholder as set forth in Part II of Schedule 2 hereto.

     d.    **Cause**, as to any Management Stockholder, shall have the same meaning set forth in such Management Stockholder's employment contract with the Company as in effect on the date hereof (or if there is no such employment contract on the date hereof, the first such employment contract between such Management Stockholder and the Company or any successor entity or other entity controlled by the Company) or, if there is no such employment contract, shall mean: (i) any misappropriation of funds or other property of the Company; (ii) conviction of or plea of guilty or no contest to a felony; (iii) any intentional or willful conduct by such Management Stockholder in his capacity as an employee that is materially injurious to the Company or any entity controlled by the Company; (iv) repeated willful refusal of such Management Stockholder to perform substantially all of his duties as an employee; or (v) repeated insobriety or any use of illegal drugs while rendering services as an employee.

     e.    **Convertible Securities** means all stock purchase options, warrants or other securities of the Company which are convertible into or exercisable for Shares.

     f.    **Equinox Representative** means Steven C. Rodger ("**Rodger**"), or in the event of Rodger's death or incapacity, or after the second anniversary of the date hereof, such other person who succeeds to Rodger's duties to the Equinox Stockholders, whether directly or in his capacity as an officer of the ultimate general partner or managing member thereof and who shall be appointed in writing by the Equinox Stockholders as Rodger's replacement; it being understood that Rodger shall not resign or retire from any of those duties prior to the second anniversary hereof.

     g.    **Exercise Period** means the time within which the Company and Equinox Partners may exercise a Call or Equinox Option, respectively, as such periods are set forth in, and determined by reference to the Triggering Events identified in, Schedule 2 hereto.

     h.    **Funded Debt** means debt for borrowed money or debt incurred for the acquisition of assets or interests in other businesses or in connection with the repurchase of Securities (including without limitation, Subordinated Notes issued in accordance with Section 12 hereof but excluding trade payables), plus all capitalized lease obligations, plus the

liquidation preference of any outstanding shares of preferred stock of the Company, plus balances outstanding or borrowings under the Company's overdraft account.

      i.    **Initial Value** for each Share outstanding as of the date of this Agreement means $100, and for each Share issued after the date of this Agreement means the price paid to the Company for such Share. Initial Value shall be appropriately adjusted to reflect any stock splits, stock dividends, stock combinations and similar capital adjustments.

      j.    **Management Stockholders** means Optionholders who have duly exercised their Options and become Securityholder parties under this Agreement.

      k.    **Other Securityholders** means all Securityholders other than Equinox Partners and any other Equinox Stockholders who become a party hereto.

      l.    **Permanent Disability**, with respect to any Management Stockholder, has the meaning expressly given that term in such Management Stockholder's employment contract with the Company or any successor entity or other entity controlled by the Company as in effect on the date hereof (or if there is no such employment contract on the date hereof, the first such employment contract between such Management Stockholder and the Company or any successor entity or other entity controlled by the Company), but in the absence of any such written agreement or expressly defined term, means any physical or mental impairment or disability which prevents a Management Stockholder from performing his duties as an employee for a period of at least 120 days measured in any period of 365 days and which is expected to be of permanent duration. A determination of whether a Management Stockholder is disabled shall be made by a licensed physician appointed by the Board of Directors of the Company.

      m.    **Purchase Price** with respect to any Shares means either Stipulated Value, Book Value or Initial Value, as the case may be, of such Shares as determined by reference to the Triggering Events identified as applicable to the Call Rights and Equinox Options identified in Schedule 2 hereto and as determined as of the end of the fiscal quarter immediately preceding such Triggering Event.

      n.    **Retirement**, with respect to any Management Stockholder, has the meaning expressly given that term in such Management Stockholder's employment contract with the Company or any successor entity or other entity controlled by the Company as in effect on the date hereof (or if there is no such employment contract on the date hereof, the first such employment contract between such Management Stockholder and the Company or any successor entity or other entity controlled by the Company), but in the absence of any such written agreement or expressly defined term, means voluntary resignation (under circumstances not constituting Cause) by a Management Stockholder that occurs on or after the later of either (A) a Management Stockholder's attainment of "normal retirement age," as such term is defined in any qualified retirement plan (under Section 401(a) of the Code) sponsored by the Company or any successor entity or other entity controlled by the Company in which the Management Stockholder participates, or (B) the Management Stockholder's attainment of age 70.

o.     **Securities** means the Shares and Convertible Securities and any other capital securities of the Company now or hereafter outstanding.

p.     **Securityholders** means Equinox Partners, any of the other Equinox Stockholders who become a party to this Agreement, any Optionholder who exercises any of his or her Options and becomes a Securityholder party to this Agreement, and their respective permitted transferees hereunder, and any other person or entity who becomes a holder of any Shares and a party to this Agreement by signing a Joinder to Securityholders Agreement pursuant to Section 14 hereof.

q.     **Shares** (or individually, a "**Share**") means shares of common stock, par value $.001 per share, of the Company, whether presently or hereafter issued, and including, without limitation, (a) any shares of capital stock into which such Shares may be reclassified, changed, converted or exchanged in the future, and (b) any shares of such common stock issued under any Convertible Securities.

r.     **Stipulated Value**, for each outstanding Share, means the quotient obtained by dividing (A) the difference obtained by subtracting (I) Funded Debt of the Company as of the date Stipulated Value shall be determined, from (II) the product of the Company's Adjusted EBITDA for the 12-month period ending on such date times five (5), by (B) the number of Shares outstanding or deemed outstanding on such date. Shares outstanding shall be fully diluted by all Convertible Securities that are at such time convertible or exercisable, other than Convertible Securities for which the exercise price or conversion price shall have been equal to or greater than the Stipulated Value of the Shares with respect to which they relate (determined without giving effect to the exercise or conversion of such Convertible Securities).

s.     **Triggering Event**, with respect to a Management Stockholder, means the termination of his or her employment relationship with the Company or any successor entity or other entity controlled by the Company, for any reason. Every Triggering Event shall fall within one (and only one) of the following categories: (A) a termination for Cause, (B) a termination without Cause, (C) a resignation by such Management Stockholder (other than upon Retirement), (D) such Management Stockholder's death, (E) such Management Stockholder's Retirement, or (F) such Management Stockholder experiences a Permanent Disability.

