# Exhibit B

R3 EDUCATION INC.

STOCK OPTION AGREEMENT
(ISO)

This Stock Option Agreement (this "**Agreement**"), dated December 8, 2009, is made by and between R3 Education Inc. (f/k/a EIC Holding, Inc.), a Delaware corporation (the "**Company**"), and **Hugh Duckworth** (the "**Optionee**"), an employee of the Company. The Option granted hereunder, together with any shares of Stock purchased by the Optionee pursuant to any partial or total exercise of this Option, shall be subject to the terms and provisions of that certain Securityholders Agreement, dated as of April 3, 2007, by and among the Company and the stockholders and other parties signatory thereto, as amended (the "**Securityholders Agreement**").

1.      Grant of Stock Option.  The Company hereby grants to the Optionee as of the date hereof (the "**Grant Date**"), subject to the terms and conditions herein set forth, an option (the "**Option**") to purchase **192** shares of the Company's common stock, par value $0.001 per share (the "**Stock**"), at the purchase price of $0.001 per share (the "**Purchase Price**"), which price represents not less than the fair market value of each share on the date hereof.  Such Option shall be exercisable and exercised as hereinafter provided.  The Optionee understands and agrees that the Option is granted subject to and in accordance with the terms of the Company's 2007 Stock Plan, as amended (the "**Plan**"), and the Optionee further agrees to be bound by the terms of the Plan.  The Optionee hereby acknowledges receipt of a copy of the Plan. The Company and the Optionee each intend that the Option granted herein qualify as an ISO (as defined in the Plan).  Optionee acknowledges that the Option may not qualify as an ISO unless the Option is exercised within three months after the date of termination of Optionee's employment with the Company.  It is hereby acknowledged by the Company and the Optionee that the Company and its lenders entered into a debt restructuring on December 8, 2009 pursuant which the Company's lenders waived existing defaults by the Company in consideration of fees which effectively eliminated the common equity value of the Company as of the date thereof and that through this Agreement, the Company desires that the Optionee be incentivized to help grow the common equity value of the Company from and after the date hereof.

2.      Specific Terms and Conditions.

(a)     Exercisability of Option.  Subject to the other terms of this Agreement regarding the exercise of this Option, this Option shall become exercisable in installments as follows:

| Provided Optionee is Employed On or After 12/8 of the Following Year: | This Option Shall be Exercisable With Respect to the Following Cumulative Percentage of the Number of Shares Subject to this Option: |
| --- | --- |
| 2010 | 20% |

| | |
|---|---|
| 2011 | 40% |
| 2012 | 60% |
| 2013 | 80% |
| 2014 | 100% |

(b)    <u>Certain Events</u>.  Notwithstanding paragraph (a), this Option shall become exercisable immediately in full upon the occurrence of the earliest to occur of (i) the liquidation, winding up or dissolution of the Company, (ii) the Initial Public Offering (as defined in the Plan) and (iii) a Change in Control of the Company (as defined in the Plan).

(c)    <u>Expiration of Option</u>.  Unless earlier terminated or forfeited pursuant to the terms of this Agreement, this Option shall expire on December 7, 2019 (the "**Expiration Date**").

(d)    <u>Termination of Employment Due to Death or Permanent Disability</u>.  If the Optionee's employment with the Company terminates due to his death or Permanent Disability (as defined in the Securityholders Agreement), then, subject to paragraph (a), this Option may be exercised by the Optionee until the later of (i) twelve months after the date of the termination of Optionee's employment and (ii) if the Company becomes a reporting company under the Securities Exchange Act of 1934 Act, as amended (the "**Exchange Act**"), before the date specified in clause (i), twelve months after it becomes a reporting company, but, with respect to (i) and (ii), not later than the expiration date specified in paragraph (c).

(e)    <u>Termination of Employment Due to Other Causes; Forfeiture of Option</u>. If  the Optionee's employment with the Company is terminated by the Company for Cause (as defined in the Securityholders Agreement), then this Option (vested and unvested) shall thereupon be forfeited.  If the Optionee's employment with the Company is terminated by the Company without Cause or is terminated by the Optionee, then, subject to paragraph (a), this Option may be exercised by the Optionee until the later of (i) twelve months after the date of the termination of Optionee's employment (provided, that Optionee acknowledges that the Option may not qualify as an ISO unless the Option is exercised within three months after such termination date) and (ii) if the Company becomes a reporting company under the Exchange Act before the date specified in clause (i), twelve months after it becomes a reporting company, but, with respect to (i) and (ii), not later than the expiration date specified in paragraph (c).

3.    <u>Manner of Exercise</u>.  During the time in which exercise is permitted hereunder, this Option may be exercised in whole at any time or in part from time to time; <u>provided</u>, that if the Optionee elects to not fully exercise its Option prior to the Expiration Date, the Optionee shall be deemed to have forfeited its right to purchase the balance of the shares of Stock available for purchase by Optionee.  Subject to the further requirements set forth in this Agreement, each exercise of the Option shall be effected by a written notice to the Company specifying the number of shares as to which the Option is being exercised; <u>provided</u>, that in no event shall the Optionee be entitled to purchase a number of shares of Stock greater than that

which the Optionee is entitled to purchase pursuant to Section 1 hereof.  Until the Company notifies the Optionee to the contrary, the form attached to this Agreement as Exhibit A shall be used to exercise the Option.  Notation of any partial exercise shall be made by the Company on Schedule A hereto.

4.    Payment of Purchase Price Upon Exercise.  At the time of any exercise of this Option, the Purchase Price for the shares as to which this Option shall be exercised shall be paid in full to the Company either (a) in cash, by certified check or wire transfer, (b) if permitted by applicable law, by the relinquishment of a portion of this Option (a "**Cashless Exercise**"), (c) in any combination of the foregoing or (d) such other consideration as may be acceptable to the Board of Directors of the Company (the "**Board**"). If the Optionee elects to pay the Purchase Price for the shares as to which this Option shall be exercised through a Cashless Exercise upon the exercise hereof, Optionee shall then be entitled to receive a number of shares of Stock computed using the following formula (which may be applied to part or all of the shares of Stock underlying this Option as the context requires):

$$X = [Y * (A-B)] / A$$

where:  X = the number of shares of Stock issuable to Optionee upon exercise of this Option as contemplated by Section 2 after giving effect to the Cashless Exercise feature contained in this Section 4; Y = the number of shares of Stock issuable to Optionee upon exercise of this Option as contemplated by Section 2 without giving effect to the Cashless Exercise feature contained in this Section 4; A = the Fair Market Value (as defined below) of one share of Stock as of the exercise date; and B = the Purchase Price of one share of Stock.  If the Purchaser elects to pay the Purchase Price for the shares as to which this Option shall be exercised through a Cashless Exercise as contemplated by this Section 4, upon exercise hereof the Purchaser shall specify in Exhibit A hereto that the Company is authorized to withhold from issuance that number of shares of Stock equal to Y minus X (each as calculated above) and to reduce the number of shares of Stock issuable hereunder by Y (as calculated above).  Notwithstanding the above, a Cashless Exercise pursuant to this Section 4 shall not be permitted at any time when (I) the Purchase Price of a share of Stock (i.e., B) is greater than or equal to the Fair Market Value of a share of Stock (i.e., A) or (II) Optionee's employment with the Company has been terminated by Optionee.  As used in this Section 4, "**Fair Market Value**" of a share of Stock on any particular date shall mean:

(i)    if Optionee's employment with the Company has been terminated by the Company other than for Cause, or terminated as a result of the death or Permanent Disability of Optionee, the Stipulated Value (as defined in the Securityholders Agreement) of such share of Stock; or

(ii)    if clause (i) is not applicable, the fair market value of a share of Stock, as determined by the Board in good faith.

5.    Issuance of Certificates.  The Optionee shall be issued a certificate for any shares as to which this Option shall be exercised.  Such shares shall be subject to such stop-transfer orders and other restrictions as the Board may deem advisable under the rules,

- 3 -

regulations, and other requirements of the Securities and Exchange Commission, any stock exchange upon which the Stock is then listed and any applicable federal or state securities laws, and the Board may cause a legend or legends to be placed on any such certificates to make appropriate reference to such restrictions.  The foregoing provision shall not be effective if and to the extent that the shares of Stock delivered hereunder are covered by an effective and current registration statement under the Securities Act of 1933 ("**Securities Act**"), or if, and so long as, the Board determines that application of such provisions is no longer required or desirable.  In making such determination, the Board may rely upon an opinion of counsel for the Company. The Company shall not be required to issue or deliver any certificates for shares of Stock prior to (i) the listing of such shares on any stock exchange on which the Stock may then be listed, or (ii) the completion of any registration or qualification of such shares under any federal or state law, or any ruling or regulation of any governmental body, which the Board shall, in its sole discretion, determine to be necessary or advisable.  So long as the Securityholders Agreement is in effect, any certificates issued for any shares as to which this Option shall be exercised shall bear the legend required by the Securityholders Agreement and shall be delivered to the Company to be held in escrow in accordance with the Securityholders Agreement.

6.    Nontransferability.    This Option shall not be directly or indirectly assignable or transferable (by operation of law or otherwise) except by will and the laws of descent and distribution, and shall be exercisable only by the Optionee during the Optionee's lifetime.  If, by reason of any attempted assignment, transfer, pledge, or encumbrance or any bankruptcy of the Optionee or similar event happening at any time, any shares issuable or amount payable under this Option would be made subject to the debts or liabilities of the Optionee to any person, then the Board may terminate such person's interest in any such shares or payment and direct that the same be held and applied to or for the benefit of the Optionee.

