# Exhibit G

1993 WL 723477
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Michael J. CAPIZZI, Plaintiff,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION as Liquidating Agent for First American Bank For Savings, et al., Defendants.

Civ. A. No. 90–12775–S.
|
March 9, 1993.

**Attorneys and Law Firms**

David J. Fine, Dangel & Fine, Boston, MA, for Michael J. Capizzi.

Marie F. Mercier, Kotin, Crabtree & Strong, Boston, MA, for First American Bancorp., Inc.

William L. Prickett, Testa, Hurwitz & Thibeault, Boston, MA, for F.D.I.C., as Liquidating Agnet for 1st American Bancorp., Inc., and Comm. Ave. Realty Corp.

Andrew C. Griesinger, Laura S. Peabody, Choate, Hall & Stewart, Boston, MA, for New England and Financial Resources, Inc., Robert J. Eisenberg, Nancy B. Adams and Gateway Realty Trust.

Geoffrey C. Cook, William L. Patton, Robert J. Stillman, John R. Baraniak, Jr., James L. Sigel, Ropes & Gray, Boston, MA, for Federal Deposit Ins. Agent, as liquidating agent for First American Bank For Sav.

Bruce V. O'Donnell, Managing Atty., F.D.I.C., Franklin, MA, for Federal Deposit Insurance Corporation.

Erik Lund, Posternak, Blankstein & Lund, Boston, MA, for the" First American Office Defendants".

Roger A. Cox, Boston, MA, for Michael J. Capizzi.

MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

SKINNER, District Judge.

*1 Plaintiff Michael J. Capizzi, a Massachusetts real estate developer, brought this action in Massachusetts Superior Court against First American Bank for Savings; former First American officers David A. Tapley, Norman B. Williamson, Jeffrey M. Liber, Barry L. Queen, Frank P. Celino and Donald C. McLeod; New England Financial Resources, Inc., which along with First American provided development financing to Capizzi; two N.E. Financial officers, Robert J. Eisenberg and Nancy B. Adams; and two other entities, Commonwealth Avenue Realty Corporation ("CARC") and Gateway Realty Trust, connected respectively to First American and N.E. Financial.

Capizzi alleges that First American and N.E. Financial, along with their individual officers and affiliated business entities, made and then broke various promises relating to financing for several development projects. More specifically, according to the amended complaint filed on May 11, 1990, Capizzi asserts that a fiduciary relationship was created by the parties' ongoing business relationships and by the parties' six joint venture agreements. Capizzi asserts that each defendant, either directly or indirectly by aiding and abetting the other defendants, breached their fiduciary duties (Count III). Capizzi also alleges that all of the defendants violated MASS.GEN.L. ch. 93A, §§ 2 and 11 by systematically violating contractual obligations and promises upon which Capizzi justifiably relied, by repeatedly breaching fiduciary obligations, and by coercing Capizzi to execute personal guaranties and releases (Count IV). As to First American and N.E. Financial specifically, Capizzi asserts breach of contract (Count I) and promissory estoppel (Count II). Additionally, Capizzi seeks imposition of a constructive trusteeship in his favor on certain properties that he was required to convey to CARC and Gateway Realty Trust (Count V). Finally, Capizzi seeks damages from N.E. Financial, Eisenberg and Adams for negligent mismanagement of one project (Count VI).

On October 10, 1990, the Commissioner of Banks for the Commonwealth of Massachusetts seized First American's property and business and appointed the FDIC as liquidating agent. The FDIC subsequently removed the action to this court. The FDIC is now the real party in interest under FED.R.CIV.P. 17(a).

There are three separate, opposed summary judgment motions presently pending. In addition to a variety of other contentions, which in light of my present findings need not be addressed, all of the defendants maintain that Capizzi's present action is barred by the releases he executed on May 20, 1988, October 30, 1989 and January

9, 1990 respectively. In opposition to summary judgment, Capizzi asserts that all three releases are unenforceable because they were executed under economic duress.[1] Therefore, the threshold issue to be resolved is whether Capizzi can assert economic duress as a valid defense to the enforcement of the releases. As a matter of law, he cannot and the defendants are entitled to summary judgment to the extent that Capizzi has released them from such liability.

## DISCUSSION

A. *Standard of Review*

### 1. SUMMARY JUDGMENT

**\*2** While the initial burden of averring an "absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986), is on the party seeking summary judgment, the nonmovant must then present evidence demonstrating a "sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). Rule 56 mandates that judgment be entered against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322; *see also* FED.R.CIV.P. 56. In making this determination, I review the record "in the light most amiable to the nonmovants and indulge all reasonable inferences favorable to them." *FDIC v. World Univ. Inc.,* 978 F.2d 10, 13 (1st Cir.1992) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990)).

