# Exhibit J

29 Employee Benefits Cas. 1533

2002 WL 1998248
United States District Court, D. Massachusetts.

Brian COCHRAN, Plaintiff,
v.
QUEST SOFTWARE, Defendant.

No. Civ.A.00-11856-DPW.
|
Aug. 19, 2002.

*MEMORANDUM AND ORDER*

WOODLOCK, J.

**\*1** Plaintiff Brian Cochran ("Cochran") brings this action against Quest Software, Inc. ("Quest") alleging wrongful termination of employment and breach of contract. Cochran contends that Quest terminated him in order to prevent his stock options from vesting, in violation of the covenant of good faith and fair dealing. He also contends that Quest breached its Stock Option Agreement by cancelling a portion of his stock option during his employment. Both parties have moved for summary judgment with respect to the entire action.

I. Background

Prior to 1999, Cochran, a resident of Massachusetts, was employed as a sales manager for Platinum Technology ("Platinum"). At the time, Cochran possessed unvested stock options in Platinum that he would forego if he were to leave employment with Platinum.[1] In early 1999, Cochran learned that Quest, a California corporation, was hiring sales managers. On February 25, 1999, after speaking with representatives of Quest, plaintiff received a written offer of employment from Quest for a regional sales manager position.

The offer letter outlined the position's scope of responsibility, its terms of compensation, and other issues including a statement that Cochran would be an at-will employee subject to termination with or without cause at any time. The compensation package included a grant of 60,000 stock options "with the standard vesting schedule

and strike price as the general employee grant being made." Cochran signed and returned the offer letter to Quest on March 2, 1999, agreeing to its terms. Cochran states that he was informed that the standard vesting schedule at Quest was four years with 25% of the stock option grant vesting annually beginning on the first anniversary of employment, although he does not remember a specific conversation to that extent.[2]

Cochran began working for Quest on March 8, 1999. His responsibilities included recruiting, training and managing a regional sales force. Initially, Cochran reported to Douglas Garn, Vice President of Sales. From April 2000 through his termination, Cochran reported to Patrick Niesen, Quest's Eastern Vice President of Sales.

During Cochran's employment at Quest, his relationship with Garn deteriorated. On various occasions both Garn and Niesen spoke with Cochran about several performance related concerns including his inability to use Power Point for his presentations, anger management, and his failure to meet sales targets in the second quarter of 2000. In January 2000, Garn met with Cochran in Boston and told him that Quest was disappointed with his performance and was thinking of taking away some of his stock options, along with those of several other regional managers.

Quest's stock split twice during Cochran's tenure-a three for two split on November 30, 1999 and a two for one split on March 31, 2000.[3] Each time, the stock option award increased the number of shares and decreased the exercise price proportionally. Thus, on November 31, 1999, Cochran's 60,000 shares increased to 90,000. Application of the second split would have given Cochran a total option grant of 180,000 shares at a final exercise price of $1.19. However, on March 23, 2000, Cochran received a written notice from Quest's Stock Plan administrator stating that his stock options had been reduced by 27,500.[4] This cancellation occurred before any shares had vested and before the second split. Therefore, as a result of the March 23, 2000 cancellation, Cochran had an unvested stock option to buy 62,500 shares, which doubled to 125,000 shares after the March 31 split. Cochran was notified of the cancellation and signed a form indicating his acknowledgment of this change on March 27, 2000. On April 1, 2000, plaintiff's option respecting 25,002 shares vested. Before the cancellation, 36,002 shares were set to vest.[5]

**\*2** Cochran continued working for Quest after cancellation of a portion of his stock options. On July 10, 2000, Niesen met with Cochran in Boston and told him

that his employment with Quest was being terminated. Cochran did not ask for nor did Niesen provide an explanation for why he was being terminated.

Shortly after his termination, Cochran exercised all 25,002 shares of vested stock options, buying the stock at a price of $1.19 per share and immediately selling it for $55 per share, for a profit of approximately $1,345,000. The plaintiff's remaining unvested option for 99,998 shares terminated upon his termination from employment.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." Fed.R.Civ.P. 56(c). All facts are to be viewed, and all inferences drawn, in the light most favorable to the nonmoving party. *Reich v. John Alden Life Ins. Co .*, 126 F.3d 1, 6 (1ˢᵗ Cir.1997). "[T]o be considered material, a disputed fact must have the potential to <affect the outcome of the suit under the governing law." ' *Sands v. Ridefilm Corp.*, 212 F.3d 657, 660-61 (1ˢᵗ Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). In order for a factual dispute to be genuine, a party must adduce evidence sufficient for a reasonable jury to find in its favor. Mere "conclusory allegations, improbable inferences, and unsupported speculation" are not sufficient to create a genuine issue of material fact. *Lopez-Carrasquillo v. Rubianes*, 230 F.3d 409, 413 (1ˢᵗ Cir.2000) (quoting *Morris v. Government Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994)).

On cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn.... Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain...." *Reich,* 126 F.3d at 6 (citations omitted).

### B. Duty of Good Faith and Fair Dealing

Cochran was an at-will employee of Quest, as evidenced by his offer letter and the employee handbook. (Def.Exs.1, 3) An employment contract that is at-will can be terminated by either side at any time for almost any

reason or no reason at all. *Pollen v. Aware, Inc.,* 53 Mass.App.Ct. 823, 827 (2002) (quoting *Jackson v. Action for Boston Community Dev,* 403 Mass. 8, 9 (1988)).

Among the limited exceptions to pure at-will employment, Massachusetts law provides for an implied covenant of good faith and fair dealing in at-will employment relationships. *Fortune v. Nat'l Cash Register Co.,* 373 Mass. 96, 102 (1977). The *Fortune* doctrine provides that "an employer is accountable to a discharged employee for unpaid compensation if the employee is terminated in bad faith and the compensation is clearly connected to work already performed." *Harrison v. NetCentric Corp.,* 433 Mass. 465, 473-74 (2001). "To prevail under the *Fortune* doctrine, a plaintiff must demonstrate that the employer terminated the plaintiff for the purposes of <depriving the employee of money that he fairly earned and legitimately expected." ' *Sands,* 212 F.3d at 662-63 (quoting *King v. Driscoll,* 424 Mass. 1, 7 (1996)). "Under *Fortune,* litigants may not recover damages for future, prospective benefits not earned by past services." *Id.* at 663.

**\*3** In *Harrison,* 433 Mass. 465, the Supreme Judicial Court addressed the application of the *Fortune* doctrine to unvested stock options. Like Cochran, the plaintiff in *Harrison* alleged that his employer had terminated him to prevent his remaining unvested stock options from vesting. *Id.* at 473. The SJC held that plaintiff's claim failed under *Fortune* because stock options which vest over time subject to continued employment "are not earned compensation for past services, but compensation contingent on ... continued employment." *Id.* at 473-74.

Cochran attempts to distinguish *Harrison* on the ground that Quest's offer of stock options was an inducement to leave Platinum Technology and therefore constitutes compensation for past services. The SJC rejected the same argument in *Harrison,* noting that the argument was "belied by the terms of the stock agreement." *Id.* at 473. As in *Harrison,* Cochran's stock options vested periodically dependent on employment and would terminate immediately on the termination of employment if unvested. *Id.* at 473-74. Had Quest intended to compensate Cochran for leaving Platinum and joining Quest, it could have awarded a signing bonus, vested stock options, or actual shares of stock on commencement of his employment. It did not do so. Rather, the nature of stock options or other compensation that vests requires the employee to earn the compensation through continued employment. *See id.* at 474 ("The longer the plaintiff was employed ..., the more vested shares he would earn."). Here, none of Cochran's options vested until April 1, 2000, more than a year after he left Platinum and joined

29 Employee Benefits Cas. 1533

Quest. It is clear that Cochran was aware that his decision to leave Platinum for Quest entailed taking a risk, but that it also held out the possibility of great reward. *See* Cochran letter (Pl.Ex. C) ("I came here on faith.... I knew what was going to happen to Platinum and what I could potentially give up.... That is why they call it <risk and reward." ').

Because Cochran's claim of breach of the covenant of good faith and fair dealing rests exclusively on the termination of his unvested stock options upon his discharge from employment, *Harrison* controls. Thus, Cochran was not deprived of any compensation for past services and his claim for breach of the covenant of good faith and fair dealing must fail.