2.     **Restrictions and Prohibitions on Transfer.**

a.     **General Restrictions on Transfer.** No Securityholder shall sell, assign, transfer, pledge, hypothecate, give away, or in any manner dispose of or encumber, whether voluntarily or by operation of law, whether for consideration or for no consideration (a "**Transfer**"), any Securities or any interest in any Securities unless such Transfer is permitted by and is in accordance with the terms and subject to the conditions of this Agreement or unless such Transfer is approved by the Equinox Representative, which approval the Equinox Representative may withhold in his sole discretion. No Securityholder shall grant any proxy with respect to any Shares that is inconsistent with any provision of this Agreement.

        b.    **Prohibited Transfers.**  Notwithstanding the provisions of Section 2.a, no Securityholder shall Transfer any Securities if such Transfer would violate any provision of the Securities Act of 1933 (the "**Securities Act**") or any applicable state securities laws.

        c.    **Agreement to be Bound.**  Notwithstanding the provisions of Section 2.a, no Securityholder shall Transfer any Securities until the person to whom such Securities are to be Transferred executes and delivers to the Company a written Joinder in the form of Exhibit B.

        d.    **Effect of Impermissible Transfer.**  Any attempted Transfer of any Securities that is not permitted under the terms of Sections 2.a, b, c or e, or Section 3, shall be null and void, and the Company shall not give effect to any such attempted Transfer on its stock records.  No person holding Securities that are Transferred in violation of this Agreement shall be entitled to vote any Shares included in such Transfer or to receive dividends or other distributions on any such Securities (including, without limitation, any right to distributions upon a merger, dissolution, liquidation or winding up of the affairs of the Company) or shall be entitled to the rights hereunder, which benefits and rights shall continue to accrue to the exclusive benefit of the person who made such impermissible Transfer.

        e.    **Other Permissible Transactions.**  Nothing herein shall be construed to prohibit the Company from issuing additional Securities to any Securityholder or any other persons (subject to any applicable preemptive or similar rights set forth in the Company's certificate of incorporation or any agreement to which the Company is a party) or, by agreement, redeeming Securities held by any Equinox Stockholder (subject to Section 6.a hereof) or Other Securityholders in circumstances or upon terms not expressly set forth herein.  Notwithstanding anything to the contrary, nothing herein shall be construed to prohibit any Equinox Stockholder from Transferring any Shares held by it to any other person (subject to Section 6.a hereof).  In the event that any Equinox Stockholder transfers any Shares held by it to an Equinox Affiliate, such Equinox Stockholder may also transfer to such Equinox Affiliate the rights associated with such Shares under this Agreement.  For purposes of this Agreement, an "**Equinox Affiliate**" of any Equinox Stockholder is any successor-in-interest to Equinox III or Equinox Partners (by operation of law or otherwise) or any entity controlled by, controlling or under common control with Equinox III or Equinox Partners but excludes any portfolio company of any such Equinox Stockholder or of any successor fund or entity thereto.

        3.    **Permitted Transferees.**  Any Securityholder may, subject to complying with Section 2.c, Transfer (i) by gift, any number of Securities (other than Options) owned by him to a trust for the benefit of his spouse or children, so long as such Transfer is for no consideration and so long as such Securityholder remains as trustee of any such trust, or (ii) by testamentary disposition, any number of Securities (other than Options) owned by him, to his spouse or lineal descendents (a "**Permitted Transferee**").  Each Permitted Transferee of a Securityholder may Transfer by gift any number of such Securities validly transferred to him, her or it back to such Securityholder or to any other Permitted Transferee of such Securityholder.  Each Permitted Transferee of a Securityholder acknowledges and agrees by acceptance of such Securities and becoming a party hereto that such Permitted Transferee shall have all other rights and be subject to all of the other obligations contained herein as are applicable to such Securityholder.

856397-2

4.     <u>Pledges</u>.  If requested by the Company, each Securityholder shall pledge any or all Securities then held by him to any institutional lender of the Company or its subsidiaries (whether the Company or such subsidiary is a borrower or guarantor of indebtedness to such lender), so long as all Securityholders make such pledge on the same terms and conditions and in the same proportion relative to their respective ownership percentages of the Securities in question and the sole purpose of such pledge is to secure the obligations of the Company or its subsidiaries to such lender or such Securityholder's guarantee thereof and such pledge is not prohibited by any applicable law or regulation.  At no time shall any Securityholder be required to guarantee any loan with his personal credit beyond a pledge of his Securities.

5.     <u>Transfers to the Company or Equinox</u>.  Subject to Section 6.a hereof, any Securityholder may Transfer any Securities to the Company or any of the Equinox Stockholders (or to any designee of the Company or any of the Equinox Stockholders) upon such terms as they may agree.

6.     <u>Co-Sale and Obligations</u>.

a.     <u>Tag Along Rights</u>.  If at any time or from time to time Equinox Partners or any other Equinox Stockholder who becomes a party to this Agreement (or any Equinox Affiliate, other than the Company, to which an Equinox Stockholder has previously transferred Shares in a transaction not subject to this Section 6.a) proposes to Transfer (in one or more series of related transactions) any Securities to any person or persons (including any Transfer to the Company, but excluding Transfers to any other Equinox Stockholder or to any Equinox Affiliate other than the Company), then the Equinox Representative shall give notice of the proposed Transfer to the Other Securityholders, setting forth the type and tenor of the Securities proposed to be Transferred, the name and address of the prospective transferee and the proposed terms and conditions of the offer, including the proposed purchase price for the offered Securities.  Each Other Securityholder shall have the option (exercisable by notice given to the Equinox Representative within 30 days thereafter) to include in the Transfer to the proposed transferee, Securities of the same type and tenor (or in the case of Convertible Securities held by an Other Securityholder, the equivalent of such Securities on an "as converted basis") on the same terms and conditions, a percentage of such Securities held by such Other Securityholder that equals the number of all such Securities held by such Other Securityholder multiplied by a fraction, the numerator of which is the number of Securities to be transferred by such Equinox Stockholder and the denominator of which is the total number of Securities owned immediately prior to the sale (or prior to the first such sale if part of a series of related transactions) by such Equinox Stockholder.  In the event that any holder of a tag-along right with respect to a proposed Transfer (whether arising hereunder, as a result of any amendment to this Agreement, or pursuant to any other document giving rise to such right) exercises such tag-along right and the proposed transferee is unwilling to increase the number of Securities to be Transferred to include the aggregate number of Securities desired to be Transferred by the Equinox Stockholders, the Other Securityholders who desire to participate in such proposed Transfer, and any other person or persons who then hold tag-along rights with respect thereto and who desire to participate therein (collectively, the "**Transferring Securityholders**"), then the aggregate number of Securities that the proposed transferee will agree to purchase in the proposed Transfer shall be allocated among the Transferring Securityholders in proportion to the Transferring Securityholders' relative

ownership percentages of the aggregate number of Securities desired to be Transferred by all Transferring Securityholders.

b. **Bring Along Rights.** If at any time or from time to time, the Equinox Representative proposes that Equinox Partners and all other Equinox Stockholders who become party to this Agreement Transfer (in one or more series of related transactions) all or any portion of the Securities owned by them to, or to cause the Company to Transfer all or any portion of its assets to, or merge with, any person or persons other than any Equinox Affiliate in an arm's length, bona-fide transaction (any such transaction, a "**Sale Event**"), then the Equinox Stockholders may at their option give written notice of the proposed Sale Event to the Other Securityholders, setting forth the name and address of the prospective acquirer and the proposed terms and conditions of the Sale Event including the proposed transaction price. Delivery of such notice to an Other Securityholder shall give rise to an obligation by such Other Securityholder (i) in the case of any Transfer of Securities, to include in such Transfer to the proposed acquirer, on the same terms and conditions, in addition to the Securities to be sold by the Equinox Stockholders, a percentage of Securities of the same type and tenor (or in the case of Convertible Securities held by an Other Securityholder, the equivalent of such Securities on an "as converted basis") held by such Other Securityholder that equals the number of all such Securities held by such Other Securityholder multiplied by a fraction, the numerator of which is the number of such Securities to be sold by the Equinox Stockholders (plus the number of such Securities theretofore sold by the Equinox Stockholders in any related transactions) and the denominator of which is the total number of such Securities owned immediately prior to the Sale Event (or prior to the first such sale if part of a series of related transactions) by the Equinox Stockholders, (ii) in the case of any other Sale Event, to vote all of its Securities in favor of such transaction, and (iii) in any such Sale Event, to take any and all corporate action required of it to consummate such Sale Event.