7.    Registration.    Unless at the time of exercise there is, in the opinion of counsel for the Company, a valid and effective registration statement under the Securities Act and appropriate qualification and registration under applicable state securities laws relating to the Stock being acquired pursuant to this Option, the Optionee shall upon exercise of this Option give a representation that the Optionee is acquiring such shares for his own account for investment and not with a view to, or for sale in connection with, the resale or distribution of any such shares.  In the absence of such registration statement, the Optionee shall be required to execute a written affirmation, in a form reasonably satisfactory to the Company, of such investment intent and to further agree that the Optionee will not sell or transfer any Stock acquired pursuant to this Option unless permitted by the Securityholders Agreement and until the Optionee requests and receives an opinion of the Company's counsel to the effect that (i) such proposed sale or transfer will not result in a violation of the Securities Act, or (ii) a registration statement filed by the Company or its representatives covering the sale or transfer of the shares has been declared effective by the Securities and Exchange Commission, or (iii) the Optionee obtains a no-action letter from the Securities and Exchange Commission with respect to the proposed transfer.

8.    Adjustments.

(a)    Stock Dividends and Stock Splits.  If the shares of common stock of the Company shall be subdivided or combined into a greater or smaller number of shares or if the Company shall issue any shares of its common stock as a stock dividend on its outstanding common stock, the number of shares of common stock deliverable upon the exercise of the Option shall be appropriately increased or decreased proportionately, and appropriate adjustments shall be made in the Purchase Price per share to reflect such subdivision, combination or stock dividend.  Notwithstanding the foregoing, any adjustment under this Section shall not be permitted to the extent that such adjustment causes this Option to constitute deferred compensation subject to Section 409A of the Code (as defined in the Plan).

(b)    Recapitalization or Reorganization.  In the event of a recapitalization or reorganization of the Company (other than in connection with a Change in Control) pursuant to which securities of the Company or of another corporation are issued with respect to the outstanding shares of common stock, the Optionee upon exercising the Option shall be entitled to receive for the purchase price paid upon such exercise the securities he would have received in connection with such recapitalization or reorganization if he had exercised his Option immediately prior thereto.  Notwithstanding the foregoing, any adjustment under this Section shall not be permitted to the extent that such adjustment causes this Option to constitute deferred compensation subject to Section 409A of the Code.

9.    No Rights as Stockholder.  The Optionee shall have no rights as a stockholder with respect to any shares of Stock subject to this Option prior to the date of issuance to the Optionee of a certificate or certificates for such shares.  Except as provided in Paragraph 8, no adjustment shall be made for dividends or other rights for which the record date is prior to the issuance of such certificate or certificates.

10.    No Right to Continued Employment.  This Agreement shall not confer upon the Optionee any right with respect to continuance of employment by the Company nor shall it interfere in any way with the right of the Company to terminate his employment at any time.

11.    Compliance With Law and Regulations.  This Agreement and the obligation of the Company to sell and deliver shares of Stock hereunder shall be subject to all applicable federal and state laws, rules and regulations and to such approvals by any government or regulatory agency as may be required under applicable law.  If at any time the Board shall determine that (i) the listing, registration or qualification of the shares of Stock issuable hereunder is required under applicable state or federal law or the rules of any applicable securities exchange, or (ii) the consent or approval of any government regulatory body is required under applicable law in connection with the issue or purchase of shares of Stock hereunder, this Option may not be exercised in whole or in part unless such listing, registration, qualification, consent, approval or agreement shall have been effected or obtained free of any conditions not reasonably acceptable to the Board.  Moreover, this Option may not be exercised if its exercise or the receipt of shares of Stock pursuant thereto would be contrary to applicable law.  This Agreement is intended to not be subject to the requirements of the American Jobs

- 5 -

Creation Act, specifically with respect to the definition of deferred compensation and the provisions of Section 409A of the Internal Revenue Code.  To the extent required by subsequent guidance regarding Section 409A issued by the U.S. Internal Revenue Service, the Company and Optionee agree that the Option granted hereunder may be modified, rescinded or substituted with an award of equal economic value as required to maintain the intent of this Section 11.

        12.    <u>Taxes</u>.  The Optionee acknowledges that any income or other taxes due from him or her with respect to this Option or the shares of Stock issuable pursuant to this Option shall be the Optionee's responsibility.  In the event of a Disqualifying Disposition (as defined in Section 18 below) or if the Option is converted into a Non-Qualified Option (as defined in the Plan) and such Non-Qualified Option is exercised, the Company may withhold from the Optionee's remuneration, if any, the appropriate amount of federal, state and local withholding taxes attributable to such amount that is considered compensation includable in such person's gross income.  At the Company's discretion, the amount required to be withheld may be withheld in cash from such remuneration, or in kind from the shares of Stock otherwise deliverable to the Optionee on exercise of the Option.  The Optionee further agrees that, if the Company does not withhold an amount from the Optionee's remuneration sufficient to satisfy the Company's income tax withholding obligation, the Optionee will reimburse the Company on demand, in cash, for the amount under-withheld.

        13.    <u>Securityholders Agreement</u>. If not already a party thereto, the Optionee shall, contemporaneously with the exercise of the Option, execute and deliver to the Company a joinder to the Securityholders Agreement, in the form of <u>Exhibit B</u> attached hereto, to evidence the Optionee's agreement to be bound by the terms and conditions of the Securityholders Agreement. The Optionee shall be a Management Stockholder, as defined in the Securityholders Agreement.

        14.    <u>Non-competition,    Non-solicitation,    Non-disparagement,    and Confidentiality Agreements</u>.

        (a)    <u>Non-competition, Non-solicitation and Non-disparagement Agreements</u>. The Optionee agrees that commencing on the date hereof and continuing until the second anniversary of the date upon which the Optionee's employment with the Company is terminated (the "**Non-Compete Period**"), the Optionee will not, whether as an owner, equity holder, partner, employee, consultant, advisor, independent contractor or otherwise, directly or indirectly (i) engage in the business of (A) continuing medical education, (B) the conferring of advanced degrees for the delivery of medical services, including, without limitation, veterinary-medical services, that lead to a doctorate in medicine or a doctorate in veterinary medicine, (C) the conferring of advanced degrees for the delivery of medical services, including, without limitation, veterinary-medical services, anywhere in the Caribbean, whether or not they lead to a doctorate in medicine or a doctorate in veterinary medicine or (D) any other business in which the Company engages during the term of Employee's employment by the Company, in the case of (A), (B), (C) or (D), in competition with the Company and its affiliates ("**Competing Activities**") including, without limitation, assisting any person in its or their efforts to obtain a franchise, charter or other arrangement that would permit such person to engage in Competing Activities, (ii) solicit or hire any individual, who, on the date hereof, at any time within the

- 6 -

twelve (12) months prior to the date hereof, or at any time during the Non-Compete Period, performs services for the Company or any of its affiliates, (iii) cause, induce or attempt to cause or induce any customer, student, sponsor, supplier, licensee, licensor, consultant or other business relation of the Company or any of its affiliates, in each of the following cases in this clause (iii) to the extent relating to Competing Activities, to cease doing business with either the Company or its affiliates, to deal with any competitor of either the Company or any of its affiliates or in any way interfere with its relationship with the Business (as hereinafter defined), and (iv) make any public or private false, derogatory or disparaging comments about either the Company or its affiliates, or the Business (as currently conducted or as it may be conducted in the future), or act in any manner to damage the goodwill or business reputation of any of the foregoing.  As used herein, the "**Business**" shall mean the operation of Caribbean-based medical and veterinary schools and all ancillary services offered and provided in connection therewith, including marketing and recruiting of students, clinical placement, back office and administration, as conducted by the Company and its affiliates.  Ownership of not more than 2% of the outstanding stock of any publicly traded company shall not be a violation of this Section 14(a).

(b)  Confidentiality Agreement.  The Optionee hereby agrees to treat and hold as confidential any information concerning the business and affairs of the Company and its affiliates (including, without limitation, all trade secrets related to student recruiting, student lists, hospital programs and compilations of information, records, and specifications) (the "**Confidential Information**"), refrain from using or disclosing any of the Confidential Information (i) except in connection with the services to be provided by the Optionee pursuant to the terms of any employment agreement between the Optionee and the Company or an affiliate thereof or (ii) unless and only to the extent that such disclosure (after making reasonable efforts to avoid such disclosure and after advising and consulting with the Company about possibly making, and the proposed contents of, such disclosure) is, required by applicable law.  In the event that the Optionee is requested or required in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process to disclose any Confidential Information, it shall notify the Company promptly of the request or requirement so that the Company may seek an appropriate protective order or waive compliance with the provisions of this Section 14(b).  If, in the absence of a protective order or the receipt of a waiver hereunder, the Optionee is, on the advice of counsel, required to disclose any Confidential Information in connection with any such process, the Optionee may disclose the Confidential Information in connection therewith.  The limitations upon disclosure in this Section 14(b) do not apply to (i) information (A) publicly known or available at the time of disclosure by the Optionee, or (B) that becomes publicly known or available thereafter other than by means in violation of this Agreement or any other duty known by the Optionee to be owed to the Company or its affiliates by any person or (ii) in the event the Optionee seeks to enforce this Agreement, the Plan or the Securityholders Agreement, the terms of this Agreement, the Plan or the Securityholders Agreement, as the case may be.