### 2. ECONOMIC DURESS

A party claiming economic duress bears a heavy burden. *Boston Shipyard Corp v. United States,* No. 87–3047, 1988 WL 115061, \*3, 1988 U.S.Dist. LEXIS 12737, \*7 (D.Mass. Oct. 26, 1988) (applying Massachusetts law). In the settlement context, Massachusetts courts have defined economic duress as " 'such fear as precludes' the settling party 'from exercising free will and judgment.' " *Ismert & Assocs., Inc. v. New Eng. Mut. Life Ins. Co.,* 801 F.2d 536, 548 (1st Cir.1986) (Breyer, Coffin, JJ., concurring) (quoting *Coveney v. President of College of Holy Cross,* 445 N.E.2d 136, 140 (Mass.1983)). The party seeking to benefit from the doctrine must demonstrate the following elements:

> (1) That one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; (3) that said circumstances were the result of coercive acts of the opposite party.

*Id.* at 548–49 (quoting *International Underwater Contractors, Inc. v. New Eng. Tel. & Tel. Co.,* 393 N.E.2d 968, 970 (Mass.App.Ct.1979)); *see also Teradyne, Inc. v. Mostek Corp.,* 797 F.2d 43, 57 (1st Cir.1986) (citation omitted). These elements clearly indicate that "[m]erely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion." *International Underwater Contractors, Inc. v. New Eng. Tel. & Tel. Co.,* 393 N.E.2d at 970 (quoting Williston, Contracts § 1617 at 708 (3d ed. 1970)). Stated differently, the "assertion of duress must be proved by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities." *Id.* (quoting *W.R. Grimshaw Co. v. Nevil C. Withrow Co.,* 248 F.2d 896, 904 (8th Cir.1957)).

Massachusetts law favors the private settlement of disputes. *Ismert & Assocs., Inc. v. New Eng. Mut. Life Ins. Co.,* 801 F.2d at 550 (citation omitted). In keeping with this long standing public policy, the Commonwealth's courts strictly interpret the "no feasible alternative" or "no real choice" element, particularly in the commercial context, such as here, where the parties "have dealt at arm's length through counsel." *Id.*

**\*3** Moreover, if the party claiming duress does not contest the validity of the release within a reasonable time, the contract will be deemed to have been ratified and affirmed. *In Re Boston Shipyard Corp.,* 886 F.2d 451, 455 (1st Cir.1989). Ratification may be found under a variety of circumstances:

> first, by intentionally accepting benefits under the contract; second, by remaining silent or acquiescing in the contract for a period of time after he has had the opportunity to avoid it; and third, by recognizing its validity ... by acting upon it, performing under it, or affirmatively acknowledging it.

*Id.* (quoting *United States v. McBride,* 571 F.Supp. 596, 613 (S.D.Tex.1983)).

With these standards in mind, I turn to the substance of Capizzi's economic duress claims.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 2

Case 1:17-cv-11169-FDS Document 9-7 Filed 08/25/17 Page 4 of 12

Capizzi v. F.D.I.C., Not Reported in F.Supp. (1993)

**B. *Relevant Facts Relating to Releases***

At bottom, Capizzi claims that the defendants affirmatively created coercive conditions that caused him to execute oppressive settlement agreements. I review the circumstances surrounding each of the purported settlement agreements in the light most favorable to Capizzi.

Capizzi has been a real estate developer in Massachusetts for over 19 years. His business relationship with First American began in October 1984 when the parties allegedly entered a joint venture agreement for the development of the Charles Bullfinch building, which was successfully completed in October 1986. While the Charles Bullfinch project was pending, First American agreed to provide Capizzi with financing for five additional projects: (1) Berkshire Mill, (2) Lincoln Wharf Power Station, (3) Charles Daniels Apartments, (4) Gateway and (5) Residences at the Quadrangle. For a time, the parties' business relationship apparently flourished and by the end of January 1987, First American had agreed to provide financing for four additional projects: (1) Purcell Farm Estates, (2) Cooper's Farm Estates, (3) Coe's Pond Estates and (4) Sawyer Mill Pond.

In March 1987, however, difficulties between Capizzi and First American began to surface. At that time, certain First American officers expressed concern over the bank's substantial financial commitment to Capizzi's projects. While assuring Capizzi that First American would continue to honor its obligations, the bank's officers asked Capizzi to seek additional or alternative financing from other sources, particularly N.E. Financial.

Capizzi complied with these requests and, ultimately, N.E. Financial agreed to finance the Gateway, Purcell Farm, Charles Daniels and Residences at the Quadrangle projects. In addition, N.E. Financial agreed to fund a tenth project that First American had rejected, Queensbury Court. As a result of these multiple development projects, Capizzi alleges that he became increasingly dependant on First American and N.E. Financial for continued financial support, and that First American and N.E. Financial thereby gained disproportionate bargaining power.

*4 Between the spring 1987 and winter 1989–90, Capizzi asseverates that his relationship with the defendants continued to deteriorate because First American and N.E. Financial repeatedly violated their financial commitments, subjecting him to even greater financial and emotional pressure and strain. In early May 1988, for instance, Capizzi alleges that, as a condition to participating in the refinancing of the Gateway project, N.E. Financial forced him to accept two unfavorable modifications to his earlier agreements with First American. First, N.E. Financial allegedly demanded that Capizzi and his business partner, John A. Brennan, personally guarantee the loans for the Gateway and Charles Daniels projects. Capizzi asserts that this was contrary to First American's earlier promise that the same loans would be non-recourse. This modification dramatically increased Capizzi's personal liability and allegedly heightened the already intense financial and emotional pressure surrounding his projects.