C. Breach of Contract

Cochran also alleges three different grounds for breach of contract related to his stock options. First, he contends that Quest's refusal to allow him to exercise his unvested options at the end of his employment violated the Quest Software, Inc. Stock Option Agreement ("Option Agreement"). Second, he contends that Quest was required under the Quest Software, Inc.1998 Stock Option/Stock Issuance Plan ("Stock Plan") to repurchase his nonvested options at the end of his employment. Finally, he contends that Quest's cancellation of his stock option for 27,500 shares in March 2000 was not authorized by the Option Agreement or the Stock Plan and therefore contravened the employment contract awarding him stock options. Violation of the terms of a stock option agreement gives rise to a claim for breach of contract. *Pollen v. Aware, Inc.,* 53 Mass.App.Ct. 823, 827-29 (2002). Therefore, I will address each of these breach of contract claims in turn.

**\*4** Plaintiff's claim that he was entitled to exercise his unvested stock options after termination of employment is wholly unsupported by the governing documents. The Stock Plan expressly provides that upon termination of employment, the option holder is entitled to exercise only those options that are exercisable and have vested as of his termination date. "The option may not be exercised in the aggregate for more than the number of vested shares for which the option is exercisable on the date of the Optionee's cessation of Service." Stock Plan, Art. II, § I(C)(iv). Furthermore, "the option shall, immediately upon the Optionee's cessation of Service, terminate and cease to be outstanding with respect to any and all option shares for which the option is not at the time exercisable or in which the Optionee is not otherwise at that time vested." Stock Plan, Art. II, § I(C)(iv). While the Stock Plan does grant the administrator the discretion to allow

for the exercise of unvested stock options, it does not require the administrator to exercise that discretion in favor of Cochran.

There is also no support for Cochran's contention that Quest was required to repurchase his unvested options at a minimum of not less than 85% of the share's fair market value on his termination. As the discussion above makes clear, all unvested options terminate immediately upon the cessation of the option holder's employment. Nowhere does not Stock Plan require Quest to repurchase or in any way compensate the option holder for unvested stock options that are about to terminate. The provision that plaintiff appears to be citing pertains to options that are exercisable for unvested shares of common stock. *See* Stock Plan, Art. II, § I(E). This type of option is distinct from normal unvested stock options which were held by Cochran and which terminate upon cessation of his employment. Furthermore, the provision only grants the corporation the right to repurchase unvested shares of common stock in its discretion; it does not require Quest to do so.

I turn now to Cochran's contention that the cancellation of 27,500 unvested stock options in March 2000 constituted a breach of contract. He maintains that notwithstanding his status as an at-will employee the parties entered into a binding contract with respect to his initial award of stock options which could not be unilaterally altered by Quest. Quest rejoins that it possessed by virtue of the Stock Plan and/or the Option Agreement the unlimited ability to amend or terminate Cochran's original grant of stock options at any time. Alternatively, Quest contends that the parties entered into a valid modification of the stock option award in March 2000 when Cochran signed the Notice of Stock Grant ("Notice") stating that 27,500 of his stock options were cancelled.

Quest cites portions of the Stock Plan and the Option Agreement for the proposition that the plan administrator or the corporation itself retained the right to amend or terminate stock option awards. My careful review of these documents fails to uncover language granting Quest the authority to alter or cancel existing stock option awards. Absent express language providing such power, I am unwilling to interpret the administrator's discretion to make initial option awards and set the terms and conditions of such awards so broadly as to allow unilateral cancellation of existing option awards.

**\*5** Next, I must consider whether the cancellation of a portion of Cochran's unvested stock options qualifies as a valid modification of the stock option contract. At the

outset, I note that the award of stock options is not a gift, but rather is "intended to promote the interests of Quest Software, Inc .... by providing eligible persons with the opportunity to acquire a proprietary interest ... in the Corporation as an incentive for them to remain in the service of the Corporation." Stock Plan, Article I, § I. The initial award of stock options was part of Quest's offer of employment to Cochran, and became a term of his employment contract subject to the provisions of the Stock Plan. *See Sargent v. Tenaska, Inc.,* 914 F.Supp. 722, 726 (D.Mass.1996) ("A contract-at-will ... may contain binding terms that are effective during the life of the contract.") Although the unvested shares could not yet be exercised, they constituted a promise by the employer of a certain level of future compensation (in the form of options to buy stock at a specified price) negotiated in exchange for the employee's continued employment.