c. **Terms of Sale.** Any Transfer of Securities or Sale Event in accordance with Section 6.a or b shall be on the same terms and conditions for all participating Securityholders, including proportionate liability for transaction expenses, purchase price adjustments and contractual indemnification obligations based on their then existing respective ownership percentage of Securities being Transferred (with respect to a Sale Event that involves a Transfer of Securities) or then owned (with respect to any other type of Sale Event) by the participating Securityholders; provided, however, that without intending to limit the responsibility of any Securityholder for contractual indemnification obligations as aforesaid, each participating Other Securityholder shall only be required to make representations and warranties regarding its own ownership of Securities and its power and authority to enter into and perform the definitive agreement with respect to the Transfer or Sale Event and the enforceability thereof against such Other Securityholder; provided further that no Securityholder shall be required to incur liability in connection with any such Transfer or Sale Event in excess of the lesser of (x) its proportionate share (determined as provided above in this Section 6.c) of any contractual indemnification obligations (except on account of representations and warranties made by such Securityholder as described in the immediately preceding proviso, as to which each Securityholder shall be solely liable for its own breach) and (y) its share of the proceeds of such Transfer or Sale Event actually paid, and in any case, each Securityholder's liability will be several and not joint with any other person unless otherwise agreed by such Securityholder.

856397-2

7.    **Representations and Warranties.**  The Company hereby represents and warrants to each Securityholder as follows:

a.    **Organization; Authority; Enforceability.**    The Company is a corporation duly organized, validly existing an in good standing under the laws of the State of Delaware. The execution, delivery and performance of this Agreement has been duly authorized by the Company.   The Company has all requisite power and authority to enter into this Agreement.   This Agreement has been duly executed and delivered by the Company and constitutes a valid and binding obligation of the Company, enforceable in accordance with its terms.   The execution and delivery by the Company of this Agreement do not and shall not (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under, (iii) result in the creation of any lien upon the Shares or the Company's assets pursuant to, (iv) give any third party the right to modify, terminate or accelerate any obligation under, (v) result in a violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or governmental body or agency pursuant to, this Agreement or any law, statute, rule or regulation to which the Company is subject, or any agreement, instrument, order, judgment or decree to which the Company or any of its subsidiaries is subject.

(b)    **Capitalization of the Company.**   The authorized capital stock of the Company consists of 350,000 shares of common stock, of which 70,000 shares are issued and outstanding, and 100,000 shares of Series A Preferred Stock, 100,000 of which are issued and outstanding.   Schedule 1 attached hereto accurately sets forth (i) the name of each holder of Shares and the number of Shares held by each such holder; (ii) the name of each holder of Series A Preferred Stock and the number of such shares of Series A Preferred Stock held by each such holder, and (iii) the name of each Optionholder and the number of Shares issuable upon exercise thereof.   Except as set forth on Schedule 1 or in the Charter, there are no outstanding options, warrants, rights, commitments, pre-emptive rights or agreements of any kind for the issuance and sale of, or other securities convertible into or exercisable or exchangeable for, any shares of capital stock of any class or other equity interests of the Company. All of the outstanding Shares have been duly and validly authorized and issued and are fully paid and non-assessable.

(c)    **Ownership of Subsidiaries.**   Approximately ninety-nine percent (99%) of the issued and outstanding capital interests of MUA and all of the issued and outstanding capital interests of MUAP are owned directly by MUA Management.  All of the issued and outstanding capital interests of MUA Management are owned directly by EIC International.  All of the issued and outstanding shares of stock of Round Hill and Saba are owned directly by Saba Management.  All of the issued and outstanding capital interests of Saba Management are owned directly by EIC International.  All of the issued and outstanding capital interests of EIC International are owned directly by the Company.  There are no outstanding options, warrants, rights, commitments, pre-emptive rights or agreements of any kind for the issuance and sale of, or other securities convertible into or exercisable or exchangeable for, any shares of capital stock of any class or other equity interests of MUA Management, Saba Management, or EIC International.  To the best of the Company's knowledge, there are no outstanding options, warrants, rights, commitments, pre-emptive rights or agreements of any kind for the issuance and sale of, or other securities convertible into or exercisable or exchangeable for, any shares of capital stock of any class or other equity interests of MUA,

856397-2

MUAP, Round Hill, and Saba, other than (i) the preemptive rights set forth in the Articles of Association of MUA and the bylaws associated therewith and (ii) the option held by William A. Cornell on 22 shares of MUA which are held by Dr. David Fredrick.

8.      **Registration Rights**.  The provisions of Exhibit A providing registration rights for Securityholders are incorporated herein by reference.

9.      **Involuntary Transfers**.  In the event that any Securities owned by any Other Securityholder shall be Transferred or subject to Transfer by reason of (a) proceedings with respect to the bankruptcy or insolvency of such Other Securityholder, whether voluntary or involuntary, (b) foreclosure, distraint, levy, execution or other involuntary Transfer in each case caused by the actions or omissions of such Other Securityholder or (c) the adjudication of a Management Stockholder as legally incompetent or the appointment of any guardian or personal representative for such Management Stockholder (other than by reason of the death of such Management Stockholder), then Equinox Partners (or its designees) shall have the right to purchase the Securities Transferred or proposed to be Transferred (unless applicable law would otherwise prohibit) pursuant to the same terms of the Transfer or proposed Transfer or their Initial Value (if any), whichever is less.   The affected Other Securityholder shall give the Company and the Equinox Representative written notice promptly upon the occurrence of any such event, stating the terms of such Transfer or proposed Transfer, the identity of the proposed transferee, the price or other consideration, if readily determinable, for which the Securities were Transferred or are proposed to be Transferred and the type and number of Securities.  The failure of an Other Securityholder to give the notice referred to in this Section shall not impair the right of Equinox Partners (or its designees) to purchase the Securities subject to such involuntary Transfer, whether or not such Transfer has occurred.

10.     Voting.  All of the Other Securityholders agree as follows:

a.      **Mandatory Voting by Other Securityholders**.  Each Other Securityholder shall vote in person or by proxy all Securities entitled to vote and held by such Other Securityholder (including any Shares in which it or he has been granted a proxy) at each and every meeting of the stockholders of the Company, and shall sign any consent in lieu of a meeting of stockholders presented to him, in the same manner as Equinox Partners and any of the other Equinox Stockholders vote the shares owned by them at any such meeting or in any such consent.  In furtherance and not in limitation of the foregoing, each Other Securityholder hereby grants to the Equinox Representative an irrevocable proxy coupled with an interest to vote all Securities entitled to vote and held by such Other Securityholder.  Such proxy shall remain in effect for the full term of this Agreement.

b.      **Waiver of Dissenter's Rights**.  Each Other Securityholder hereby acknowledges that the provisions of Section 10.a, above, obligating such Other Securityholder to vote its Securities in the manner directed by the Equinox Stockholders, and the provisions of Section 6.b, above, obligating such Other Securityholder to vote its Securities in favor of a Sale Event, have the practical effect of preventing such Other Securityholder from voting against certain fundamental corporate transactions and thus from exercising appraisal rights that may be available under Section 262 of the Delaware General Corporation Law or otherwise, which, if such Other Securityholder were able to exercise such rights, might enable such Other

Securityholder to obtain a judicially determined fair value of such Other Securityholder's Securities. Each Other Securityholder hereby waives to the fullest extent permitted by law all such appraisal rights.