(c)  Forfeiture and Right to Purchase Upon Violation of Obligations.  If the Optionee breaches (whether before or after the termination of employment with the Company) any confidentiality, non-competition, non-solicitation, non-disparagement or any other obligation to the Company or its affiliates, including any such obligation contained in this Agreement or

any other agreement between the Optionee and the Company or its affiliates, then (i) any unexercised portion of this Option shall thereupon be automatically be forfeited and (ii) the Company shall have an option for a period of eighteen (18) months after it first becomes aware of such breach to purchase all or any portion of the shares of Stock issued upon prior exercise of this Option, for an aggregate purchase price equal to the purchase price paid by the Optionee for such shares of Stock.  If the Company elects to repurchase any such shares of Stock, then upon ten (10) days prior notification to the Optionee, Optionee shall sell and the Company shall purchase the shares of Stock.  The closing of such purchase and sale shall take place on a date designated by the Company, which shall not be more than sixty (60) days following the date of notification to the Optionee.

(d)     Specific Performance.  Each party hereby agrees that in addition to the rights and remedies that may be available to either party under this Agreement, each party shall be entitled to obtain specific performance and each party hereby waives the defense that a remedy in damages will be adequate.

(e)     Survival.  The provisions of this Section 14 shall survive termination of the Option.

15.     Notices.  Any notice required or permitted to be given by or under this Agreement to the Company shall be delivered to its principal place of business or to Optionee shall be delivered to its address identified below its signature line below (or at such other addresses as shall be specified by the parties pursuant to this Section).  All notices, and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given or made (a) the second day after mailing, if sent by registered or certified mail, return receipt requested, (b) upon delivery, if sent by hand delivery, (c) when received, if sent by prepaid overnight carrier, with a record of receipt, or (d) the second day after dispatch, if sent by cable, telegram, facsimile or telecopy (with a copy simultaneously sent by registered or certified mail, return receipt requested).  Any notice required hereunder may be waived in writing by the party to whom notice is required to be given.

16.     Lock-up Agreement. The Optionee agrees that, in the event that the Company effects any underwritten public offering of the Stock registered under the Securities Act, neither the shares of Stock obtained by the Optionee hereunder nor any interest in such shares of Stock may be sold, offered for sale, pledged or otherwise disposed of, directly or indirectly (including through the granting of options or any hedging transactions), without the prior written consent of the managing underwriter(s) of the offering, for the same period of time after the execution of an underwriting agreement in connection with such offering, and on the same terms, that all of the Company's then directors and executive officers agree to be restricted.

17.     Option is Intended to be an ISO.  The parties each intend that the Option be an ISO so that the Optionee may qualify for the favorable tax treatment provided to holders of Options that meet the standards of Code Section 422 of the Code.  Any provision of this Agreement or the Plan which conflicts with the Code so that this Option would not be deemed an ISO is null and void and any ambiguities shall be resolved so that the Option qualifies as an ISO.  Nonetheless, if the Option is determined not to be an ISO, the Optionee understands that neither

- 8 -

the Company nor any affiliate is responsible to compensate him or her or otherwise make up for the treatment of the Option as a Non-Qualified Option and not as an ISO. The Optionee should consult with the Optionee's own tax advisors regarding the tax effects of the Option and the requirements necessary to obtain favorable tax treatment under Section 422 of the Code, including, but not limited to, holding period requirements.

18.     Notice to Company of Disqualifying Disposition. The Optionee agrees to notify the Company in writing within 10 days after the Optionee realizes that he has made a Disqualifying Disposition of any of the shares of Stock acquired pursuant to the exercise of the Option. A "**Disqualifying Disposition**" is defined in Section 424(c) of the Code and includes any disposition (including any sale) of such shares before the later of (a) two years after the date the Optionee was granted the Option or (b) one year after the date the Optionee acquired shares of Stock by exercising the Option, except as otherwise provided in Section 424(c) of the Code.

19.     Miscellaneous.

(a)     Entire Agreement. This Agreement, the Securityholders Agreement and the Plan contain the entire understanding among the parties hereto with respect to their subject matter and supersede any prior understandings or agreements between the parties with respect to such subject matter.

(b)     Governing Law. All questions concerning the construction, validity, and interpretation of this Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(c)     No Third Party Beneficiaries. No person not a party hereto shall have any rights under this Agreement.

(d)     Amendments. Neither this Agreement nor any provision hereof shall be modified, changed, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, change, discharge or termination is sought.

(e)     Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

(f)     Relationship Among Parties.   This Agreement does not create any relationships among the parties hereto (including, without limitation, any agency, partnership or joint venture relationship) other than those set forth herein.

(g)     Filing.   A copy of this Agreement shall be retained on file at the principal place of business of the Company.

(h)     Construction.   As used herein, unless the context otherwise requires: (i) the terms defined herein shall have the meaning set forth herein for all purposes; (ii) references to "Section" are to a section hereof; (iii) "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; (iv) "writing," "written" and comparable terms refer to printing, typing, lithography and other means of reproducing words in a visible form; (v) "hereof," "herein," "hereunder" and comparable terms refer to the entirety of this Agreement and not to any particular section hereof; (vi) references to any gender include references to all genders; (vii) references to an agreement or other instrument or statute or regulation are referred to as amended and supplemented from time to time and, in the case of a statute or regulation, any successor provisions thereof; (viii) the headings of the various Sections hereof are for convenience of reference only and shall not modify, define or limit any of the terms or provisions hereof; and (ix) the exhibits and schedules referred to herein and the recitals on page one of this Agreement are incorporated herein by reference.

(i)     No Strict Construction.   The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any person.   The parties hereto have participated jointly in the negotiation and drafting of this Agreement.   In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(j)     Submission to Jurisdiction; Choice of Forum.   Each of the parties hereto submits to the exclusive jurisdiction of the United States District Court for the District of Delaware and of any Delaware State court sitting in the City of Wilmington, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated herein and agrees that all claims in respect of such action or proceeding may be heard and determined in any such court.   Each of the parties hereto waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other party with respect thereto.   Nothing in this section however shall affect the right of any party to serve legal process in any other manner permitted by law.   Each party hereto agrees that a final judgment (after giving effect to any timely appeals) in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law.

(k)     Waiver of Jury Trial.     TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF

OR RELATING TO THIS AGREEMENT, THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

(l) Time of Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

(m) Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, taken together, shall constitute a single agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 11 -

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by a duly authorized officer and the Optionee has executed this Agreement both as of the day and year first above written.

R3 EDUCATION INC.:

By: _____

    Name:   Steven C. Rodger
    Title:    Chairman


OPTIONEE:

Name:   Hugh Duckworth, M.D.
Address:  8567 Coral Way, #399
         Miami, FL 33155

SCHEDULE A

R3 EDUCATION INC.

STOCK OPTION

NOTATIONS AS TO PARTIAL EXERCISES

| Date of Exercise | Number of Shares Purchased | Balance of Shares on Option | Authorized Signature | Notation Date |
|---|---|---|---|---|

EXHIBIT A

EXERCISE OF OPTION

Chairman of the Board of Directors
R3 Education Inc.
_____
_____

Dear Sir:

        The undersigned, the optionee under the Stock Option Agreement, dated as of _____ (the "**Agreement**"), by and between R3 Education Inc. (the "**Company**") and the undersigned, hereby irrevocably elects to exercise the Option granted in the Agreement to purchase _____ shares of common stock of the Company, par value $0.001 per share (the "**Stock**"), and herewith makes payment of $_____.

        [IF CASHLESS EXERCISE:  The undersigned, pursuant to the provisions set forth in the Agreement, hereby irrevocably elects to exercise the right of cashless exercise in accordance with the provisions of the Agreement for _____ shares of Stock, and as payment therefor hereby directs the Company to withhold _____ shares of Stock that the undersigned would otherwise be entitled thereunder.]

Dated: _____

                                                _____
                                                Optionee

Dated Received by the Company: _____

Received by:

_____
Name:
Title:

EXHIBIT B

JOINDER TO SECURITYHOLDERS AGREEMENT


The undersigned has been granted a certain option (the "**Option**") to acquire up to **192** shares (the "**Shares**") of the Common Stock, par value $0.001 per share, of R3 Education Inc., a Delaware corporation (the "**Company**"), upon the terms and conditions of that certain Stock Option Agreement dated as of December 8, 2009 (the "**Option Agreement**");

The Company has conditioned the undersigned's exercise of the Option upon the express acknowledgment and agreement of the undersigned that the Shares are subject to that certain Securityholders Agreement, dated as of April 3, 2007 among the Company and the stockholders and other signatories thereto (as the same be amended and supplemented from time to time, the "**Securityholders Agreement**"); and

The undersigned has been given a copy of the Securityholders Agreement and afforded ample opportunity in which to read it, and the undersigned is thoroughly familiar with its terms;

NOW, THEREFORE, in consideration of the premises and to induce the Company to permit the undersigned to exercise the Option, the undersigned does hereby acknowledge and agree that (i) the undersigned has been given a copy of the Securityholders Agreement and ample opportunity in which to read it, and the undersigned is thoroughly familiar with its terms, (ii) the Shares subject to the Option are subject to the Securityholders Agreement, (iii) the undersigned shall be a Management Stockholder as that term is defined and used in the Securityholders Agreement, and (iv) the undersigned does hereby agree fully to be bound thereby.

This ___ day of _____, 20___


_____

By:  Hugh Duckworth

Address:

R3 EDUCATION INC.

STOCK OPTION AGREEMENT
(ISO)


This Stock Option Agreement (this "**Agreement**"), dated December 8, 2009, is made by and between R3 Education Inc. (f/k/a EIC Holding, Inc.), a Delaware corporation (the "**Company**"), and **Hugh Duckworth** (the "**Optionee**"), an employee of the Company. The Option granted hereunder, together with any shares of Stock purchased by the Optionee pursuant to any partial or total exercise of this Option, shall be subject to the terms and provisions of that certain Securityholders Agreement, dated as of April 3, 2007, by and among the Company and the stockholders and other parties signatory thereto, as amended (the "**Securityholders Agreement**").