A second condition imposed by N.E. Financial was Capizzi's promise to forego payment of a $2.4 million property value enhancement on the Gateway project that resulted from a favorable rezoning petition. According to the amended complaint, this demand was also contrary to Capizzi's original agreement with First American. Allegedly, First American originally promised that any increase in the Gateway project's value that may result from the rezoning application would be paid directly to Capizzi and Brennan, and would not be part of the alleged joint venture with First American. In order to get N.E. Financial to participate in the financing, Capizzi was forced to leave the money attributable to the property value enhancement in the project.

Capizzi alleges that had the defendants fulfilled their original obligations his "financial position in 1989 would have been far better than it was." (Capizzi Aff. Oct. 18, 1990 ¶ 27.) He describes his predicament in agreeing to the modifications as follows:

> Neither Mr. Brennan nor I received anything in return for agreeing to these demands by [N.E. Financial]. We simply had to agree to them, or face [N.E. Financial]'s refusing to provide financing for the projects in question. Given the enormous financial pressure we were under, and the certain prospect of bankruptcy and financial ruin if [N.E. Financial] abandoned the projects, Mr. Brennan and I had no choice but to accede to [N.E. Financial]'s demands.

*Id.* at ¶ 25.

1. QUEENSBURY RELEASE

The relationship between the parties continued to deteriorate. In fact, during a December 3, 1987 meeting

with N.E. Financial, Capizzi threatened to sue N.E. Financial if it did not follow through on its promise to finance the Queensbury Court project. While the parties disagree as to whether N.E. Financial breached any obligations regarding Queensbury Court, it is undisputed that the parties negotiated a settlement of the dispute. The negotiations, which culminated in the Queensbury Release, lasted for nearly five months, during which time Capizzi was represented by counsel. At least one draft letter agreement was prepared, to which Capizzi's counsel requested and received one modification.[2]

**\*5** Under the terms of the final letter agreement, a non-refundable $100,000 commitment fee paid by Capizzi for the Queensbury Court project would be applied as payment toward the Gateway project. In addition, Capizzi promised to release N.E. Financial from all claims arising from the proposed financing of the Queensbury Court project. The letter agreement was signed by Capizzi and assented to by Eisenberg as president of N.E. Financial.

Capizzi alleges that he signed the letter agreement under duress because Eisenberg threatened to breach N.E. Financial's commitment on the Gateway project, unless Capizzi released N.E. Financial from any liability regarding Queensbury Court. Capizzi also asserts that defendant Frank Celino, a First American vice president, threatened that Capizzi's entire portfolio with First American would be affected, unless Capizzi released N.E. Financial from the Queensbury Court project and N.E. Financial assumed First American's commitment on the Gateway project. By threatening to cut off financing for the Gateway project, Capizzi alleges that his entire portfolio with First American was put in jeopardy. He offers the following explanation:

> ... at the time Mr. Eisenberg and Mr. Celino made the foregoing statements to me. Mr. Brennan and I could not have been in a more vulnerable position regarding the Gateway project. Construction was already well under way, Mr. Brennan and I were personally liable on notes to [First American] for over 10 million dollars, and we had no alternative source of financing to turn to. [First American] itself had told us it could not provide significantly more financing than it already had, and we knew of no other place to go. The market for lenders willing to take on a large condominium project like Gateway was extremely bad, and we knew of no lenders who would have even the slightest interest. Moreover, the timing could not have been worse. Because we relied so completely on [N.E. Financial] to keep its word, we had no active applications for financing with any other lenders. Even if the market for lenders had been better, there would not have been enough time to try to find another lender, and to go through the entire application process that we had already gone through with first [First American] and then [N.E. Financial], from scratch. Therefore, I believed that I had no choice by to accede to Mr. Eisenberg's demand for a release regarding Queensbury Court. I believed that if I did not agree to sign a Queensbury release, I would have been thrown into bankruptcy and been completely ruined financially. Accordingly, I agreed, under duress, to sign a Queensbury release on or about January 1988, and did in fact sign such a release in May 1988, the signed release being one of the documents [N.E. Financial] required as a condition for closing on the [N.E. Financial] financing of the Gateway Project in May 1988.

(Capizzi Aff. Oct. 18, 1990 ¶ 40.)

### 2. GATEWAY RELEASE

**\*6** Capizzi was ultimately successful in obtaining refinancing for the Gateway project, but less than a year later project costs were allegedly over budget. According to the loan documents, any cost overruns on the Gateway project were to be paid by Capizzi upon demand by the lender. In April 1989, N.E. Financial, on behalf of itself and other lenders, issued a notice of default on the Gateway loan and demanded payment for cost overruns.