Under Massachusetts law, a party to a contract cannot unilaterally alter the terms of a contract, but rather must enter into a mutually agreed upon modification for which valid consideration is required. *Sargent,* 914 F.Supp. at 727. Where the parties reach an agreement to modify the terms of an employment contract, the employee's continued performance of his work duties can satisfy the consideration requirement. *See Gishen v. Dura Corp.,* 362 Mass. 177, 183 (1972). Thus, to establish a modification, Quest must show that Cochran was aware of and consented to the cancellation of stock options and that he received consideration in exchange for accepting the reduction in stock options. *Sargent,* 914 F.Supp. at 727.

At the summary judgment hearing, Cochran attempted to argue that he was not aware of the cancellation of options at the time it occurred. This argument is belied by the record which demonstrates that he was told in January that some portion of his stock options might be taken back and that he received a Notice of Grant of Stock Options and Option Agreement ("Notice") in March notifying him of the decision to rescind a portion of his stock options. In his deposition, Cochran concedes that he was aware that Quest was taking back some of his options in March, signed the Notice on March 27 acknowledging the rescission of options, and continued to work for Quest notwithstanding the cancellation.[6] Cochran now contends that he believed that the March Notice only changed the vesting schedule of the options. However, the cover letter accompanying the Notice clearly explained that it was being sent "as a result of the cancellation of a portion of your Options."

The validity of the cancellation turns on whether Cochran's continued employment constitutes valid consideration in support of a modification of contract. In

*Gishen,* the SJC held as a matter of law that an at will employee's decision to continue working for his employer after accepting significantly lower commission rates constituted consideration and assent to support a modification of his employment contract. 362 Mass at 183. The question here is whether an award of stock options that has not yet vested can be modified in the same way as Gishen's commission structure, with the consideration requirement satisfied by Cochran's continued employment.

**\*6** At first glance, Cochran's situation appears distinguishable. Unlike *Gishen,* where the change in commission structure was purely prospective in application, the cancellation of stock options appears to be at least partially retroactive. Cochran was awarded the options at the inception of his employment and labored for nearly a year under the impression that a certain portion of those options would vest at the end of that year. On the eve of vesting, he was faced with the difficult choice between accepting a rescission of his stock options and refusing it with the risk of being terminated and thereby losing all of his unvested options.

However, the difference between future commissions and unvested stock options is less significant on closer examination. As *Harrison* makes clear, "unvested [stock option] shares are not earned compensation for past services, but compensation contingent on [ ] continued employment." 433 Mass. at 473. At the time of the alleged modification, Cochran had not yet earned his options nor did he possess any sort of property interest in them. Although the promise of stock options was made at the initiation of employment, the options did not become vested compensation for past services performed until the vesting date. Accordingly, Cochran's prospective interest in his stock options for purposes of modification is no different than his interest in his future salary.

Cochran's lack of an appreciable interest in the unvested options is magnified by the nature of at-will employment. Chief Judge Young of this Court described the character of at-will employment and the nature of both parties' consideration in a case he decided sitting by designation in Arizona.
At-will employment contracts are unilateral and typically start with an employer's offer of a wage in exchange for work performed; subsequent performance by the employee provides consideration to create the contract. Thus, before performance is rendered, the offer can be modified by the employer's unilateral withdrawal of the old offer and substitution of a new one; the employer makes a new offer with different terms and the employee again accepts the new offer by performance (such as

**Cochran v. Quest Software, Not Reported in F.Supp.2d (2002)**

29 Employee Benefits Cas. 1533

continued employment). Thus a new unilateral contract is formed-a day's work for a day's wages. But the parties are free to create a different relationship beyond one at will "and define the parameters of that relationship, based upon the totality of their statements and actions."

*Kavanagh v. Phoenix,* 87 F.Supp.2d 958, 966 (D.Az.2000) (internal citations omitted) (quoting *Demasse v. ITT Corp.,* 984 P.2d 1138, 1142-43 (Ariz.1999) (en banc)). In *Kavanagh,* Chief Judge Young held that an implied promise of regular merit increases could be (and was) modified by the parties, with consideration provided by the employee's continued employment. *Id.* at 966-67. The modification "was proper because the parties never had an agreement, express or implied, to a guaranteed duration of employment on the original terms." *Id.* at 967 n. 5.