11. **Custody of Certificates.** Each Other Securityholder shall deliver to the Company all stock certificates representing Securities held by such Other Securityholder with undated stock powers attached, duly endorsed in blank. The Company shall hold all such certificates in its custody, as bailee, for all of the Other Securityholders, but shall have no obligation at any time to deliver such certificates to the Other Securityholders except (a) the Company shall permit each Other Securityholder to endorse certificates representing Securities to effect any Transfer permitted hereunder; (b) the Company shall permit each Other Securityholder to have a photocopy of the certificates representing Securities held by such Other Securityholder; and (c) the Company shall deliver at the direction of each Other Securityholder certificates representing Securities held by such Other Securityholder to any other person to perfect a pledge of such Securities required hereunder. If any Securities held by an Other Securityholder are required to be Transferred under Section 4, 6.b or 9 and such Other Securityholder shall, after written notice from the Equinox Representative, refuse or be unable to endorse and deliver certificates representing such Securities in order to effect such Transfer, then the Company shall be appointed, and the Company is hereby irrevocably constituted and appointed, such Other Securityholder's attorney-in-fact with full power and authority to execute the necessary stock powers, effect such Transfer on the stock records of the Company, deliver such Securities and perform such other acts necessary to effect such Transfer in accordance with the terms of this Agreement. Notwithstanding the foregoing, the Company shall have no obligation to effect any such Transfer.

12. **Calls and Equinox Options.**

a. **Call Rights.** Subject to the Equinox Option held by Equinox Partners pursuant to Section 12.b hereof, upon the occurrence of a Call Event affecting a Management Stockholder, the Company shall have the right to purchase from such Management Stockholder, and upon exercise of that right such Management Stockholder shall sell to the Company (a "**Call**"), all, but not less than all, of the Shares held by such Management Stockholder at the Purchase Price and during the Exercise Period applicable thereto as described opposite the Call Event in Schedule 2 hereto. Any Call right of the Company hereunder may be assigned at any time and from time to time by the Company to any one or more of its affiliates. For purposes of this Agreement, an "affiliate" of the Company means any successor-in-interest to the Company (by operation of law or otherwise) or any entity controlling, controlled by or under common control with the Company.

b. **Equinox Options.** Upon the occurrence of a Triggering Event described in Schedule 2 hereto affecting a Management Stockholder, Equinox Partners shall have the right to purchase from such Management Stockholder, and upon exercise of that right such Management Stockholder shall sell to Equinox Partners (an "**Equinox Option**"), all, but not less than all, of the Shares held by such Management Stockholder at the Purchase Price and during the Exercise Period applicable thereto as described opposite such Triggering Event in Schedule 2 hereto. The Equinox Option rights held by Equinox Partners hereunder shall have priority over

the Call rights held by the Company and may be assigned by Equinox Partners at any time and from time to time to any one or more of the Equinox Affiliates.

      c.    **Exercise; Payment of Purchase Price**.  The Call and Equinox Option rights hereunder shall be exercised by written notice to the Company, Equinox Partners and the applicable Management Stockholder, as the case may be.  The Purchase Price payable upon exercise of an Equinox Option right hereunder shall be paid in cash on the Closing Date (as defined in Section 12.c).  The Purchase Price payable upon a Call of any Shares hereunder shall be paid (i) in cash on the Closing Date or, at the discretion of the Company, (ii) one-fourth in cash on the Closing Date and the balance in equal annual installments payable over a period of up to three years, with the first such installment payable on the first anniversary of the Closing Date, pursuant to a Subordinated Promissory Note substantially in the form attached hereto as Schedule 3 (a "**Subordinated Note**"), with interest on the outstanding balance thereof at a rate per annum equal to the lesser of 6% or the "prime rate" publicly announced from time to time by Bank of America, N.A.  All attorneys' fees and other out-of-pocket expenses incurred by the Company in connection with any Transfer of Shares under Sections 12.a and 12.b shall be borne by the transferring Management Stockholder.

      d.    **Certain Restrictions**.

      (i)    Restrictions Imposed By Law.  Notwithstanding anything else herein to the contrary, the Call rights under this Section 12 shall be suspended and may not be exercised during such times where such exercise would, in the good faith judgment of the Company's Board of Directors, violate or invoke remedies of any third party adverse to the Company under, any applicable law (including, without limitation, the Delaware General Corporation Law, the Securities Act or any applicable state securities act or fraudulent conveyance or transfer act).  Any payments that would otherwise have been due but for the restrictions set forth in this Section 12.d.(i) shall not accrue interest, and the rights and obligations suspended hereunder shall cease to be suspended at such time as the condition giving rise to such suspension no longer exists, so long as no other condition exists that would give rise to a suspension of such rights and obligations.  Any exercise period reflected on Schedule 2, or the Closing Date, or any other time requirements hereunder that shall be operative at the time of such suspension shall be tolled for so long as such suspension shall remain in effect.

      (ii)    Subordination.  Each Management Stockholder acknowledges and agrees that all payments that may be due from the Company hereunder, whether under a Subordinated Note or otherwise, by virtue of a purchase of Shares by the Company shall be subordinate and subject in right of payment to the prior payment in full in cash of any indebtedness incurred at any time and from time to time by the Company to any of its creditors, including its senior lenders.  Each Management Stockholder agrees to deliver to any such creditor, upon request, from time to time subordination agreements acceptable to such creditor in its discretion setting forth in greater detail the terms of the subordination of any such Company indebtedness to such Management Stockholder to the obligations of the Company to such creditor.

      e.    **Closing**.  In the event of an exercise of a Call or Equinox Option right hereunder, the parties to such transaction shall mutually determine a closing date (a "**Closing**

**Date**") which shall not be more than 90 days, subject to any applicable regulatory waiting periods, after the date upon which the Company or Equinox Partners shall have exercised its rights to purchase Shares in accordance with this Section 12, or if any such day is not a business day, then the first business day thereafter. Such closing ("**Closing**") shall be held at 11:00 a.m., local time, at the principal executive office of the Company, or at such other time or place as the parties may agree.

           f.       **Deliveries at Closing**. On the Closing Date of a purchase of Shares pursuant to this Section 12, the Management Stockholder party to the transaction shall deliver certificates, with stock powers endorsed in blank, representing the Shares to be purchased. In addition, if the person selling the Shares is the personal representative of a deceased Management Stockholder, the personal representative shall also deliver to the Company (i) copies of letters testamentary or letters of administration evidencing his appointment and qualification, (ii) a certificate issued by the Internal Revenue Service pursuant to Section 6325 of the Internal Revenue Code of 1986, as amended (the "**Code**"), discharging the Shares being sold from liens imposed by the Code (or, if it is not possible to obtain such certificate by the Closing Date, the sale of such Shares may be consummated and the proceeds placed in escrow pending receipt thereof), and (iii) any estate tax waiver that may be required by the state of the decedent's domicile. The purchaser of the Shares shall deliver the Purchase Price for such Shares, payable in accordance with Section 12.c hereof.