 1. <u>Grant of Stock Option</u>. The Company hereby grants to the Optionee as of the date hereof (the "**Grant Date**"), subject to the terms and conditions herein set forth, an option (the "**Option**") to purchase **255** shares of the Company's common stock, par value $0.001 per share (the "**Stock**"), at the purchase price of $0.001 per share (the "**Purchase Price**"), which price represents not less than the fair market value of each share on the date hereof. Such Option shall be exercisable and exercised as hereinafter provided. The Optionee understands and agrees that the Option is granted subject to and in accordance with the terms of the Company's 2007 Stock Plan, as amended (the "**Plan**"), and the Optionee further agrees to be bound by the terms of the Plan. The Optionee hereby acknowledges receipt of a copy of the Plan. The Company and the Optionee each intend that the Option granted herein qualify as an ISO (as defined in the Plan). Optionee acknowledges that the Option may not qualify as an ISO unless the Option is exercised within three months after the date of termination of Optionee's employment with the Company. It is hereby acknowledged by the Company and the Optionee that the Company and its lenders entered into a debt restructuring on December 8, 2009 pursuant which the Company's lenders waived existing defaults by the Company in consideration of fees which effectively eliminated the common equity value of the Company as of the date thereof and that through this Agreement, the Company desires that the Optionee be incentivized to help grow the common equity value of the Company from and after the date hereof.

 2. <u>Specific Terms and Conditions</u>.

 (a) <u>Exercisability of Option</u>. Subject to the other terms of this Agreement regarding the exercise of this Option, this Option shall become exercisable in installments as follows:

| Provided Optionee is Employed On or After **12/1** of the Following Year: | This Option Shall be Exercisable With Respect to the Following Cumulative Percentage of the Number of Shares Subject to this Option: |
|---|---|
| 2009 | 20% |

| | |
|---|---|
| 2010 | 40% |
| 2011 | 60% |
| 2012 | 80% |
| 2013 | 100% |

(b)    Certain Events.  Notwithstanding paragraph (a), this Option shall become exercisable immediately in full upon the occurrence of the earliest to occur of (i) the liquidation, winding up or dissolution of the Company, (ii) the Initial Public Offering (as defined in the Plan) and (iii) a Change in Control of the Company (as defined in the Plan).

(c)    Expiration of Option.  Unless earlier terminated or forfeited pursuant to the terms of this Agreement, this Option shall expire on December 7, 2019 (the "**Expiration Date**").

(d)    Termination of Employment Due to Death or Permanent Disability.  If the Optionee's employment with the Company terminates due to his death or Permanent Disability (as defined in the Securityholders Agreement), then, subject to paragraph (a), this Option may be exercised by the Optionee until the later of (i) twelve months after the date of the termination of Optionee's employment and (ii) if the Company becomes a reporting company under the Securities Exchange Act of 1934 Act, as amended (the "**Exchange Act**"), before the date specified in clause (i), twelve months after it becomes a reporting company, but, with respect to (i) and (ii), not later than the expiration date specified in paragraph (c).

(e)    Termination of Employment Due to Other Causes; Forfeiture of Option.  If the Optionee's employment with the Company is terminated by the Company for Cause (as defined in the Securityholders Agreement), then this Option (vested and unvested) shall thereupon be forfeited.  If the Optionee's employment with the Company is terminated by the Company without Cause or is terminated by the Optionee, then, subject to paragraph (a), this Option may be exercised by the Optionee until the later of (i) twelve months after the date of the termination of Optionee's employment (provided, that Optionee acknowledges that the Option may not qualify as an ISO unless the Option is exercised within three months after such termination date) and (ii) if the Company becomes a reporting company under the Exchange Act before the date specified in clause (i), twelve months after it becomes a reporting company, but, with respect to (i) and (ii), not later than the expiration date specified in paragraph (c).

3.    Manner of Exercise.  During the time in which exercise is permitted hereunder, this Option may be exercised in whole at any time or in part from time to time; provided, that if the Optionee elects to not fully exercise its Option prior to the Expiration Date, the Optionee shall be deemed to have forfeited its right to purchase the balance of the shares of Stock available for purchase by Optionee.  Subject to the further requirements set forth in this Agreement, each exercise of the Option shall be effected by a written notice to the Company specifying the number of shares as to which the Option is being exercised; provided, that in no event shall the Optionee be entitled to purchase a number of shares of Stock greater than that

which the Optionee is entitled to purchase pursuant to Section 1 hereof.  Until the Company notifies the Optionee to the contrary, the form attached to this Agreement as Exhibit A shall be used to exercise the Option.  Notation of any partial exercise shall be made by the Company on Schedule A hereto.

4.       Payment of Purchase Price Upon Exercise.  At the time of any exercise of this Option, the Purchase Price for the shares as to which this Option shall be exercised shall be paid in full to the Company either (a) in cash, by certified check or wire transfer, (b) if permitted by applicable law, by the relinquishment of a portion of this Option (a "**Cashless Exercise**"), (c) in any combination of the foregoing or (d) such other consideration as may be acceptable to the Board of Directors of the Company (the "**Board**"). If the Optionee elects to pay the Purchase Price for the shares as to which this Option shall be exercised through a Cashless Exercise upon the exercise hereof, Optionee shall then be entitled to receive a number of shares of Stock computed using the following formula (which may be applied to part or all of the shares of Stock underlying this Option as the context requires):

$$X = [Y * (A-B)] / A$$

where:  X = the number of shares of Stock issuable to Optionee upon exercise of this Option as contemplated by Section 2 after giving effect to the Cashless Exercise feature contained in this Section 4; Y = the number of shares of Stock issuable to Optionee upon exercise of this Option as contemplated by Section 2 without giving effect to the Cashless Exercise feature contained in this Section 4; A = the Fair Market Value (as defined below) of one share of Stock as of the exercise date; and B = the Purchase Price of one share of Stock.  If the Purchaser elects to pay the Purchase Price for the shares as to which this Option shall be exercised through a Cashless Exercise as contemplated by this Section 4, upon exercise hereof the Purchaser shall specify in Exhibit A hereto that the Company is authorized to withhold from issuance that number of shares of Stock equal to Y minus X (each as calculated above) and to reduce the number of shares of Stock issuable hereunder by Y (as calculated above).  Notwithstanding the above, a Cashless Exercise pursuant to this Section 4 shall not be permitted at any time when (I) the Purchase Price of a share of Stock (i.e., B) is greater than or equal to the Fair Market Value of a share of Stock (i.e., A) or (II) Optionee's employment with the Company has been terminated by Optionee.  As used in this Section 4, "**Fair Market Value**" of a share of Stock on any particular date shall mean:

(i)      if Optionee's employment with the Company has been terminated by the Company other than for Cause, or terminated as a result of the death or Permanent Disability of Optionee, the Stipulated Value (as defined in the Securityholders Agreement) of such share of Stock; or

(ii)     if clause (i) is not applicable, the fair market value of a share of Stock, as determined by the Board in good faith.

5.       Issuance of Certificates.  The Optionee shall be issued a certificate for any shares as to which this Option shall be exercised.  Such shares shall be subject to such stop-transfer orders and other restrictions as the Board may deem advisable under the rules,

- 3 -

regulations, and other requirements of the Securities and Exchange Commission, any stock exchange upon which the Stock is then listed and any applicable federal or state securities laws, and the Board may cause a legend or legends to be placed on any such certificates to make appropriate reference to such restrictions.  The foregoing provision shall not be effective if and to the extent that the shares of Stock delivered hereunder are covered by an effective and current registration statement under the Securities Act of 1933 ("**Securities Act**"), or if, and so long as, the Board determines that application of such provisions is no longer required or desirable.  In making such determination, the Board may rely upon an opinion of counsel for the Company. The Company shall not be required to issue or deliver any certificates for shares of Stock prior to (i) the listing of such shares on any stock exchange on which the Stock may then be listed, or (ii) the completion of any registration or qualification of such shares under any federal or state law, or any ruling or regulation of any governmental body, which the Board shall, in its sole discretion, determine to be necessary or advisable.  So long as the Securityholders Agreement is in effect, any certificates issued for any shares as to which this Option shall be exercised shall bear the legend required by the Securityholders Agreement and shall be delivered to the Company to be held in escrow in accordance with the Securityholders Agreement.

      6.    <u>Nontransferability</u>.  This Option shall not be directly or indirectly assignable or transferable (by operation of law or otherwise) except by will and the laws of descent and distribution, and shall be exercisable only by the Optionee during the Optionee's lifetime.  If, by reason of any attempted assignment, transfer, pledge, or encumbrance or any bankruptcy of the Optionee or similar event happening at any time, any shares issuable or amount payable under this Option would be made subject to the debts or liabilities of the Optionee to any person, then the Board may terminate such person's interest in any such shares or payment and direct that the same be held and applied to or for the benefit of the Optionee.

      7.    <u>Registration</u>.  Unless at the time of exercise there is, in the opinion of counsel for the Company, a valid and effective registration statement under the Securities Act and appropriate qualification and registration under applicable state securities laws relating to the Stock being acquired pursuant to this Option, the Optionee shall upon exercise of this Option give a representation that the Optionee is acquiring such shares for his own account for investment and not with a view to, or for sale in connection with, the resale or distribution of any such shares.  In the absence of such registration statement, the Optionee shall be required to execute a written affirmation, in a form reasonably satisfactory to the Company, of such investment intent and to further agree that the Optionee will not sell or transfer any Stock acquired pursuant to this Option unless permitted by the Securityholders Agreement and until the Optionee requests and receives an opinion of the Company's counsel to the effect that (i) such proposed sale or transfer will not result in a violation of the Securities Act, or (ii) a registration statement filed by the Company or its representatives covering the sale or transfer of the shares has been declared effective by the Securities and Exchange Commission, or (iii) the Optionee obtains a no-action letter from the Securities and Exchange Commission with respect to the proposed transfer.