The default was never cured, but the parties entered into settlement negotiations culminating in the second release signed by Capizzi, the Gateway Release. Negotiations on this settlement began in June and continued to October

Case 1:17-cv-11169-FDS   Document 9-7   Filed 08/25/17   Page 6 of 12

Capizzi v. F.D.I.C., Not Reported in F.Supp. (1993)

1989. Early on in the negotiations, Brennan's counsel threatened, by letter dated June 2, 1989, to file a lender liability action against N.E. Financial unless a settlement could be reached. In the same letter. Brennan's counsel suggested that in exchange for being released from personal liability on the loans, Capizzi and Brennan would transfer title to the Gateway project to the lenders.

Capizzi, who was also represented by counsel, attended the July 6, 1989 meeting where the basic terms of the settlement were negotiated. At least eight draft settlement agreements and related documents were exchanged and reviewed by the parties between August 1 and October 30, 1989. In his deposition testimony, Capizzi's counsel acknowledged that, "I believe that between July 11, 1989, and October, 30 1989[,] I discussed with Mr. Capizzi more that 20 times some aspect of the terms of the deal." (Griesinger Aff. Ex. 2 at 7.) In fact, Capizzi, through counsel, requested and received several changes in the proposed settlement agreement.

Under the terms of the final agreement, which was signed on October 30, 1989, Capizzi and Brennan released N.E. Financial and First American from all claims arising from the Gateway project and turned title to the Gateway project over to defendants Eisenberg and Adams in their capacity as trustees for Gateway Realty Trust. In return, N.E. Financial and First American, among other things, released all claims they had against Capizzi and Brennan, including any claims arising from the personal guaranties that were executed by the partners in May 1988. At the time of settlement, Capizzi also executed an Affidavit and Estoppel Certificate, in which he attested under oath that he was acting freely and voluntarily, not under duress. Following settlement, the defendants released additional funds to complete the Gateway project.

Capizzi asserts that he signed the settlement under duress because First American threatened to withhold additional funds that were necessary to install windows in the Gateway structure unless Capizzi and Brennan signed the release. The window installation was particularly critical because the weather was getting colder and significant damage could be inflicted on the structure if adequate windows were not installed. In addition, Capizzi alleges that defendant Barry Queen, a First American vice president, threatened to foreclose on all of Capizzi's projects with First American and force Capizzi into bankruptcy unless the release was executed. Capizzi summarizes the circumstances leading up to the signing of the Gateway Release as follows:

> *7 In early 1989, [First American] and [N.E. Financial] began to put pressure on Mr. Brennan and me to agree to a "workout" pursuant to which we would, among other things, agree to deed the Gateway project to a special entity formed by [N.E. Financial] to hold title to the project. Mr. Brennan and I were extremely vulnerable to this pressure precisely because the violations of their commitments committed by [N.E. Financial] and [First American] ... had pushed Mr. Brennan and me to the brink of bankruptcy. For example, had [First American] and [N.E. Financial] lived up to the original agreement with us that the Gateway financing was to be non-recourse, Mr. Brennan and I would not have been personally liable for the outstanding debt on the Gateway project. But because they had not done so, and had required us to sign, under duress, personal guaranties for the Gateway financing in 1988, Mr. Brennan and I were confronted with personal liability of staggering proportions. Moreover, [N.E. Financial] used this personal liability to impose its will upon us in the most bare-knuckled fashion. Thus, on May 19, 1989, Mr. Eisenberg sent Mr. Brennan and me a letter ... formally demanding that we come up with $16.8 million "in cash or other collateral" to cure an alleged "out-of-balance" circumstance that had arisen regarding the Gateway project. On information and belief, at the time Mr. Eisenberg sent this letter, he knew full well that Mr. Brennan and I had no way of raising anything near $16.8 million, and sent the letter for the sole purpose of coercing us into agreeing to the "workout" he wanted.

(Capizzi Aff. Oct. 18, 1990 ¶ 26.)

With regard to his personal finances, Capizzi states:

> At the same time, my personal

Case 1:17-cv-11169-FDS   Document 9-7   Filed 08/25/17   Page 7 of 12

Capizzi v. F.D.I.C., Not Reported in F.Supp. (1993)

financial position had become dire. I owed hundreds of thousands of dollars to third parties in construction costs in connection with the Purcell Farm project, the Berkshire Mill project, and other projects. Subcontractors had either been threatening lawsuits or saying they would go out of business unless I paid them. Many creditors did file suit—over 15 such suits had been filed by the end of October 1989—and a number sought to put me into receivership.

(Capizzi Aff. Feb. 7, 1991 ¶ 8.)

### 3. OMNIBUS RELEASE

By the summer of 1989, First American considered Capizzi to be in default on several loans. As a result, the parties entered into negotiations leading to the Omnibus Release. As with the two prior releases, Capizzi was represented by counsel and negotiations occurred over a period of several months, from June 1, 1989 to January 9, 1990. Counsel for the parties met on six separate occasions during the negotiations. Capizzi personally attended four of meetings. Several draft agreements were discussed and reviewed. In fact, Capizzi requested and received several changes prior to signing the final agreement.

In the Omnibus Release, Capizzi and Brennan released First American from any liability relating to all of the projects financed by First American. As a condition to settlement, Capizzi was required to deed the Berkshire Mill, Purcell Farms and Charles Daniels projects to defendant CARC. In return, First American, among other things, forgave approximately $18,650.000 in loans and lines of credit extended to Capizzi.