*7 Other jurisdictions have adopted the rule that continued employment by an at-will employee constitutes valid consideration to support a modification in the terms of compensation. *See, e.g., Schoppert v. CCTC International Inc.,* 972 F.Supp. 444, 447 (N.D.Ill.1997) (Illinois law); *Keck v. Trifoods International, Inc.,* 1996 WL 665536, *4-5 (E.D. Pa 1996) (Pennsylvania law); *In re. Halliburton Co.,* 2001 WL 1873035, *5 (Tex.2002) (not yet released for final publication) (Texas law); *Asmus v. Pacific Bell,* 991 P.2d 71, 78-79 (Cal.2000) (California law); *Olson v. F & D Publishing Co., Inc.,* 160 Or.App. 582, 586 (1999) (Oregon law). As *Olson* makes clear, a modification to the terms of compensation can only apply prospectively. *Id.* at 588. As discussed above, Massachusetts law treats unvested stock options as prospective compensation contingent on continued employment.

It is undisputed that Cochran was an at-will employee throughout his career at Quest. Since either party can terminate the employment relationship at any point without cause, Quest was free to terminate Cochran's employment at the time of the alleged modification, as was Cochran. Had Quest done so, Cochran would have lost all his stock options because none had vested. Thus, in March 2000, the parties essentially renegotiated the terms of Cochran's future compensation. In terms of consideration, Cochran offered his services in exchange for compensation, albeit on new terms with fewer stock options. Because the options had not yet vested, they

remained a form of future compensation which Cochran could continue to earn by his ongoing service. Similarly, since Quest was not entitled to Cochran's continued employment, Cochran provided consideration for the modification by working after the modification.

Expressed differently, Quest agreed to extend Cochran's employment by not terminating him in exchange for a diminution in his unvested stock options. Although Quest did not expressly threaten to terminate Cochran if he didn't accept the new terms, it had the right to do so. Moreover, the possibility/threat of termination is always implicit in at-will employment. Since Cochran was not entitled to either continued employment or his unvested stock options, Cochran received the continued opportunity to earn salary and to move towards vesting of his options as valuable consideration in support of the modification. *See Taylor v. Zoltek Co. Inc,* 18 S.W.3d 541, 546 (Mo.Ct.App.2000) (no breach of contract where at-will employee was presented with alternative of reduced stock options or termination).

In conclusion, I find that Cochran was aware of the change made to his stock option award and consented to this change. As an at-will employee, Cochran's continued employment constituted valid consideration to support a modification to the terms of his compensation. Thus, the March 23 Notice created a valid modification of Cochran's stock option award, the terms of which the parties satisfied. Accordingly, I find as a matter of law the cancellation of Cochran's unvested stock options does not constitute a breach of contract.

### Conclusion

*8 For the reasons set forth more fully above, I hereby GRANT defendant's motion for summary judgment with respect to both claims.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 1998248, 29 Employee Benefits Cas. 1533

### Footnotes

1    Platinum was later taken over by Computer Associates. Had plaintiff remained at Platinum, he estimates that his options would have vested immediately upon the takeover and been worth approximately $300,000. At the time he left Platinum, Cochran was not aware of rumors of an imminent takeover of Platinum by Computer Associates.

29 Employee Benefits Cas. 1533

2    The record appears to indicate the vesting schedule was semi-annual with varying portions of the overall grant vesting at the different six month intervals. A schedule provided that 20% would vest on April 1, 2000, 13% more would vest every six months for the next three years, and the final 15% would vest April 1, 2003. Plaintiff does not appear to claim that any alleged change in vesting schedule constituted a breach of contract.

3    Quest's stock also split two for one in March 1999, just as Cochran was hired. Quest states that the initial grant of 60,000 took into account this split. This is confirmed by the initial Notice of Grant which describes a grant effective January 1, 1999 for 30,000 shares with an exercise price of $7.10 per share.

4    Plaintiff alleges that in March 2000, Quest took back 117,500 shares leaving him with only 62,500 shares. However, the record makes clear that Cochran's grant was reduced from 90,000 to 62,500 before the second split. Therefore, after March 31, 2000, Cochran had 125,000 shares, 55,000 shares fewer than he would have had if the "take-away" had not occurred.

5    Exhibit 8, which provides the vesting schedule for plaintiff's options following the November 1999 three for two split, states that 18,001 shares vested on April 1, 2000. Without changes to the vesting schedule or cancellation of any shares, the split would have doubled the number of vesting shares to 36,002.

6    The Notice states: "By your signature and the Company's signature below, you and the Company agree that these options are granted under and governed by the terms and conditions of the Company's Stock Option Plan as amended and the Option Agreement, al of which are attached and made a part of this document." Cochran signed the March Notice on a signature line located directly below this provision acknowledging the reduction in his options.

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.