        13.     **Legend**. All certificates and instruments representing Securities shall be endorsed with a legend reading substantially as follows:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER THE SECURITIES ACT OF 1933 AND APPLICABLE STATE SECURITIES LAWS.

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN A SECURITYHOLDERS AGREEMENT, DATED AS OF APRIL 3, 2007, COPIES OF WHICH MAY BE OBTAINED FROM THE CORPORATION OR FROM THE HOLDER OF THIS SECURITY.

        14.     **Additional Securities and Securityholders**. Securities purchased or otherwise acquired by any Securityholder from the Company or any Other Securityholder (or the personal representative thereof) after the date hereof shall be subject to all the terms and conditions of this Agreement. Each such person who acquires any Securities (other than Options) shall execute and deliver to the Company a Joinder to Securityholders Agreement in the form of Exhibit B hereto agreeing to be bound by the terms hereof, and shall have its name and registered office and the number of Securities owned by it set forth on Schedule 1 by the Company. Any Equinox Affiliate that acquires Securities from a Securityholder following the date of this Agreement and becomes a party hereto in accordance with the preceding sentence will be deemed to be an Equinox Stockholder for purposes of this Agreement. Persons who execute such Joinder to this

Agreement after the date hereof shall thereupon become Securityholders for all purposes of this Agreement; provided, however, that, in the case of any such person who acquires Securities from a Securityholder in accordance with this Agreement (as opposed to from the Company), such person's rights and obligations hereunder shall be determined by reference to the Securityholder who previously owned the Securities acquired by such person. The Company shall revise Schedule 1 to include any additional Securityholders and to show at all times the proper record ownership of the Securities.

15.    **Further Actions**. Each of the Company and the Securityholders shall take all such further action and execute and deliver such additional documents as may be reasonably necessary to implement the provisions of this Agreement.

16.    Intentionally Omitted

17.    **Recapitalization, Exchanges, Etc., Affecting Stock**. The provisions of this Agreement regarding Securities shall apply to any and all capital shares of the Company or any successor or assign of the Company that may be issued in respect of, in exchange for, or in substitution of the Securities by reason of any stock dividend, stock split, stock issuance, reverse stock split, combination, recapitalization, reclassification, merger, consolidation, division or otherwise.

18.    **Management Fee**. The Company shall pay to Equinox Capital, Inc. the management and ancillary fees set forth in (a) that certain Management Services Agreement between Equinox Capital, Inc. and the Company, dated as of the date hereof and (b) that certain Ancillary Fee Agreement among Equinox Capital, Inc., the Company, EIC International, Saba Management, Saba, MUA Management, and MUA, dated as of the date hereof.

19.    **Information Rights**. Within 120 days of the end of each fiscal year of the Company, the Company shall deliver to each Securityholder a consolidated balance sheet of the Company and its subsidiaries as of the end of such fiscal year and a consolidated statement of income and cash flows of the Company and its subsidiaries for such fiscal year, together with a report, if available, of the Company's independent accountants with respect thereto.

20.    **Remedies**. The parties acknowledge that in the event that a party breaches or threatens to breach any provisions of this Agreement, the remedies at law available to the other parties may be inadequate, and therefore such other parties will be entitled to appropriate injunctive and other relief in addition to their legal remedies. Neither any failure of any party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other party with its obligations hereunder, nor any custom or practice of the parties at variance with the terms hereof, shall constitute a waiver by such party of its right to exercise any such right, power or remedy or to demand such compliance.

21.    **Notices**. Any notice required or permitted to be given by or under this Agreement to the Company shall be delivered to its principal place of business or to a Securityholder shall be delivered to its address identified below his signature line below (or at such other addresses as shall be specified by the parties pursuant to this Section). All notices, and other communications

given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given or made (a) the second day after mailing, if sent by registered or certified mail, return receipt requested, (b) upon delivery, if sent by hand delivery, (c) when received, if sent by prepaid overnight carrier, with a record of receipt, or (d) the second day after dispatch, if sent by cable, telegram, facsimile or telecopy (with a copy simultaneously sent by registered or certified mail, return receipt requested). Any notice required hereunder may be waived in writing by the party to whom notice is required to be given.

22.   **Entire Agreement**. This Agreement contains the entire understanding among the parties hereto with respect to its subject matter and supersedes any prior understandings or agreements between the parties with respect to such subject matter.

23.   **Governing Law**. All questions concerning the construction, validity, and interpretation of this Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

24.   **No Third Party Beneficiaries**. No person not a party hereto shall have any rights under this Agreement.

25.   **Amendment**. This Agreement may be amended or modified at any time, but only in writing executed by the Company and Securityholders who then hold more than 50% of all issued and outstanding Shares. Any such amendment or modification shall be binding on all Securityholders notwithstanding that not all such Securityholders shall have agreed to such amendment or modifications.

26.   **Assignment**. Except as otherwise provided herein, this Agreement shall not be assignable (by operation of law or otherwise), but shall be binding upon and inure to the benefit of the successors and permitted assigns of the Company and the Securityholders.

27.   **Severability**. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

28.   **Relationship Among Parties**. This Agreement does not create any relationships among the parties hereto (including, without limitation, any agency, partnership or joint venture relationship) other than those set forth herein.

29.   **Continuation of Employment Relationship**. Neither this Agreement nor the ownership of Securities by a Securityholder shall confer upon any Securityholder any right to continue his employment relationship with the Company or any subsidiary or limit in any respect

the right of the Company or any subsidiary to terminate his employment relationship at any time, subject to the terms of any applicable employment agreements.

30.   **Termination of Agreement.**   Upon the consummation of (a) the dissolution or liquidation of the Company without the formation of a successor thereto, (b) a merger or consolidation with the Company as a result of which the Securityholders of the Company who own Shares or other voting Securities prior to such transaction shall own, directly or indirectly, less than 50% of the voting securities of the surviving entity immediately following such transaction, or (c) a sale of Securities by the Securityholders as a result of which a person or persons, other than existing Securityholders, possess the voting power to elect a majority of the Company's Board of Directors (each a "Termination Event"),  all rights and obligations of the parties under this Agreement shall terminate immediately and be of no further effect.

31.   **Filing.**  A copy of this Agreement shall be retained on file at the principal place of business of the Company.

32.   **Construction.**   As used herein, unless the context otherwise requires: (a) the terms defined herein shall have the meaning set forth herein for all purposes; (b) references to "Section" are to a section hereof; (c) "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; (d) "writing," "written" and comparable terms refer to printing, typing, lithography and other means of reproducing words in a visible form; (e) "hereof," "herein," "hereunder" and comparable terms refer to the entirety of this Agreement and not to any particular section hereof; (f) references to any gender include references to all genders; (g) references to an agreement or other instrument or statute or regulation are referred to as amended and supplemented from time to time and, in the case of a statute or regulation, any successor provisions thereof; (h) the headings of the various Sections hereof are for convenience of reference only and shall not modify, define or limit any of the terms or provisions hereof; and (i) the exhibits and schedules referred to herein and the recitals on page one of this Agreement are incorporated herein by reference.