- 4 -

8.    Adjustments.

(a)    Stock Dividends and Stock Splits.  If the shares of common stock of the Company shall be subdivided or combined into a greater or smaller number of shares or if the Company shall issue any shares of its common stock as a stock dividend on its outstanding common stock, the number of shares of common stock deliverable upon the exercise of the Option shall be appropriately increased or decreased proportionately, and appropriate adjustments shall be made in the Purchase Price per share to reflect such subdivision, combination or stock dividend.  Notwithstanding the foregoing, any adjustment under this Section shall not be permitted to the extent that such adjustment causes this Option to constitute deferred compensation subject to Section 409A of the Code (as defined in the Plan).

(b)    Recapitalization or Reorganization.  In the event of a recapitalization or reorganization of the Company (other than in connection with a Change in Control) pursuant to which securities of the Company or of another corporation are issued with respect to the outstanding shares of common stock, the Optionee upon exercising the Option shall be entitled to receive for the purchase price paid upon such exercise the securities he would have received in connection with such recapitalization or reorganization if he had exercised his Option immediately prior thereto.  Notwithstanding the foregoing, any adjustment under this Section shall not be permitted to the extent that such adjustment causes this Option to constitute deferred compensation subject to Section 409A of the Code.

9.    No Rights as Stockholder.  The Optionee shall have no rights as a stockholder with respect to any shares of Stock subject to this Option prior to the date of issuance to the Optionee of a certificate or certificates for such shares.  Except as provided in Paragraph 8, no adjustment shall be made for dividends or other rights for which the record date is prior to the issuance of such certificate or certificates.

10.    No Right to Continued Employment.  This Agreement shall not confer upon the Optionee any right with respect to continuance of employment by the Company nor shall it interfere in any way with the right of the Company to terminate his employment at any time.

11.    Compliance With Law and Regulations.  This Agreement and the obligation of the Company to sell and deliver shares of Stock hereunder shall be subject to all applicable federal and state laws, rules and regulations and to such approvals by any government or regulatory agency as may be required under applicable law.  If at any time the Board shall determine that (i) the listing, registration or qualification of the shares of Stock issuable hereunder is required under applicable state or federal law or the rules of any applicable securities exchange, or (ii) the consent or approval of any government regulatory body is required under applicable law in connection with the issue or purchase of shares of Stock hereunder, this Option may not be exercised in whole or in part unless such listing, registration, qualification, consent, approval or agreement shall have been effected or obtained free of any conditions not reasonably acceptable to the Board.  Moreover, this Option may not be exercised if its exercise or the receipt of shares of Stock pursuant thereto would be contrary to applicable law.  This Agreement is intended to not be subject to the requirements of the American Jobs

- 5 -

Creation Act, specifically with respect to the definition of deferred compensation and the provisions of Section 409A of the Internal Revenue Code.  To the extent required by subsequent guidance regarding Section 409A issued by the U.S. Internal Revenue Service, the Company and Optionee agree that the Option granted hereunder may be modified, rescinded or substituted with an award of equal economic value as required to maintain the intent of this Section 11.

12.     Taxes.  The Optionee acknowledges that any income or other taxes due from him or her with respect to this Option or the shares of Stock issuable pursuant to this Option shall be the Optionee's responsibility.  In the event of a Disqualifying Disposition (as defined in Section 18 below) or if the Option is converted into a Non-Qualified Option (as defined in the Plan) and such Non-Qualified Option is exercised, the Company may withhold from the Optionee's remuneration, if any, the appropriate amount of federal, state and local withholding taxes attributable to such amount that is considered compensation includable in such person's gross income.  At the Company's discretion, the amount required to be withheld may be withheld in cash from such remuneration, or in kind from the shares of Stock otherwise deliverable to the Optionee on exercise of the Option.  The Optionee further agrees that, if the Company does not withhold an amount from the Optionee's remuneration sufficient to satisfy the Company's income tax withholding obligation, the Optionee will reimburse the Company on demand, in cash, for the amount under-withheld.

13.     Securityholders Agreement. If not already a party thereto, the Optionee shall, contemporaneously with the exercise of the Option, execute and deliver to the Company a joinder to the Securityholders Agreement, in the form of Exhibit B attached hereto, to evidence the Optionee's agreement to be bound by the terms and conditions of the Securityholders Agreement. The Optionee shall be a Management Stockholder, as defined in the Securityholders Agreement.

14.     Non-competition,     Non-solicitation,     Non-disparagement,     and Confidentiality Agreements.

(a)     Non-competition, Non-solicitation and Non-disparagement Agreements. The Optionee agrees that commencing on the date hereof and continuing until the second anniversary of the date upon which the Optionee's employment with the Company is terminated (the "**Non-Compete Period**"), the Optionee will not, whether as an owner, equity holder, partner, employee, consultant, advisor, independent contractor or otherwise, directly or indirectly (i) engage in the business of (A) continuing medical education, (B) the conferring of advanced degrees for the delivery of medical services, including, without limitation, veterinary-medical services, that lead to a doctorate in medicine or a doctorate in veterinary medicine, (C) the conferring of advanced degrees for the delivery of medical services, including, without limitation, veterinary-medical services, anywhere in the Caribbean, whether or not they lead to a doctorate in medicine or a doctorate in veterinary medicine or (D) any other business in which the Company engages during the term of Employee's employment by the Company, in the case of (A), (B), (C) or (D), in competition with the Company and its affiliates ("**Competing Activities**") including, without limitation, assisting any person in its or their efforts to obtain a franchise, charter or other arrangement that would permit such person to engage in Competing Activities, (ii) solicit or hire any individual, who, on the date hereof, at any time within the

- 6 -

twelve (12) months prior to the date hereof, or at any time during the Non-Compete Period, performs services for the Company or any of its affiliates, (iii) cause, induce or attempt to cause or induce any customer, student, sponsor, supplier, licensee, licensor, consultant or other business relation of the Company or any of its affiliates, in each of the following cases in this clause (iii) to the extent relating to Competing Activities, to cease doing business with either the Company or its affiliates, to deal with any competitor of either the Company or any of its affiliates or in any way interfere with its relationship with the Business (as hereinafter defined), and (iv) make any public or private false, derogatory or disparaging comments about either the Company or its affiliates, or the Business (as currently conducted or as it may be conducted in the future), or act in any manner to damage the goodwill or business reputation of any of the foregoing.  As used herein, the "**Business**" shall mean the operation of Caribbean-based medical and veterinary schools and all ancillary services offered and provided in connection therewith, including marketing and recruiting of students, clinical placement, back office and administration, as conducted by the Company and its affiliates.  Ownership of not more than 2% of the outstanding stock of any publicly traded company shall not be a violation of this Section 14(a).

(b)     Confidentiality Agreement.  The Optionee hereby agrees to treat and hold as confidential any information concerning the business and affairs of the Company and its affiliates (including, without limitation, all trade secrets related to student recruiting, student lists, hospital programs and compilations of information, records, and specifications) (the "**Confidential Information**"), refrain from using or disclosing any of the Confidential Information (i) except in connection with the services to be provided by the Optionee pursuant to the terms of any employment agreement between the Optionee and the Company or an affiliate thereof or (ii) unless and only to the extent that such disclosure (after making reasonable efforts to avoid such disclosure and after advising and consulting with the Company about possibly making, and the proposed contents of, such disclosure) is, required by applicable law.  In the event that the Optionee is requested or required in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process to disclose any Confidential Information, it shall notify the Company promptly of the request or requirement so that the Company may seek an appropriate protective order or waive compliance with the provisions of this Section 14(b).  If, in the absence of a protective order or the receipt of a waiver hereunder, the Optionee is, on the advice of counsel, required to disclose any Confidential Information in connection with any such process, the Optionee may disclose the Confidential Information in connection therewith.  The limitations upon disclosure in this Section 14(b) do not apply to (i) information (A) publicly known or available at the time of disclosure by the Optionee, or (B) that becomes publicly known or available thereafter other than by means in violation of this Agreement or any other duty known by the Optionee to be owed to the Company or its affiliates by any person or (ii) in the event the Optionee seeks to enforce this Agreement, the Plan or the Securityholders Agreement, the terms of this Agreement, the Plan or the Securityholders Agreement, as the case may be.

(c)     Forfeiture and Right to Purchase Upon Violation of Obligations.  If the Optionee breaches (whether before or after the termination of employment with the Company) any confidentiality, non-competition, non-solicitation, non-disparagement or any other obligation to the Company or its affiliates, including any such obligation contained in this Agreement or

- 7 -

any other agreement between the Optionee and the Company or its affiliates, then (i) any unexercised portion of this Option shall thereupon be automatically be forfeited and (ii) the Company shall have an option for a period of eighteen (18) months after it first becomes aware of such breach to purchase all or any portion of the shares of Stock issued upon prior exercise of this Option, for an aggregate purchase price equal to the purchase price paid by the Optionee for such shares of Stock.  If the Company elects to repurchase any such shares of Stock, then upon ten (10) days prior notification to the Optionee, Optionee shall sell and the Company shall purchase the shares of Stock.  The closing of such purchase and sale shall take place on a date designated by the Company, which shall not be more than sixty (60) days following the date of notification to the Optionee.

        (d)    <u>Specific Performance</u>.  Each party hereby agrees that in addition to the rights and remedies that may be available to either party under this Agreement, each party shall be entitled to obtain specific performance and each party hereby waives the defense that a remedy in damages will be adequate.