### C. *Enforceability of Releases*

\*8 Despite the generous reading to which Capizzi's allegations are entitled, the record evidence demonstrates that, as a matter of law, Capizzi's claims of economic duress are not well founded. Capizzi has failed to demonstrate that material factual issues exist regarding (1) his ratification of the Queensbury Release and (2) the absence of at least two elements essential to his economic duress defense.

#### 1. RATIFICATION

Even assuming that Capizzi were able to demonstrate economic duress regarding the Queensbury Release, the record evidence indicates that Capizzi ratified the agreement in at least two respects. First, Capizzi accepted and retained the benefits conferred by N.E. Financial's return of the $100,000 commitment fee and by N.E. Financial's refinancing of the Gateway project. Second, Capizzi remained silent, apparently acquiescing in the settlement, for nearly two years after executing the release.

Under Massachusetts law, a party claiming economic duress must do so promptly or it will be deemed to have waived its right to the defense. *In re Boston Shipyard Corp.*, 886 F.2d at 455 (citing *DiRose v. PK Management Corp.*, 691 F.2d 628, 633–34 (2d Cir.1982), *cert. denied*, 461 U.S. 915 (1983)). Here, Capizzi signed the Queensbury Release on May 20, 1988, but waited until filing the present action on March 16, 1990 to raise economic duress as a defense. During this time, Capizzi retained the benefits of his settlement agreement and continued working with N.E. Financial on a myriad of projects. Based on this uncontradicted record evidence, I find that there is no material factual dispute regarding Capizzi' ratification of the Queensbury Release.

While material factual issues remain regarding Capizzi's alleged ratification of the Gateway and Omnibus Releases, I find that Capizzi's economic duress defense fails for an alternative reason. Capizzi has failed to demonstrate that the circumstances surrounding each of the challenged releases permitted no available alternatives or that his will was overborne. Since these conclusions apply equally to the Queensbury Release, I elect to address the enforceability of all three challenged releases.

#### 2. NO OTHER ALTERNATIVES & INVOLUNTARINESS

Where, as is manifest here, the avenue of litigation is available, but the party elects to ignore that option in favor of settlement, it cannot be said that the resulting settlement agreement was the product of duress. In this regard, I am guided by our court of appeal's opinion in *Ismert & Assocs., Inc. v. New Eng. Mutual Life Ins. Co.*, 801 F.2d at 549. In that case, the court affirmed entry of summary judgment against a plaintiff who, like Capizzi, alleged that the release it executed under a settlement agreement was unenforceable due to economic duress. *Id.* The majority of the court rejected the plaintiff's contention and noted the following:

> Ismert's claim that it had no

Case 1:17-cv-11169-FDS   Document 9-7   Filed 08/25/17   Page 8 of 12

Capizzi v. F.D.I.C., Not Reported in F.Supp. (1993)

alternative rests upon its assertion that, in the absence of settlement, NEL would have demanded that Ismert repay its loan on schedule, and that this demand would have forced Ismert into bankruptcy. Yet, this assertion overlooks the fact that, in order to enforce its demand over Ismert's objection, NEL would have had to bring a legal action—and Ismert could then have raised its claims against NEL in defense. Alternatively, Ismert might have refused to sign a release and brought its own action against NEL—leaving NEL to counterclaim for repayment of the loan.

**\*9** *Id.*

In my view, a similar analysis governs the present case. Like the plaintiff in *Ismert,* Capizzi faced the threat of foreclosure and discontinued financing unless he agreed the releases. Capizzi had the option of waiting for the defendants to foreclose and raising the defendants' alleged violations as a defense or initiating his own affirmative suit against the defendants. By his own admission, Capizzi acknowledges that he knew of the defendants' alleged contractual violations as early as spring 1987. He also knew that he had viable claims against the defendants. In fact, in December 1987 Capizzi threatened to bring legal action against N.E. Financial for not honoring its promise to refinance the Gateway project. Capizzi's partner threatened a similar lender liability suit in June 1989. Despite these threats, Capizzi and his partner chose to resolve their ongoing disputes with the defendants in exchange for gaining additional financing.

Capizzi fails to show why he could not have averted his predicaments in May 1988, October 1989 and January 1990 respectively by suing the defendants as he threatened. Instead, in each instance, Capizzi chose to wait rather than to sue. These voluntary business choices fatally undermine Capizzi's present claims of economic duress. As our circuit court observed in *Ismert:*

> ... long before the parties began negotiating over a release, Ismert knew of NEL's alleged wrongful acts and had the opportunity to seek redress in court. NEL terminated one-third of its general agents in the summer of 1982. That fall, Ismert had 'numerous conversations' with NEL and threatened to bring suit for breach of contract. In July 1983 Ismert told NEL that NEL's breach of contract was forcing Ismert out of business. But negotiations over a release did not begin until September 1983, and Ismert did not sign a release form until July 1984. Having alleged these facts, Ismert has not gone on to show why it could not have averted its July 1984 predicament by suing NEL, as in fact it threatened to do. Ismert chose to wait rather than to sue; and that choice, at least in part, contributed to Ismert's later predicament.