33.   **No Strict Construction.**  The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and, in the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

34.   **Submission to Jurisdiction; Choice of Forum.**  Each of the parties hereto submits to the exclusive jurisdiction of the United States District Court for the District of Delaware and of any Delaware State court sitting in the City of Wilmington, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated herein and agrees that all claims in respect of such action or proceeding may be heard and determined in any such court.  Each of the parties hereto waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other party with respect thereto.  Nothing in this section however shall affect the right of any party to serve legal process in any other manner permitted by law.

856397-2

35.    <u>Waiver of Jury Trial</u>.   TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

36.    <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

37.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, taken together, shall constitute a single Agreement.

*****

856397-2

IN WITNESS WHEREOF, the undersigned have executed this Securityholders Agreement as of the day and year first above written.

COMPANY:

EIC ACQUISITION CORP.

By: _____
       Steven C. Rodger, President

SECURITYHOLDERS:

EQUINOX EIC PARTNERS LLC

By:    Equinox EIC Management LLC,
       its Managing Member

By:    Equinox Capital, Inc., its
       Managing Member

By: _____
       Steven C. Rodger, President

## EXHIBIT A
### (to Securityholders Agreement)

## REGISTRATION RIGHTS

**A.1**   Incidental Registration

(a)   **Right to Include Registrable Securities**.  If the Company at any time proposes to register any Shares under the Securities Act for sale for the account of the Company (other than pursuant to the Company's initial public offering under an effective registration statement) or any Securityholder in a manner that would permit registration of Shares for sale to the public under the Securities Act (a "**Secondary Offering**"), it shall promptly give written notice to the Securityholders of their rights under this Section A.1 to include in the Secondary Offering the Registrable Securities, as hereinafter defined, held by them and of the Securities and Exchange Commission ("**SEC**") registration form the Company shall use (the "**Notice**").  The Company shall use all reasonable efforts to include in the proposed registration all Registrable Securities held by the Securityholders that the Company is requested in writing by the Securityholders (collectively, the "**Requesting Holders**" and individually, a "**Requesting Holder**"), within 15 calendar days after the Notice is given, to register (the "**Securityholder's Shares**"); provided, however, that (i) if, prior to the effective date of the registration statement filed in connection with such registration, the Company decides, for any reason, not to proceed with the Secondary Offering, the Company shall give written notice of such decision to the Requesting Holders and, thereupon, shall be relieved of its obligation to register the Registrable Securities in connection with such abandoned registration, and (ii) in case of a decision by the Company to delay the Secondary Offering, the Company shall be permitted to delay the registration of the Registrable Securities for the same period as the delay in registering such other Shares.

(b)   **Expenses**.  The Company shall pay all Registration Expenses, as hereinafter defined, incurred in connection with the Secondary Offering; provided, however, that any Requesting Holder shall pay the fees and disbursements of counsel, if any, separately retained by him relating to the sale or disposition of the Registrable Securities of such Requesting Holder.

(c)   **Priority of Incidental Registrations**.  If the managing underwriter for the Secondary Offering shall advise the Company in writing that the number of securities to be included in such registration exceeds the number (the "**Maximum Number**") that can be sold in an orderly manner in such offering, then the number of Registrable Securities included in such registration shall be allocated first to the Company to the full extent of the total number of Shares that the Company desires to include in such registration, and second among all Requesting Holders having contractual rights to have shares registered in such offering pro rata on the basis of the total number of Shares that such Requesting Holder desires to include in such registration. If, as a result of the proration provisions of this Subsection A.1(c), any Requesting Holder shall not be entitled to include all Registrable Securities in a registration pursuant to this Section A.1 that such Requesting Holder has requested be included, such Requesting Holder may elect to withdraw his Registrable Securities from inclusion in such registration (a "**Withdrawal Election**"); provided, however, that such Withdrawal Election shall be irrevocable and, after

making a Withdrawal Election, a Requesting Holder shall no longer have any right to include Registrable Securities in the registration as to which such Withdrawal Election was made.

      **(d)**    **Information.**  The Company may require each Requesting Holder holding Registrable Securities as to which any registration is being effected to furnish the Company such information regarding such Requesting Holder and the distribution of such Registrable Securities as the Company may from time to time reasonably request in writing.

      **(e)**    **Discontinuance.**  Each Requesting Holder holding Registrable Securities agrees that upon receipt of any notice from the Company of the discovery or occurrence of any material fact or event not theretofor disclosed in the Registration Statement or prospectus, such Requesting Holder will forthwith discontinue disposition of Registrable Securities pursuant to the registration statement covering such Registrable Securities until such Requesting Holder's receipt of the copies of the supplemented or amended prospectus, and, if so directed by the Company, such Requesting Holder will deliver to the Company (at the Company's expense), all copies, other than permanent file copies then in such Requesting Holder's possession, of the prospectus covering such Registrable Securities that was in effect prior to such amendment or supplement.

      **A.2**    **Indemnification.**  In the event of a Secondary Offering, the Company and each Requesting Holder holding any Registrable Securities covered by such registration statement shall enter into agreements providing customary indemnification and contribution provisions.

      **A.3**    **Certain Definitions.**  In addition to the terms defined in the Securityholders Agreement to which this Exhibit A is attached, as used in this Exhibit A, the following terms have the following meanings:

    **"Registrable Securities"** means Shares held by a Securityholder with respect to which such person has registration rights in connection with the subject registration. As to any particular Registrable Securities, once issued such securities shall cease to be Registrable Securities when (i) a registration statement with respect to the sale of such securities shall have become effective under the Securities Act and such securities shall have been disposed of in accordance with such registration statement, (ii) such securities shall have been sold in open market transaction pursuant to Rule 144 (or any successor provision) under the Securities Act or (iii) such securities shall have been otherwise sold to a transferee not consenting to the terms of the Securityholders Agreement.

    **"Registration Expenses"** means any and all expenses incident to performance or compliance with this Exhibit A, including without limitation, (i) all SEC and stock exchange or National Association of Securities Dealers, Inc. registration and filing fees, (ii) all fees and expenses of complying with securities or blue sky laws (including reasonable fees and disbursements or counsel for the underwriters in connection with blue sky qualifications of the Registrable Securities), (iii) all printing, messenger and delivery expenses, (iv) the fees and disbursements of counsel for the Company and of the Company's independent public accountants, including the expenses of any special audits and/or "cold comfort" letters required by or incident to such performance and compliance, including any fee payable to a qualified independent underwriter within the meaning of the rules of the National Association of

Securities Dealers, Inc., but excluding underwriting discounts and commissions and transfer taxes, if any.

A-2

**EXHIBIT B**
(to Securityholders Agreement)


## JOINDER TO SECURITYHOLDERS AGREEMENT


The undersigned wishes to receive certain shares (the "**Shares**") of the Common Stock, par value $.001 per share, of **EIC ACQUISITION CORP.**, a Delaware corporation (the "**Company**"), upon the terms and conditions of a certain **[DESCRIBE AGREEMENT]**, dated as of [_____] (the "**Agreement**");

The Company has conditioned the issuance of the Shares to the undersigned upon the express acknowledgment and agreement of the undersigned that the Agreement and the Shares are subject to that certain Securityholders Agreement, dated as of April 3, 2007 among the Company and the stockholders and other signatories thereto (as the same be amended and supplemented from time to time, the "**Securityholders Agreement**"); and

The undersigned has been given a copy of the Securityholders Agreement and afforded ample opportunity in which to read it, and the undersigned is thoroughly familiar with its terms;

NOW, THEREFORE, in consideration of the premises and to induce the Company to permit the undersigned to receive the Shares, the undersigned does hereby acknowledge and agree that (i) the undersigned has been given a copy of the Securityholders Agreement and ample opportunity in which to read it, and the undersigned is thoroughly familiar with its terms, (ii) the Agreement and the Shares are subject to the Securityholders Agreement, (iii) **[the transferor of the Shares is [a Management Stockholder/or Other Securityholder] as that term is defined and used in the Securityholders Agreement and (iv]** the undersigned shall be a "Securityholder" and as transferee, a **[Management Stockholder/or Other Securityholder]** as those terms are defined and used in the Securityholders Agreement, and **[(iv)/(v)]** the undersigned does hereby agree fully to be bound thereby.