        (e)    <u>Survival</u>.  The provisions of this Section 14 shall survive termination of the Option.

        15.    <u>Notices</u>.  Any notice required or permitted to be given by or under this Agreement to the Company shall be delivered to its principal place of business or to Optionee shall be delivered to its address identified below its signature line below (or at such other addresses as shall be specified by the parties pursuant to this Section).  All notices, and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given or made (a) the second day after mailing, if sent by registered or certified mail, return receipt requested, (b) upon delivery, if sent by hand delivery, (c) when received, if sent by prepaid overnight carrier, with a record of receipt, or (d) the second day after dispatch, if sent by cable, telegram, facsimile or telecopy (with a copy simultaneously sent by registered or certified mail, return receipt requested).  Any notice required hereunder may be waived in writing by the party to whom notice is required to be given.

        16.    <u>Lock-up Agreement</u>.  The Optionee agrees that, in the event that the Company effects any underwritten public offering of the Stock registered under the Securities Act, neither the shares of Stock obtained by the Optionee hereunder nor any interest in such shares of Stock may be sold, offered for sale, pledged or otherwise disposed of, directly or indirectly (including through the granting of options or any hedging transactions), without the prior written consent of the managing underwriter(s) of the offering, for the same period of time after the execution of an underwriting agreement in connection with such offering, and on the same terms, that all of the Company's then directors and executive officers agree to be restricted.

        17.    <u>Option is Intended to be an ISO</u>.  The parties each intend that the Option be an ISO so that the Optionee may qualify for the favorable tax treatment provided to holders of Options that meet the standards of Code Section 422 of the Code.  Any provision of this Agreement or the Plan which conflicts with the Code so that this Option would not be deemed an ISO is null and void and any ambiguities shall be resolved so that the Option qualifies as an ISO. Nonetheless, if the Option is determined not to be an ISO, the Optionee understands that neither

the Company nor any affiliate is responsible to compensate him or her or otherwise make up for the treatment of the Option as a Non-Qualified Option and not as an ISO. The Optionee should consult with the Optionee's own tax advisors regarding the tax effects of the Option and the requirements necessary to obtain favorable tax treatment under Section 422 of the Code, including, but not limited to, holding period requirements.

18.    Notice to Company of Disqualifying Disposition. The Optionee agrees to notify the Company in writing within 10 days after the Optionee realizes that he has made a Disqualifying Disposition of any of the shares of Stock acquired pursuant to the exercise of the Option. A "**Disqualifying Disposition**" is defined in Section 424(c) of the Code and includes any disposition (including any sale) of such shares before the later of (a) two years after the date the Optionee was granted the Option or (b) one year after the date the Optionee acquired shares of Stock by exercising the Option, except as otherwise provided in Section 424(c) of the Code.

19.    Miscellaneous.

(a)    Entire Agreement. This Agreement, the Securityholders Agreement and the Plan contain the entire understanding among the parties hereto with respect to their subject matter and supersede any prior understandings or agreements between the parties with respect to such subject matter.

(b)    Governing Law. All questions concerning the construction, validity, and interpretation of this Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(c)    No Third Party Beneficiaries. No person not a party hereto shall have any rights under this Agreement.

(d)    Amendments. Neither this Agreement nor any provision hereof shall be modified, changed, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, change, discharge or termination is sought.

(e)    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

PRV 1082831.1

(f)     Relationship Among Parties.   This Agreement does not create any relationships among the parties hereto (including, without limitation, any agency, partnership or joint venture relationship) other than those set forth herein.

(g)     Filing.  A copy of this Agreement shall be retained on file at the principal place of business of the Company.

(h)     Construction.  As used herein, unless the context otherwise requires: (i) the terms defined herein shall have the meaning set forth herein for all purposes; (ii) references to "Section" are to a section hereof; (iii) "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; (iv) "writing," "written" and comparable terms refer to printing, typing, lithography and other means of reproducing words in a visible form; (v) "hereof," "herein," "hereunder" and comparable terms refer to the entirety of this Agreement and not to any particular section hereof; (vi) references to any gender include references to all genders; (vii) references to an agreement or other instrument or statute or regulation are referred to as amended and supplemented from time to time and, in the case of a statute or regulation, any successor provisions thereof; (viii) the headings of the various Sections hereof are for convenience of reference only and shall not modify, define or limit any of the terms or provisions hereof; and (ix) the exhibits and schedules referred to herein and the recitals on page one of this Agreement are incorporated herein by reference.

(i)     No Strict Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any person.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(j)     Submission to Jurisdiction; Choice of Forum.  Each of the parties hereto submits to the exclusive jurisdiction of the United States District Court for the District of Delaware and of any Delaware State court sitting in the City of Wilmington, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated herein and agrees that all claims in respect of such action or proceeding may be heard and determined in any such court.  Each of the parties hereto waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other party with respect thereto.  Nothing in this section however shall affect the right of any party to serve legal process in any other manner permitted by law.  Each party hereto agrees that a final judgment (after giving effect to any timely appeals) in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law.

(k)     Waiver of Jury Trial.   TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF

PRV 1082831.1

OR RELATING TO THIS AGREEMENT, THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

(l)     <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

(m)     <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, taken together, shall constitute a single agreement.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

PRV 1082831.1

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by a duly authorized officer and the Optionee has executed this Agreement both as of the day and year first above written.

R3 EDUCATION INC.:

By: _____

    Name:   Steven C. Rodger

    Title:    Chairman


OPTIONEE:

Name:    Hugh Duckworth, M.D.

Address:  8567 Coral Way, #399

          Miami, FL 33155

SCHEDULE A

R3 EDUCATION INC.

STOCK OPTION

NOTATIONS AS TO PARTIAL EXERCISES

| Date of Exercise | Number of Shares Purchased | Balance of Shares on Option | Authorized Signature | Notation Date |
|---|---|---|---|---|
| | | | | |

EXHIBIT A

EXERCISE OF OPTION

Chairman of the Board of Directors
R3 Education Inc.

_____
_____

Dear Sir:

      The undersigned, the optionee under the Stock Option Agreement, dated as of December 8, 2009 (the "**Agreement**"), by and between R3 Education Inc. (the "**Company**") and the undersigned, hereby irrevocably elects to exercise the Option granted in the Agreement to purchase _____ shares of common stock of the Company, par value $0.001 per share (the "**Stock**"), and herewith makes payment of $_____.

      IF CASHLESS EXERCISE:  The undersigned, pursuant to the provisions set forth in the Agreement, hereby irrevocably elects to exercise the right of cashless exercise in accordance with the provisions of the Agreement for _____ shares of Stock, and as payment therefor hereby directs the Company to withhold _____ shares of Stock that the undersigned would otherwise be entitled thereunder.

Dated: _____

 

                                  _____
                                    Optionee

Dated Received by the Company: _____

Received by:

_____
Name:
Title:

EXHIBIT B

JOINDER TO SECURITYHOLDERS AGREEMENT

The undersigned has been granted a certain option (the "**Option**") to acquire up to **255** shares (the "**Shares**") of the Common Stock, par value $0.001 per share, of R3 Education Inc., a Delaware corporation (the "**Company**"), upon the terms and conditions of that certain Stock Option Agreement dated as of December 8, 2009 (the "**Option Agreement**");

The Company has conditioned the undersigned's exercise of the Option upon the express acknowledgment and agreement of the undersigned that the Shares are subject to that certain Securityholders Agreement, dated as of April 3, 2007 among the Company and the stockholders and other signatories thereto (as the same be amended and supplemented from time to time, the "**Securityholders Agreement**"); and

The undersigned has been given a copy of the Securityholders Agreement and afforded ample opportunity in which to read it, and the undersigned is thoroughly familiar with its terms;

NOW, THEREFORE, in consideration of the premises and to induce the Company to permit the undersigned to exercise the Option, the undersigned does hereby acknowledge and agree that (i) the undersigned has been given a copy of the Securityholders Agreement and ample opportunity in which to read it, and the undersigned is thoroughly familiar with its terms, (ii) the Shares subject to the Option are subject to the Securityholders Agreement, (iii) the undersigned shall be a Management Stockholder as that term is defined and used in the Securityholders Agreement, and (iv) the undersigned does hereby agree fully to be bound thereby.

This ___ day of _____, 20____

_____

By:  Hugh Duckworth

Address:

PRV 1082831.1

A

# EIC ACQUISITION CORP.
## 2007 STOCK PLAN

**Effective as of April 3, 2007**

Section 1
Title

This Plan shall be known as the EIC Acquisition Corp. 2007 Stock Plan.

Section 2
Purpose

The purpose of the Plan is to advance the interests of the Company by providing key employees and certain other persons with opportunities to participate in the ownership of the Company and its future growth through (a) the grant of options which qualify as "incentive stock options" under Section 422(b) of the Code; (b) the grant of options which do not qualify as ISOs; and (c) other stock based awards.  This Plan is intended to constitute a "written compensatory benefit plan" within the meaning of Rule 701 under the Securities Act of 1933, as amended.

Section 3
Definitions

As used in the Plan, the following capitalized words shall have the meanings indicated:

3.1    "**Administrator**" means the Board, or if and to the extent the Board does not administer the Plan, a person or committee appointed by the Board.

3.2    "**Board**" means the Board of Directors of the Company.

3.3    "**Cause**", as to any Optionee, shall have the same meaning set forth in such Optionee's employment contract with the Company as in effect on the date hereof (or if there is no such employment contract on the date hereof, the first such employment contract between such Optionee and the Company or any successor entity or other entity controlled by the Company) or, if there is no such employment contract, shall mean: (i) any misappropriation of funds or other property of the Company; (ii) conviction of or plea of guilty or no contest to a felony; (iii) any intentional or willful conduct by such Optionee in his capacity as an employee that is materially injurious to the Company or any entity controlled by the Company; (iv) repeated willful refusal of such Optionee to perform substantially all of his duties as an employee; or (v) repeated insobriety or any use of illegal drugs while rendering services as an employee.