*Id.* at 549–50.

Moreover, apart from any lender liability or breach of contract action, Capizzi could have sought the protection afforded by the Bankruptcy Code. While Capizzi apparently disregards bankruptcy as a viable alternative, several courts have held that bankruptcy is a valid legal option sufficient to defeat an economic duress claim. *See, e.g., Freedlander, Inc. v. North Carolina Nat'l Bank,* 706 F.Supp. 1211, 1216 (E.D.Va.1988) (assessing claim of economic duress under Virginia law, which is substantively similar to Massachusetts' treatment of the defense). As one court observed:

> Threatened bankruptcy is insufficient to create economic duress. Quite the contrary is true on defendants' own version of things: Bankruptcy proceedings would appear to have been their opportunity for legal escape from oppressive demands by [creditors]. Any resulting financial embarrassment from declaring bankruptcy is not sufficient to explain why such legal redress would be inadequate.

**\*10** *Id.* (quoting *FDIC v. Linn,* 671 F.Supp. 574, 560 (N.D.Ill.1987)).

In short, Capizzi's present claims demonstrate the type of "[h]eads I win, tails you lose" mentality that Massachusetts law expressly disfavors. *See Ismert &*

Case 1:17-cv-11169-FDS   Document 9-7   Filed 08/25/17   Page 9 of 12

Capizzi v. F.D.I.C., Not Reported in F.Supp. (1993)

*Assocs., Inc. v. New Eng. Mut. Life Ins. Co.,* 801 F.2d at 550–51. As early as December 1987, Capizzi made a business decision to settle his disputes with First American and N.E. Financial, rather than pursue available legal remedies. As I noted earlier, Massachusetts law strictly interprets the no real choice concept, particularly in the commercial context. *Id.* As a matter of law, I find that Capizzi has failed to establish that a material factual issue exists as to this essential element of his economic duress defense.

In addition, the circumstances surrounding Capizzi's assent to each of the releases significantly undermines his contention that he did so "under the influence of such fear as preclude[d] him from exercising free will and judgment." *Delaney v. Chief of Police of Wareham,* 539 N.E.2d 65, 70 (Mass.App.Ct.1989) (citing *Coveney v. President of College of Holy Cross,* 445 N.E.2d at 140). Capizzi was a sophisticated businessman with nearly two decades of experience in real estate development. Throughout the extensive negotiations leading up to each release, Capizzi was represented by able counsel. The record evidence clearly indicates that Capizzi actively consulted with counsel regarding his settlement options. Capizzi's counsel acknowledged, for instance, that he advised Capizzi regarding the Gateway Release alone on at least 20 separate occasions.

While Capizzi correctly notes that the presence of counsel during negotiations does not necessarily defeat his claim of economic duress, legal representation is certainly relevant to the issue of voluntariness. *Ismert & Assocs., Inc. v. New Eng. Mut. Life Ins. Co.,* 801 F.2d at 545. It strongly suggests that Capizzi was fully informed of both his settlement alternatives and his rights under the proposed agreements. At the very least, the presence of counsel acted as a calming influence, enabling Capizzi to rationally assess his alternatives and make an informed decision. *See Freedlander, Inc. v. North Carolina Nat'l Bank,* 706 F.Supp. at 1222.

Capizzi's ability to rationally weigh his options is also evidenced by the significant changes that he suggested, either directly or through counsel, to the numerous draft releases that were exchanged in the course of negotiations. Moreover, the defendants' contention that each release was negotiated over a period of several months is uncontradicted by the record. In addition to indicating that Capizzi had adequate opportunity to consider each proposed settlement, the protracted negotiations surrounding each release also reveal an absence of urgency, that is typically present in cases alleging economic coercion. *Id.* As other courts have noted, "time plays a critical role in this causation assessment because duress is usually marked by immediacy." *Id.* at 1216. Here, the lapse of time between the initiation of settlement discussions and the closing of each settlement significantly undermines Capizzi's present claim that he was coerced into releasing the defendants from liability.

**\*11** More specifically, with regard to the Queensbury Release, the record evidence directly refutes Capizzi's contention that he signed the Queensbury Release under economic duress. While the final version of the release was not signed until May 20, 1988, Capizzi acknowledges that he agreed to sign a release regarding the Queensbury Court project as early as January 1988. This acknowledgement demonstrates that Capizzi made the operative decision to execute a release several months prior to allegedly being forced, in early May 1988, to surrender his nonrecourse loan and enhanced property value rights.

In short, apart from Capizzi's conclusory allegation that his will was overborne, the record evidence surrounding each contested release negates this contention. Capizzi has not even attempted to reconcile the factual record surrounding each release with his present assertion of economic duress.

Under Rule 56, "... an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." FED.R.CIV.P. 56(e). Capizzi has failed to satisfy this burden because his affidavits regarding voluntariness are not responsive to the record evidence introduced by the defendants. Accordingly, I conclude that, even if Capizzi had no viable alternatives to settlement, the circumstances surrounding each release could lead to only one reasonable conclusion—that Capizzi's assent was "freely and voluntarily" obtained, as in fact he attested under oath. Capizzi's economic duress defenses fail as a matter of law.