This ___ day of _____, _____.


                                    _____
                                    Name:
                                    Address:

SCHEDULE 1

(to Securityholders Agreement)

Securityholder
Common Stock Ownership

| Securityholder | No. of Shares of Company Common Stock | No. of Shares of Company Series A Preferred Stock |
|---|---|---|
| Equinox EIC Partners LLC | 70,000 | 100,000 |

| Optionholder | No. of Shares of Company Common Stock Issuable/Issued |
|---|---|
| | |
| Reserved for Future Issuance | 17,500 |

SCHEDULE 2

(to Securityholders Agreement)

Call Rights and Equinox Options

| Triggering Events | Exercise Period | Purchase Price |
|---|---|---|
| Termination with **Cause** | 60 days | Lower of **Initial Value** and **Book Value** |
| Termination without **Cause** | 60 days | **Stipulated Value** |
| Resignation | 60 days | Lower of **Initial Value** and **Book Value** |
| Death | 210 days | **Stipulated Value** |
| **Retirement** | 60 days | **Stipulated Value** |
| **Permanent Disability** | 210 days | **Stipulated Value** |

Note: Terms appearing in bold type are defined in Section 1 of the Securityholders Agreement to which this Schedule is attached.

Schedule 3
(to Securityholders Agreement)

**[FORM OF SUBORDINATED PROMISSORY NOTE]**

THIS NOTE IS NOT TRANSFERABLE WITHOUT
THE WRITTEN CONSENT OF THE COMPANY.

$ _____   _____ .                                                 _____, 200__

JUNIOR UNSECURED SUBORDINATED INSTALLMENT NOTE

For value received, EIC Acquisition Corp., a Delaware corporation (the "Company"),
hereby promises to pay to _____ (the "Payee"), the sum of $ _____ in
_____ equal annual installments of $ _____ __ each,
commencing on the first anniversary hereof, and to pay interest, compounded semiannually, at
the rate per annum equal to the lesser of 6% and the "prime rate" publicly announced from time
to time by Bank of America N.A. (the "Interest Rate") on the unpaid balance thereof,
semiannually in arrears on each _____ 15 and _____ 15.[1]

Notwithstanding the foregoing, no amount of principal or interest hereunder shall be
payable if the Company does not have the available cash to make such payments or if making
such payment would otherwise have a material adverse effect on the Company (in each case as
determined in good faith by the Board of Directors of the Company).  Any interest not so paid
within five days after any interest payment date shall be added to principal and accrue interest
from such interest payment date at a rate per annum equal to the Interest Rate.

The Company and the Payee, by the Payee's acceptance hereof, covenant and agree that the
indebtedness represented by this Note and the payment of the principal of and the interest on this
Note and any claim for rescission of the purchase of this Note, and any claim which is the
equivalent of or substitute for principal of or interest on this Note, for damages arising from the
purchase or issuance of this Note or for reimbursement or contribution on account of such a
claim, and all other payments with respect to or on account of this Note (collectively, the
"Subordinated Indebtedness") are hereby expressly made subordinate and subject in right of
payment to the prior payment in full in cash of all obligations of the Company to any creditor,
whether currently existing or hereafter arising.  The Payee shall deliver to such creditor, from
time to time upon request, subordination agreements acceptable to such creditor in its discretion
setting forth in greater detail the terms of the subordination of the Company's indebtedness to the
Payee hereunder to the obligations of the Company to such creditor.

---

[1] Appropriate payment dates to be filled in on the date of issuance of the Note, the first such semiannual installment
to occur on the last day of the sixth month after the date of this Note.

Notwithstanding any other provision herein contained to the contrary, the Company shall have the right to defer payment of any interest or principal due hereunder in those circumstances described, and in accordance with the terms set forth, in Section 12.d (or successor provision) of the Securityholders Agreement dated April 3, 2007, among the Company and its securityholders (as such agreement is in effect on the date hereof and may be amended from time to time; the "Securityholders Agreement").

The Payee shall not sell, assign or otherwise transfer or encumber any portion of this Note or interest herein without first procuring the written consent of the Company, which consent the Company is under no obligation to provide.

This Note may be prepaid in full, or in part, at any time and from time to time, without premium or penalty. All prepayments shall be applied first to accrued but unpaid interest and then to principal.

All notices and other communications hereunder shall be in writing and shall be deemed to have been given when delivered, or deposited in the mails, first-class, postage prepaid, or delivered to a telegraph office for transmission, if to the Payee, at his address as set forth below his signature line in the Securityholders Agreement or if to the Company, at its principal place of business, or such other addresses as the Payee or the Company shall designate by notice hereunder.

This Note shall be governed by the laws of the State of Delaware.

The Company may set off against its obligations hereunder any obligations that the Payee has to the Company and the Company may, as agent for [_____], set off against the Company's obligations hereunder any obligations that Payee has to [_____], in either case for any reason. The Payee shall be released from any obligations to the Company or [_____] to the extent (and only to such extent) such obligations are set off hereunder.

IN WITNESS WHEREOF, the undersigned has executed this Note intending to be legally bound hereby as of the date first above written.

EIC Acquisition Corp.

By:_____
Title:

The undersigned agrees to the provisions of the penultimate paragraph above the signature line of EIC Acquisition Corp.:

[_____]

By:_____
Title:_____

- 2 -

PRV_856397_7/CGRAHAM

**FIRST AMENDMENT**
to the
**SECURITYHOLDERS AGREEMENT**
of
**EIC HOLDING, INC.**

This First Amendment to the Securityholders Agreement of EIC Holding, Inc., a Delaware limited liability company, f/k/a EIC Acquisition Corp., (the "Company"), is made effective September 11, 2007 (the "Effective Date"). All capitalized terms used herein but not otherwise defined herein will have the same respective meanings given to them in the Securityholders Agreement of the Company dated as of April 3, 2007 (the "Securityholders Agreement").

WHEREAS, the Company and Equinox Partners desire to update the Securityholders Agreement to reflect the current capitalization of the Company;

NOW, THEREFORE, the Company and Equinox Partners hereby amend the Securityholders Agreement as follows:

1.     The first sentence of Section 7(b) of the Securityholders Agreement is hereby deleted in its entirety and replaced with the following:

" The authorized capital stock of the Company consists of 350,000 shares of common stock, of which 145,000 shares are issued and outstanding, and 212,500 shares of Series A Preferred Stock, 212,500 of which are issued and outstanding."

2.     Schedule 1 of the Securityholders Agreement is hereby deleted in its entirety and replaced with the Schedule 1 attached hereto as Exhibit A.