3.3    "**Code**" means the Internal Revenue Code of 1986, as amended.

3.4    "**Common Stock**" means the Company's common stock, par value $0.001 per share.

3.5    **"Company"** means EIC Acquisition Corp., a Delaware corporation, or any successor thereto.

3.6    **"Disability"** means "disability," as such term is defined in Section 22(e)(3) of the Code, except as otherwise may be required by Section 409A of the Code if Section 7.4 below is applicable, in which case "disability" shall be defined as set forth in section 409A.

3.7    **"Disqualifying Disposition"** means any disposition (within the meaning of Section 424(c) of the Code) of shares of Common Stock acquired upon the exercise of an ISO before the later of (a) two years after the Optionee was granted the ISO or (b) one year after the Optionee acquired the shares of Common Stock by exercising the ISO.

3.8    **"Exchange Act"** means the Securities Exchange Act of 1934, as amended.

3.9    **"Fair Market Value"** means, with respect to a share of Common Stock as of any date of determination, in the discretion of the Administrator, (i) the average (on that date) of the high and low prices of the Common Stock on the principal national securities exchange on which the Common Stock is traded, if the Common Stock is then traded on a national securities exchange; or (ii) the last reported sale price (on that date) of the Common Stock on the NASDAQ Stock Market, if the Common Stock is not then traded on a national securities exchange; or (iii) the closing bid price (or average of bid prices) last quoted (on that date) by an established quotation service for over-the-counter securities, if the Common Stock is not reported on the NASDAQ Stock Market; or (iv) if the Common Stock is not publicly traded, the fair market value of such share of Common Stock as determined by the Administrator in accordance with a reasonable valuation method approved by the Administrator in good faith.

3.10    **"Grant Date"** means the effective date of an Option as specified by the Administrator and set forth in the applicable Option Agreement.

3.11    **"Incentive Stock Option"** or **"ISO"** means an option to purchase shares of Common Stock granted to an Optionee under Section 7 of the Plan that is intended to meet the requirements of Section 422 of the Code.

3.12    **"Initial Public Offering"** means the first public offering of the Company's equity securities registered under the Securities Act, or any successor statute, or such other event as a result of which outstanding equity securities of the Company (or any successor entity) shall be publicly traded.

3.13    **"Non-Qualified Option"** or **"NQO"** means an option to purchase shares of Common Stock granted to an Optionee under Section 7 of the Plan that is not intended to be an ISO.

3.14    **"Option"** means an ISO or an NQO.

3.15    **"Optionee"** means an individual or entity selected by the Administrator to receive an Option under the Plan.

3.16    **"Permanent Disability"**, with respect to any Optionee, has the meaning expressly given that term in such Optionee's employment contract with the Company or any successor entity or other entity controlled by the Company as in effect on the date hereof (or if there is no

such employment contract on the date hereof, the first such employment contract between such Optionee and the Company or any successor entity or other entity controlled by the Company), but in the absence of any such written agreement or expressly defined term, means any physical or mental impairment or disability which prevents an Optionee from performing his duties as an employee for a period of at least 120 days measured in any period of 365 days and which is expected to be of permanent duration. A determination of whether an Optionee is disabled shall be made by a licensed physician appointed by the Board.

3.16    "**Plan**" means the EIC Acquisition Corp. 2007 Stock Plan set forth in this document and as hereafter amended from time to time in accordance with Section 12.

3.17    "**Securities Act**" means the Securities Act of 1933, as amended.

Section 4
Administration

4.1    <u>Administrator</u>. The Plan shall be administered by the Administrator.

4.2    <u>Duties of Administrator</u>. It shall be the duty of the Administrator to conduct the general administration of the Plan in accordance with its provisions. The Administrator shall have the power to interpret the Plan and the agreements pursuant to which Options are granted, and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and with any agreements pursuant to which Options are granted and to interpret, amend or revoke any such rules. Any grant under the Plan need not be the same with respect to each Optionee. Any Option constituting "deferred compensation" as defined under Section 409A of the Code, shall comply in all respects with the requirements of Section 409A and applicable regulatory guidance.

Section 5
Eligibility

The Administrator may grant Options to those employees, officers, directors, consultants and advisors whom the Administrator, in its sole discretion, identifies as being in a position which enables such individuals to contribute to the continued growth, development and future financial success of the Company. A director, officer or other person who is not also an employee of the Company shall not be eligible to receive an ISO. The granting of any Option to any individual shall neither entitle that individual to, nor disqualify him or her from, participation in any other grant of Options.

Section 6
Stock Reserved For Options

6.1    <u>Aggregate Number of Shares Available for Options</u>. Subject to adjustment as provided in Section 8, the maximum number of shares of Common Stock to be reserved for issuance under the Plan shall be 17,500 shares, all of which are entitled (but not required) to be

treated as ISOs. Any or all of the shares of Common Stock subject to Options under the Plan may be authorized but unissued shares, or shares issued under the Plan that have been or shall have been reacquired by the Company, as the Board may from time to time determine.

6.2     Lapsed, Forfeited or Expired Options.  If any Option granted under the Plan shall expire or terminate for any reason without having been exercised in full or shall cease for any reason to be exercisable in whole or in part, the unpurchased shares subject to such Option shall again be available for grants of Options under the Plan unless the Plan shall have been terminated.

Section 7
Stock Options

7.1     Grant of Options.  Subject to the limitations of the Plan, the Administrator may, after consultation with and consideration of the recommendations of the Board as the Administrator deems desirable, select those individuals to be granted Options and determine the time when each such Option shall be granted and such other terms of each Option.  The Administrator shall clearly designate and identify each Option at the time it is granted as either an ISO or a Non-Qualified Option, as the case may be.  The Grant Date of an Option under the Plan will be the date specified by the Administrator at the time it grants the Option; provided, however, that such date shall not be prior to the date on which the Administrator acts to approve the grant.  The Company shall have no liability to an Optionee or to any other party if an Option (or any portion thereof) that is intended to be an ISO is determined not to be an ISO (including, without limitation, due to the determination that the exercise price per share of the Option was less than the fair market value per share as of the Grant Date).  The Administrator may grant both ISOs and NQOs to the same employee, and the exercise of one such Option does not in any way affect the employee's right to exercise the other.

7.2     Exercise Price.  Unless the Administrator determines otherwise, the exercise price specified in the Option Agreement relating to each Option granted under the Plan shall be not less than the Fair Market Value on the Grant Date.

7.3     Exercise of Options.  The Administrator, in its discretion, shall prescribe in the option agreement the manner in which, the number and size of installments (which need not be equal) for which, and the contingencies upon which an Option may be exercised during its term.

7.4     Certain Additional Provisions for ISOs.

(a)     Exercise Price.  In the case of an ISO, the exercise price of an ISO shall be not less than 100% of the Fair Market Value on the Grant Date of the shares subject to the Option; provided, however, that if on the Grant Date, the Optionee (together with persons whose stock ownership is attributed to the Optionee pursuant to Section 424(d) of the Code) owns stock possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or any related corporation, the exercise price per share specified in the

859365-1

agreement relating to such ISO shall not be less than one hundred ten percent (110%) of the Fair Market Value per share of Common Stock on the Grant Date.

(b)    Exercisability.  Each eligible employee may be granted Options treated as ISOs only to the extent that, in the aggregate under this Plan and all incentive stock option plans of the Company, ISOs do not become exercisable for the first time by such employee during any calendar year with respect to stock having a Fair Market Value (determined at the time the ISOs were granted) in excess of $100,000. The Company intends to designate any Options granted in excess of such limitation as Non-Qualified Options to the extent required by Section 422 of the Code and issue such Non-Qualified Options in a separate option grant.  The rule set forth in the preceding sentence shall be applied by taking Options into account in the order in which they are granted.

(c)    Expiration.  No ISO may be exercised after the expiration of ten years from the Grant Date; provided, however, that if the Option is granted to an Optionee who, together with persons whose stock ownership is attributed to the Optionee pursuant to Section 424(d) of the Code, owns stock possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company, the ISO may not be exercised after the expiration of five years from the Grant Date.

(d)    Notice to Company of Disqualifying Disposition.  Each agreement under which an Optionee receives an ISO will require the Optionee to notify the Company in writing within ten days after the Optionee realizes he or she has made a Disqualifying Disposition of any shares received pursuant to the exercise of an ISO.

7.5    Certain Additional Provisions for Non-Qualified Stock Options

(a)    Non-Qualified Stock Options with Fair Market Value Exercise Price.  Unless otherwise determined by the Administrator pursuant to Section 7.5(b) below, to avoid a deferral of compensation falling within the requirements of Section 409A of the Code, any option to purchase stock, other than an Incentive Stock Option described in Section 422 of the Code, will have the following characteristics: (i) the exercise price will never be less than the Fair Market Value of the underlying stock on the date the option is granted; (ii) the receipt, transfer or exercise of the option will be subject to taxation under Section 83 of the Code, and (iii) the option will not include any feature for the deferral of compensation other than the deferral of recognition of income until the later of exercise or disposition of the option.

(b)    Non-Qualified Stock Options with an Exercise Price Less than Fair Market Value. Notwithstanding Section 7.5(a) above, to the extent that any Non-Qualified Option may constitute a deferral of compensation, such option shall comply with the requirements of Section 409A of the Code as set forth in the corresponding stock option agreement.