### D. *Fiduciary Obligations*
Distinct from his claims of economic duress, Capizzi alleges that the releases should be set aside because they were obtained in violation of the defendants' fiduciary obligations. Capizzi alleges that fiduciary obligations were created by (1) the parties' long standing business relationships and, (2) more specifically, by the joint venture agreements allegedly entered into with the defendants. As a result of these alleged fiduciary

Case 1:17-cv-11169-FDS   Document 9-7   Filed 08/25/17   Page 10 of 12

Capizzi v. F.D.I.C., Not Reported in F.Supp. (1993)

obligations, Capizzi asserts that summary judgment is precluded because a material dispute exists regarding whether the releases were obtained "on fair terms" within the meaning of RESTATEMENT (SECOND) OF CONTRACTS § 173.[3]

"Traditionally, Massachusetts courts have viewed a bank's relationship to its customers simply as one of creditor and debtor," a relationship not giving rise to fiduciary obligations. *Flaherty v. Baybank Merrimack Valley, N.A.,* 808 F.Supp. 55, 64 (D.Mass.1992) (citation omitted). While Capizzi's dealings with the defendants were admittedly long standing, this fact alone cannot transform what was a business relationship between a lender and borrower into a fiduciary relationship. It has long been recognized under Massachusetts law that, "one party cannot unilaterally transform a business relationship into a fiduciary relationship by reposing trust and confidence in another." *Id.* (citations omitted).

*12 The only special circumstance that could give rise to fiduciary obligations on any defendant's part is Capizzi's allegation that, in addition to providing financing, First American held equity ownership interests in the Charles Bullfinch, Gateway, Purcell Farm, Cooper's Farm, Coe's Pond and Sawyer's Mill projects. (Am.Compl. ¶ 18.) Since "joint venturers owe one another substantially the same fiduciary duties as are owed by partners to one another," *Zimmerman v. Bogoff,* 524 N.E.2d 849, 855 (Mass.1988) (citing *DeCotis v. D'Antona,* 214 N.E.2d 21, 23 (Mass. 1966)), Capizzi has raised a genuine issue of fact regarding First American's fiduciary obligations.

With regard to the remaining defendants, including the individual First American officers, Capizzi has failed to allege any special circumstances beyond the traditional bank/borrower relationship to create a material dispute as to the existence of any fiduciary obligations on their part. Apart from First American, Capizzi has failed to produce any evidence establishing any of the elements characteristic of joint venture agreements under Massachusetts law.[4] As a matter of law, therefore, no fiduciary relationship could have been created with any of the defendants, except First American. *See Payton v. Abbott Labs,* 512 F.Supp. 1031, 1039 (D.Mass.1981) (Skinner J.) (summary judgment allowed where plaintiffs failed to produce any evidence raising a genuine dispute regarding any of the elements traditionally present in a joint venture enterprise).

Capizzi attempts to avoid this fact by alleging that each defendant knowingly and intentionally aided and abetted First American in violating its fiduciary obligations. However, Capizzi has failed to allege any specific facts supporting this assertion and his opposition memorandum is simply not responsive to the affidavits submitted by the individual defendants in support of summary judgment. Accordingly, Capizzi has failed to sustain his Rule 56 burden of producing sufficient facts to establish a material dispute on this point.

While Capizzi has raised a genuine issue regarding the existence of a fiduciary relationship with First American, the record evidence reveals no genuine factual issue regarding the fairness of Omnibus Release. Under § 173, the fairness of a contract is to be determined "in the light of the circumstance at the time of its making." RESTATEMENT (SECOND) OF CONTRACTS § 173 cmt. b. As I have already discussed, the circumstances here reveal that the parties negotiated the terms of each release at arm's length. Moreover, Capizzi has failed to allege with any particularity how or why the Omnibus Release or, for that matter, any of the releases were unfair. Accordingly, I conclude that no genuine issue exists as to the fairness of the Omnibus Release and that First American is also entitled to summary judgment on Capizzi's fiduciary claims.

E. *Remaining Claims*

None of the releases signed by Capizzi preclude his present claims against N.E. Financial relating to the Purcell Farm, Residences at the Quadrangle and Charles Daniels projects. Since material factual issues exist regarding whether N.E. Financial breached its oral promises to provide financing for these projects and whether Capizzi justifiably relied to his detriment on these alleged commitments, N.E. Financial's motion for summary judgment must be denied to the extent that it is based on the Purcell Farm, Residences at the Quadrangle and Charles Daniels projects.

*13 However, Capizzi's claims against the individual N.E. Financial defendants, Eisenberg and Adams, based on the same three projects must fail. Under Massachusetts law, corporate officers are not generally liable for the corporation's alleged breach of contract. *Union Mut. Life Ins. Co. v. Chrysler Corp.,* 793 F.2d 1, 11 (1st Cir.1986). As our court of appeals has noted, "[i]n the absence of malice, one who knowingly and voluntarily contracts with a corporation must look to the corporation, not to its officers, for redress, even for obvious failures to perform contractual promises." *Id.* at 11–12. Accordingly, Eisenberg and Adams are entitled to summary judgment on those claims relating to the Purcell Farm, Residences at the Quadrangle and Charles Daniels projects.