[Remainder of Page Intentionally Left Blank]

PRV_907178_1

IN WITNESS WHEREOF, the undersigned have executed this Securityholders Agreement as of the day and year first above written.

**COMPANY:**

EIC HOLDING, INC.

By: _____
Steven C. Rodger, Chairman

**SECURITYHOLDER:**

EQUINOX EIC PARTNERS LLC

By:   Equinox EIC Management LLC,
      its Managing Member

By:   Equinox Capital, Inc., its
      Managing Member

By: _____
Steven C. Rodger, President

[Signature Page to First Amendment to Securityholders Agreement of EIC Holding, Inc.]

SCHEDULE 1

(to Securityholders Agreement)

Securityholder
Common Stock Ownership

| Securityholder | No. of Shares of Company Common Stock | No. of Shares of Company Series A Preferred Stock |
|---|---|---|
| Equinox EIC Partners LLC | 145,000 | 212,500 |

| Optionholder | No. of Shares of Company Common Stock Issuable/Issued |
|---|---|
|  |  |
|  |  |
| Reserved for Future Issuance | 36,250 |

**SECOND AMENDMENT**
to the
**SECURITYHOLDERS AGREEMENT**
of
**R3 EDUCATION INC.**

This Second Amendment to the Securityholders Agreement of R3 Education Inc., a Delaware corporation, f/k/a EIC Holding, Inc. f/k/a EIC Acquisition Corp. (the "Company"), is made effective October 9, 2009.  All capitalized terms used herein but not otherwise defined herein will have the same respective meanings given to them in the Securityholders Agreement of the Company dated as of April 3, 2007, as amended by that certain amendment dated September 21, 2007 (the "Securityholders Agreement").

NOW, THEREFORE, the Company and Equinox Partners hereby amend the Securityholders Agreement as follows:

1.     Recital E of the Securityholders Agreement shall become a new Recital F and a new Recital E shall read as follow:

E.     "The Company will issue to individuals, corporate entities or others having business dealings with the Company and its subsidiaries (the "**Warrantholders**") warrants to purchase shares of the Company's common stock.

2.     Section 1(p) of the Securityholders Agreement shall be deleted in its entirety and replaced with the following:

p.     **Securityholders** means Equinox Partners, any of the other Equinox Stockholders who become a party to this Agreement, any Optionholder who exercises any of his or her Options and becomes a Securityholder party to this Agreement (acknowledged by the Company), and their respective permitted transferees hereunder, and any other person or entity who becomes a holder of any Securities and a party to this Agreement by signing a Joinder to Securityholders Agreement pursuant to Section 14 hereof (acknowledged by the Company).

*[Remainder of Page Intentionally Left Blank]*

PRV 1033335.4

IN WITNESS WHEREOF, the undersigned have executed this amendment to the Securityholders Agreement as of the day and year first above written.

**COMPANY:**

R3 EDUCATION, INC.

By: _____

Steven C. Rodger, Chairman

**SECURITYHOLDER:**

EQUINOX EIC PARTNERS LLC

By:    Equinox EIC Management LLC,
       its Managing Member

By:    Equinox Capital, Inc., its
       Managing Member

By: _____

Steven C. Rodger, President

**SIGNATURE PAGE TO 2ND AMENDMENT TO THE SECURITYHOLDERS AGREEMENT**

**THIRD AMENDMENT**
to the
**SECURITYHOLDERS AGREEMENT**
of
**R3 EDUCATION INC.**

This Third Amendment to the Securityholders Agreement of R3 Education Inc., a Delaware corporation, f/k/a EIC Holding, Inc. f/k/a EIC Acquisition Corp., (the "Company"), is made effective December __, 2009 (the "Effective Date"). All capitalized terms used herein but not otherwise defined herein will have the same respective meanings given to them in the Securityholders Agreement of the Company dated as of April 3, 2007, as amended by that certain amendment September 21, 2007 and as further amended by that certain amendment dated October 9, 2009 (the "Securityholders Agreement").

WHEREAS, the Company and Equinox Partners desire to update the Securityholders Agreement to reflect the current capitalization of the Company;

NOW, THEREFORE, the Company and Equinox Partners hereby amend the Securityholders Agreement as follows:

1.      The first two sentences of Section 7(b) of the Securityholders Agreement are hereby deleted in their entirety and replaced with the following:

"The authorized capital stock of the Company consists of 350,000 shares of common stock, of which 198,125 shares are issued and outstanding, and 100,000 shares of Series A Preferred Stock, none of which are issued and outstanding. Schedule 1 attached hereto accurately sets forth (i) the name of each holder of Shares and the number of Shares held by each such holder; (ii) the name of each holder of Series A Preferred Stock and the number of such shares of Series A Preferred Stock held by each such holder, (iii) the name of each Optionholder and the number of Shares issuable upon exercise thereof, and (iv) the name of each Warrantholder and the number of Shares issuable upon exercise thereof.

2.      Schedule 1 of the Securityholders Agreement is hereby deleted in its entirety and replaced with the Schedule 1 attached hereto as Exhibit A.

*[Remainder of Page Intentionally Left Blank]*

PRV 1038332.3

IN WITNESS WHEREOF, the undersigned have executed this amendment to the Securityholders Agreement as of the day and year first above written.

**COMPANY:**

R3 EDUCATION INC.

By: _____
Steven C. Rodger, Chairman

**SECURITYHOLDER:**

EQUINOX EIC PARTNERS LLC

By:   Equinox EIC Management LLC,
      its Managing Member

By:   Equinox Capital, Inc., its
      Managing Member

By: _____
Steven C. Rodger, President

SIGNATURE PAGE TO THE 3RD AMENDMENT TO THE SECURITYHOLDERS AGREEMENT

SCHEDULE 1

(to Securityholders Agreement)

Securityholder
Common Stock Ownership

| Securityholder | No. of Shares of Company Common Stock | No. of Shares of Company Series A Preferred Stock |
|---|---|---|
| Equinox EIC Partners LLC | 198,125 | none |

| Warrant Holder | No. of Shares of Company Common Stock Issuable/Issued |
|---|---|
| Ares Capital Corporation[a] | 10% of the Company's common stock on a fully diluted basis |
| Steven C. Rodger[b] | 10% of the Company's common stock on a fully diluted basis |

| Optionholder | No. of Shares of Company Common Stock Issuable | No. of Additional Shares of Company Common Stock Authorized (but not yet issuable) |
|---|---|---|
| Joseph Chu | 543 | 408 |
| Gregory Czuba | 3,595 | 2,700 |
| Patrick Donnellan | 2,368 | 1,779 |
| Donald Donahue | 797 | 599 |
| Hugh Duckworth | 255 | 192 |
| Gordon Green | 512 | 385 |
| John Marvin | 4,349 | 3,266 |
| Terry Moya | 1,598 | 1,200 |
| Jay Turkewitz | 255 | 192 |

[a] Ares Capital Corporation ("Ares") is only a party to sections 6 and 10 of the Securityholders Agreement; provided, however, that section 10 shall only be binding upon Ares and its Securities to the extent appropriate to effectuate section 6.
[b] Steven C. Rodger ("Rodger") is only a party to sections 6 and 10 of the Securityholders Agreement; provided, however, that section 10 shall only be binding upon Rodger and his Securities to the extent appropriate to effectuate section 6.

PRV 1038332.3