7.6    Termination of Employment, Death and Disability

859365-1

(a)     ISO.  Unless otherwise specified in the agreement relating to such ISO, if an ISO Optionee ceases to be employed by the Company (including retirement) other than by reason of death or Disability, no further installments of his or her ISOs shall become exercisable, and his or her ISOs shall terminate on the earlier of (a) ninety (90) days after the date of termination of his or her employment; provided, however, if such termination occurs by reason of death or Disability, such period shall be extended to one (1) year following the date of such event, or (b) their specified expiration dates, except to the extent that such ISOs (or unexercised installments thereof) have been converted into Non-Qualified Options pursuant to Section 7.7 hereof.

(b)     Non-Qualified Option.  If not otherwise specified in the option agreement or, in the absence of an option agreement, if not otherwise determined by the Administrator, in its sole discretion, a Non-Qualified Option must be exercised no later than the thirtieth (30th) day after the Optionee's termination of employment with the Company.

(c)     Leave of Absence.  For purposes of this Section, employment shall be considered as continuing uninterrupted during any bona fide leave of absence (such as those attributable to illness, military obligations or governmental service) provided that the period of such leave does not exceed ninety (90) days or, if longer, any period during which such Optionee's right to reemployment is guaranteed by statute.  A bona fide leave of absence with the written approval of the Administrator shall not be considered an interruption of employment, provided that such written approval contractually obligates the Company to continue the employment of the Optionee after the approved period of absence.

7.7     Transferability of Options.  Except as otherwise provided in an option agreement pertaining to Non-Qualified Options, no Option shall be assignable or transferable by the grantee except by will or by the laws of descent and distribution nor shall an Option be subject to attachment, execution or similar process.  Except as set forth in the previous sentence and except as otherwise provided in an option agreement pertaining to Non-Qualified Options, during the lifetime of a grantee, each Option shall be exercisable only by such grantee.  In the event of (a) any attempt by the Optionee to alienate, assign, pledge, hypothecate or otherwise dispose of the Option, except as provided in this Plan or in the underlying option agreement, or (b) the levy of any attachment, execution or similar process upon the rights or interest hereby conferred, the Company may terminate the Option by notice to the Optionee and it shall thereupon become null and void.

7.8     Cancellation of Options.  Except as otherwise expressly provided in the agreement pursuant to which an Option is issued, the Administrator may, in its sole discretion, in cases involving a serious breach of conduct by an employee or former employee, or activity of a former employee in competition with the business of the Company, cancel any Option, whether vested or not, in whole or in part.  Such cancellation shall be effective as of the date specified by the Administrator.

7.9     Other Stock Based Awards.  The Administrator shall have the right to grant other awards based upon the Common Stock having such terms and conditions as the Administrator may determine, including, without limitation, the grant of shares of Common

859365-1

Stock based upon certain conditions and restricted stock, provided, however, that the form and/or operation of such awards does not constitute "deferred compensation" under Section 409A of the Code or if such awards, in form and/or operation, constitute "deferred compensation", the award shall comply with the requirements of Section 409A of the Code as set forth in the corresponding award Agreement.

Section 8
Adjustments Upon Changes in Capitalization and "Terminating Transaction" Events

8.1   Upon the occurrence of any of the following events, an Optionee's rights with respect to Options granted to such Optionee hereunder shall be adjusted as hereinafter provided, unless otherwise specifically provided in the option agreement:

(a)   Stock Dividends and Stock Splits.  If the shares of Common Stock of the Company shall be subdivided or combined into a greater or smaller number of shares or if the Company shall issue any shares of its Common Stock as a stock dividend on its outstanding Common Stock, the number of shares of Common Stock deliverable upon the exercise of Options shall be appropriately increased or decreased proportionately, and appropriate adjustments shall be made in the exercise price per share to reflect such subdivision, combination or stock dividend.  Notwithstanding the foregoing, any adjustment under this Section shall not be permitted to the extent that such adjustment causes the Option or this Plan to constitute deferred compensation subject to Section 409A of the Code unless the option agreement sets forth the terms and conditions necessary to comply with the requirements of Section 409A of the Code.

(b)   Recapitalization or Reorganization.   In the event of a recapitalization, reorganization or similar change with respect to the capital stock of the Company (other than in connection with a Change in Control (as defined in Section 8.1(c) below)) pursuant to which securities of the Company or of another corporation are issued with respect to the outstanding shares of Common Stock, an Optionee upon exercising an Option shall be entitled to receive for the purchase price paid upon such exercise the securities he or she would have received in such recapitalization, reorganization or similar change if he or she had exercised his or her Option immediately prior thereto.  Notwithstanding the foregoing, any adjustment under this Section shall not be permitted to the extent that such adjustment causes the Option or this Plan to constitute deferred compensation subject to Section 409A of the Code unless the option agreement sets forth the terms and conditions necessary to comply with the requirements of Section 409A of the Code.

(c)   Change in Control.  Notwithstanding any other provision of the Plan, but subject to the provisions of Section 409A of the Code and subject to, and unless otherwise provided in, the provisions of any particular option agreement, in the event of any Change in Control (as defined below) of the Company, and in anticipation thereof if required by the circumstances, but in all cases subject to the consummation thereof, the Administrator, in its sole discretion, may, on either an overall or on an Optionee by Optionee basis, (i) accelerate the exercisability, prior to the effective date of such Change in Control, of any outstanding Options, (ii) upon written notice, provide that any outstanding Options must be exercised, to the extent then exercisable, within a specified number of days after the date of such notice, at the end of which period such Options

859365-1

shall terminate, (iii) if there is a surviving or acquiring entity, cause that entity or an affiliate of that entity to grant replacement Options having such terms and conditions as the Administrator determines to be appropriate in its sole discretion, upon which replacement the replaced Options shall be terminated or cancelled, as the case may be, (iv) terminate any outstanding Options and make such payments, if any, therefor (or cause the surviving or acquiring entity to make such payments, if any, therefor) as the Administrator determines to be appropriate in its sole discretion, upon which termination such Options shall immediately cease to have any further force or effect, or (v) take any combination (or none) of the foregoing actions. Except as otherwise may be required with respect to any Option constituting deferred compensation under Section 409A of the Code, for purposes of this Plan, a "**Change in Control**" shall mean a single transaction or series of related transactions, other than an Initial Public Offering (unless otherwise specified in the provisions of a particular option agreement), pursuant to which a person or persons, other than existing stockholders of the Company (i) acquires capital stock of the Company possessing the voting power to elect a majority of the Board, (ii) consummates a merger, amalgamation or consolidation with the Company as a result of which the stockholders of the Company who own common stock or other voting securities prior to such transaction(s) shall own, directly or indirectly, less than fifty percent (50%) of the voting securities of the surviving entity, or (iii) acquire all or substantially all of the assets of the Company.

(d)    Dissolution or Liquidation.    Unless otherwise specified in the provisions of a particular option agreement, in the event of the proposed dissolution or liquidation of the Company, each Option will terminate immediately prior to the consummation of such proposed action or at such other time and subject to such other conditions as shall be determined by the Administrator.

8.2    Assumption of Options Upon Certain Events.    In connection with a merger or consolidation of an entity with the Company or the acquisition by the Company of property or stock of an entity, the Administrator may grant Options under the Plan in substitution for stock and stock based awards issued by such entity or affiliate thereof, as long as such substitute Option will not constitute a deferral of compensation under Section 409A of the Code. Notwithstanding the foregoing, to the extent that the Administrator determines that any such substitute Option shall constitute a deferral of compensation under Section 409A of the Code, such Option shall be accompanied by a written option agreement which shall set forth the terms and conditions required to comply with the requirements of Section 409A of the Code. The substitute Options shall be granted on such terms and conditions as the Administrator considers appropriate in the circumstances.

8.3    No Effect.    Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares subject to Options. No adjustments shall be made for dividends paid in cash or in property other than securities of the Company.

8.4    Appropriate Adjustments.    Upon the happening of any of the events described in Section 8.1 above, the class and aggregate number of shares set forth in Section 6.1 hereof that are subject to Options which previously have been or subsequently may be granted under the

859365-1

Plan shall also be appropriately adjusted to reflect the events described in such subparagraphs. The Administrator or the Board shall determine the specific adjustments to be made under this Section 8.4 and, subject to Section 4.2, its determination shall be conclusive.

Section 9
Amendment and Termination

The Board may amend, suspend or terminate the Plan in whole or in part at any time and for any reason; provided, however, that any amendment of the Plan which is necessary to comply with any applicable tax or regulatory requirement, including any requirements for exemptive relief under Section 16(b) of the Exchange Act or any successor provision, shall be subject to the approval of the Company's stockholders. The Administrator may amend, modify or terminate any outstanding Option, including without limitation changing the dates of vesting, exercise or settlement, causing the Option to be assumed by another entity, and converting an ISO to a NQO, provided that the Optionee's consent to such action shall be required unless the terms of the Option permit such action, the Administrator determines that such action is required by law, or the Administrator determines that the action, taking into account any related action, would not materially and adversely affect the Optionee. Unless terminated earlier by the Board, the Plan shall terminate on the tenth anniversary of the Plan's date of adoption by the Board. In no event shall any Options be made under the Plan after such expiration date, but Options previously granted may extend beyond such date.

Section 10
Legal Construction

10.1    Severability. In the event any provision of the Plan is held invalid or illegal for any reason, the illegality or invalidity shall not affect the remaining provisions of the Plan, and the Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

10.2    Governing Law. The Plan and all rights under the Plan shall be construed in accordance with and governed by the internal laws of the State of Delaware, without giving effect to the principles of the conflicts of laws thereof.

****

859365-1

Adopted as of the date first written above.

EIC ACQUISITION CORP.

By: _____

Name:   Steven C. Rodger

Title:   President