Finally, Capizzi alleges financial loss resulting from N.E.

Capizzi v. F.D.I.C., Not Reported in F.Supp. (1993)

Financial, Eisenberg and Adams' negligent mismanagement of the Gateway project. (Am.Com pl. ¶¶ 50–52.) Under Massachusetts law, however, a negligence claim cannot stand where the only damage claimed is economic harm. *See Bay State–Spray & Provincetown S.S., Inc. v. Caterpillar Tractor Co.,* 533 N.E.2d 1350, 1353 (Mass.1989). Since Capizzi has not alleged the type of physical damage to property or personal injury required to maintain an action for negligence, *see Marcil v. John Deere Indus. Equip. Co.,* 403 N.E.2d 430, 433–34 (Mass.App.Ct.1980), summary judgment is allowed on Count VI of the amended complaint.

CONCLUSION

Having failed to establish a material dispute regarding the enforceability of the May 1988, October 1989 and January 1990 releases, the majority of Capizzi's present claims are barred by the releases' express terms. Capizzi's fiduciary claims likewise fail as a matter of law. Accordingly, summary judgment in favor of all of the defendants, except N.E. Financial, is *allowed* as to all counts of the amended complaint.

With regard to N.E. Financial's summary judgment motion, the motion is allowed in part and denied in part. Summary judgment is *allowed* in favor of N.E. Financial on all counts except those claims not covered by the Queensbury and Gateway Releases. More specifically, summary judgment is *denied* with regard to N.E. Financial's alleged violations of oral agreements relating to the Purcell Farm, Daniels and Residences at the Quadrangle projects (Counts I, II & IV).

In view of my dismissal of the claims against First American and CARC, the FDIC's motion to dissolve the *lis pendens* on the Charles Daniels, Purcell Farms and Berkshire Mills properties is *allowed.* The FDIC's motion for summary judgment on its counterclaim for damages incurred in defending the present action is *denied.*

**All Citations**

Not Reported in F.Supp., 1993 WL 723477

Footnotes

1   Capizzi also asserts that N.E. Financial's present summary judgment motion is precluded by the endorsed order issued by the Suffolk Superior Court prior to removal. That order summarily denied N.E. Financial's previous summary judgment motion, raising nearly identical issues to the present motion.
    Capizzi's argument is without merit. The general rule is that, "[a]ny orders issued by the state court prior to removal are not conclusive in the federal action after removal; however, they do remain binding until set aside." 14A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3738 (1985). Accordingly, a federal court may properly allow summary judgment despite an earlier denial of the same motion by a state court. *Preaseau v. Prudential Ins. Co.,* 591 F.2d 74, 79 (9th Cir.1979); *see also Quinn v. Aetna Life & Casualty Co.,* 616 F.2d 38, 40–41 (2d Cir.1980) (federal court following removal was free to reexamine state court decision denying motion to dismiss, despite plaintiff's contention that the decision was binding as law of the case). The only case cited by Capizzi to support the contrary proposition, *Cities Serv. Co. v. United States,* 330 F.Supp. 421, 422 (S.D.N.Y.1971), did not involve removal from a state to federal court and is, therefore, inapposite.

2   Capizzi's counsel requested that the following sentence be deleted from the final draft:
    Despite [N.E. Financial's] willingness to proceed in accordance with the terms of the Commitment Letter, I failed to obtain in a timely manner certain zoning relief necessary to enable me to go forward with the [Queensbury] Project, and your obligations under the Commitment Letter expired.
    (Eisenberg Aff. Ex. 5–6.)

3   Section 173 provides as follows:
    If a fiduciary makes a contract with his beneficiary relating to matters within the scope of his fiduciary relation, the contract is voidable by the beneficiary, unless
    (a) it is on fair terms, and
    (b) all parties beneficially interested manifest assent with full understanding of their legal rights and of all relevant facts that the fiduciary knows or should know.
    RESTATEMENT (SECOND) OF CONTRACTS § 173 (1981).

4   The Commonwealths' courts have identified the following "pragmatic checklist" to determine whether a joint venture exists:
    (1) an agreement by the parties manifesting their intention to associate for joint profit not amounting to a

**Capizzi v. F.D.I.C., Not Reported in F.Supp. (1993)**

> partnership or a corporation; (2) a contribution of money, property, effort, knowledge, skill, or other assets to a common undertaking; (3) a joint property interest in all or parts of the subject matter of the venture; (4) a right to participate in the control or management of the enterprise; (5) an expectation of profit; (6) a right to share in profits; (7) an express or implied duty to share in losses; and (8) a limitation to a single undertaking (or possibly a small number of enterprises).

*Shain Invest. Co. v. Cohen,* 443 N.E.2d 126, 130 (Mass.App.Ct.1982).

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.