UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUGH DUCKWORTH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 17-11169-FDS |
| ) | |
| R3 EDUCATION, INC., ) | |
| STEVEN C. RODGER, and ) | |
| TERRY J. MOYA, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION TO DISMISS**

**SAYLOR, J.**

This is a lawsuit claiming an alleged wrongful termination. Dr. Hugh Duckworth contends that because his employer wrongfully categorized his termination as "for cause," he was deprived of his rights under a Securityholders Agreement and Stock Option Agreement. The complaint asserted claims under the Americans with Disabilities Act ("ADA"), the Massachusetts anti-discrimination statute, and state contract law. Defendants have moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. For the following reasons, the motion to dismiss will be granted.

**I. Background**

**A. Factual Background**

The following facts are as stated in the complaint.

### 1. **Duckworth's Termination**

Dr. Hugh Duckworth was employed by R3 Education, Inc. ("R3"), a holding company that owns three medical schools in the Caribbean: St. Matthews University School of Medicine, Medical University of the Americas, and the Saba School of Medicine. (Compl. ¶ 10). Duckworth served as Executive Dean at the Saba University School of Medicine and Associate Dean of Basic Sciences at Medical University of the Americas and the Saba University School of Medicine. (*Id.* ¶ 13).

R3 is a Delaware corporation with a principal place of business in Massachusetts. (*Id.* ¶ 2). Steven Rodger and Terry Moya are, respectively, the Chief Executive Officer and the Chief Financial Officer of R3. (*Id.* ¶¶ 11-12).

On July 1, 2013, Duckworth received a letter signed by Rodger confirming that he had been placed on paid leave from his employment because of "repeated insobriety while rendering services as an employee." (*Id.* ¶ 36; Docket No. 9, Ex. 5).[1] The letter indicated that his salary would be reduced to $110,000 while he remained on paid leave. (Docket No. 9, Ex. 5). It also stated that his "repeated insobriety would justify [his] termination for cause," but that Rodger "was willing to continue [his] employment with the Company," subject to various terms and conditions. (*Id.*).

Among the terms and conditions were that Duckworth would be relieved of his current duties, although he would retain certain titles; that he would "perform such duties as requested," but he would cease to come in to the office; and that he would surrender all keys and other

---

[1] Under Fed. R. Civ. P. 12(b)(6), a court normally cannot consider evidence outside the complaint and attached exhibits without converting the motion into a motion for summary judgment. However, the First Circuit has recognized "narrow exceptions" to that rule, including "documents central to [plaintiff's] claim[s]" and "documents sufficiently referred to in the complaint." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). The complaint makes many references to the July 1, 2013 and July 14, 2014 letters, both of which defendants have provided as exhibits. Plaintiff has not contested the authenticity of those documents. The Court will therefore consider the letters in connection with the motion to dismiss.

company property. (*Id.* ¶¶ 1-4). It also provided that he would lose certain non-vested or non-exercised stock option rights. (*Id.* ¶ 6). It directed him to "immediately seek appropriate professional help for [his] substance abuse problem." (*Id.* ¶ 7). It included a paragraph releasing the company and its officers and employers from all claims. (*Id.* ¶ 9). It included a statement that his continued employment would be at-will. (*Id.* ¶ 8). Finally, it included an integration clause that superseded and cancelled "all prior or contemporaneous discussions, negotiations, representations or agreements with respect to the matters addressed herein." (*Id.* ¶ 11).

Duckworth was given until 5:00 p.m. on July 28, 2013, to decide whether to accept the offer. (*Id.* ¶ 10). The release language of the letter also stated he would have seven days from the date of execution to revoke his acceptance of the agreement. (*Id.*). According to the complaint, Rodger orally assured Duckworth that he could keep his job provided he signed the letter. (Compl. ¶ 36). Duckworth ultimately signed the letter on July 29, 2013. (Docket No. 9, Ex. 5).

About a year later, on July 14, 2014, Duckworth received a letter signed by Moya stating his employment would be terminated effective August 15, 2014. (Compl. ¶¶ 26-27). The termination was "for cause," although the letter did not specify the specific basis. (*Id.* ¶ 30).

The July 1, 2013 letter did not provide any specific examples of Duckworth's insobriety. The complaint alleges that R3 encouraged a "party atmosphere" and that other employees, including top management, were intoxicated at company events but did not suffer similarly adverse employment consequences. (*Id.* ¶¶ 48-49).

### 2. The Securityholders Agreement and Stock Option Agreement

As noted, the letter provided that Duckworth would lose certain rights concerning R3 stock options. In December 2008, Duckworth became a party to R3's Securityholders

3

Agreement by executing a joinder document to become a "management stockholder." (*Id.* ¶ 14). As relevant here, the agreement stated:

> [U]pon the occurrence of a Call Event affecting a Management Stockholder, the Company shall have the right to purchase . . . all . . . of the Shares held by such Management Stockholder at the Purchase Price and during the Exercise Period applicable thereto as described . . . in Schedule 2 hereto.

(*Id.* ¶ 15). The agreement defined "Call Event" as "the first to occur of any of the Triggering Events." (*Id.* ¶ 16). A "Triggering Event" in turn was defined as the "termination of [the] employment relationship . . . for any reason." (*Id.* ¶ 17). There were six categories of triggering events, including "a termination for Cause." (*Id.*). Justification for termination with cause included "repeated insobriety or any use of illegal drugs while rendering services as an employee." (*Id.* ¶ 19).

Schedule 2 of the Securityholders Agreement provided that in the event of a termination for cause, the "purchase price" of the securities would be the "lower of initial value and book value." (*Id.* ¶ 18). The "initial value" of the securities at Duckworth's termination was $0.001 per share. (*Id.* ¶ 43). Because Duckworth held 319 shares of R3 common stock at his termination date, the "total purchase price payable by [R3] for [his] stock [was] $0.319, or $0.32 (rounded)." (*Id.*).

By contrast, termination without cause would result in the "purchase price" being the "stipulated value" of the securities, which was defined as:

> [T]he quotient obtained by dividing (A) the difference obtained by subtracting (I) Funded Debt of the Company as of the date Stipulated Value shall be determined, from (II) the product of the Company's Adjusted EBITDA for the 12-month period ending on such date times five (5), by (B) the number of Shares outstanding or deemed outstanding on such date.

(*Id.* ¶ 44). Because the value of several variables remains unknown to Duckworth, additional information is required to calculate the exact "stipulated value." (*Id.* ¶ 45). Nevertheless, the

4

complaint contends that the stipulated value was much higher than the "initial value," and uses the Company's reported par value of $350 per share as a proxy. (*Id.*).

Duckworth was also a party to a Stock Option Agreement dated December 1, 2008. (*Id.* ¶ 20). The Stock Option Agreement granted him the opportunity to purchase 255 shares of R3 common stock at $100 per share. (*Id.* ¶ 21). However, if his employment was terminated for cause, then those options would be forfeited. (*Id.* ¶ 22). Approximately two weeks after Duckworth's departure, R3 common stock was valued at $350 per share, according to publicly available information on file with the Massachusetts Secretary of State. (*Id.* ¶ 40). Therefore, Duckworth would have been entitled to profits of $250 per option had he not been terminated for cause. (*Id.*).

### B. Procedural Background

Duckworth filed the complaint in this action on June 23, 2017. It asserts asserting ten counts: Counts 1, 3, and 5 allege breach of contract; Counts 2, 4, and 6 allege breach of the implied covenant of good faith and fair dealing; Counts 7 and 8 allege violation of the ADA; and Counts 9 and 10 allege violation of the Massachusetts anti-discrimination statute. Defendants have moved to dismiss the complaint for failure to state a claim, contending that plaintiff's claims are barred by the release included in the July 1, 2013 letter.

## II. Legal Standard

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual

allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

### III. Analysis

Plaintiff's counsel conceded during oral argument that plaintiff's claims are totally barred if the July 1, 2013 release is valid. The principal question, therefore, is the enforceability of the release.

#### A. Whether the Release Was Knowing and Voluntary

A release of employment claims is valid where the employee knowingly and voluntarily assented to it. *Rivera-Olmo v. State Ins. Fund Corp. (SIFC)*, 250 Fed. Appx. 365, 367 (1st Cir. 2007). The First Circuit has provided a six-factor test to determine whether there has been a knowing and voluntary assent. *Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007). The six factors are the following:

> (1) the plaintiff's education, business experience, and sophistication; (2) the parties' respective roles in deciding the final terms of the arrangement; (3) the agreement's clarity; (4) the amount of time available to the plaintiff to study the agreement before acting on it; (5) whether the plaintiff had independent advice—such as the advice of counsel—when [signing] the agreement; and (6) the nature of the consideration tendered in exchange for the waiver.

*Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 181 (1st Cir. 1995). "Because

6

release is an affirmative defense, the burden rests with the releasee to establish that a particular release [is valid]." *Hernandez*, 486 F.3d at 8 (internal citations omitted).

The first factor, plaintiff's education and experience, weighs strongly in favor of defendants here. By his own admission, plaintiff holds a medical degree, is an accomplished surgeon, and has held a variety of leadership positions at hospitals and universities during his career. (Compl. ¶ 23). It is highly doubtful that plaintiff did not understand the ramifications of the release.

Plaintiff relies heavily on the second factor—that is, whether there was an opportunity to negotiate the terms of the agreement. He alleges that "there was no opportunity to negotiate or change the terms of the letter and his choices were [to] sign the letter or be terminated," and thus the release was effectively a contract of adhesion. (Pl.'s Opp. at 8). Even assuming the truth of that statement, that factor favors the plaintiff, but is "of only modest import here." *Hernandez*, 486 F.3d at 9. Among other things, the complaint does not allege that plaintiff even suggested changes to the language, or attempted to negotiate terms and was rebuffed.

The third factor, the clarity of the agreement, favors enforceability. The release's provisions are straightforward and clear, stating that plaintiff was waiving "all claims or liabilities of any kind, whether known by the Employee or unknown, including but not limited to any claims arising out of or relating in any way to Employee's employment with [R3]." (Docket No. 9, Ex. 5 ¶ 9).

The fourth factor, the time available to study the agreement, also favors enforceability. Plaintiff was given 27 days to decide whether to accept the terms of the release, and ultimately signed one day after the deadline. (*Id.* ¶ 10).[2] In addition, he was granted an additional seven

---

[2] The release states "[e]mployee further acknowledges that he has been given at least 21 days to consider the meaning and effect of this agreement before signing it." (Docket No. 9, Ex. 5, ¶ 10). However, the release was

7

days following the date of execution to revoke the release. (*Id.*). That was ample time for anyone, much less someone of plaintiff's education and sophistication, to review the agreement. *See Bukuras v. Mueller Group, LLC*, 2008 WL 3978210, at *8 (D. Mass. Aug. 14, 2008) (finding 21 days sufficient for an employee to decide whether to sign a release).

The fifth factor, the opportunity to seek independent counsel, favors enforceability. The release urged plaintiff to seek legal counsel of his choosing before signing. (Docket No. 9, Ex. 5 ¶ 10). Plaintiff's failure to consult an attorney before signing is irrelevant to consideration of this factor. *See Hogan v. Eastern Enters./Boston Gas*, 165 F. Supp. 2d 55, 62 (D. Mass. 2001).

Finally, the sixth factor, the nature of the consideration, similarly favors enforceability. Plaintiff received consideration in exchange for signing the release, which provided him the opportunity to continue indefinitely as an at-will employee and to be paid despite performing little or no work.[3] He was "relieved of [his] duties as Executive Dean of [the] Saba University School of Medicine." (Docket No. 9, Ex. 5, ¶ 1). He would nominally remain as "Associate Dean of Basic Sciences of Medical University of the Americas and St. Matthew's University School of Medicine" but otherwise be placed on paid leave. (*Id.* ¶ 2).[4] Commensurate with his greatly reduced workload, his salary was reduced to $110,000, and all options under the Stock Option Agreement were forfeited. (*Id.* ¶¶ 5-6). Plaintiff enjoyed the benefits of the contract for more than a year. R3's "forbearance from ending the employment relationship [immediately], coupled with [plaintiff's] continued performance, can satisfy the consideration requirement."

---

dated as of July 1, 2013, and provided plaintiff until 5:00 p.m. on July 28, 2013, to decide whether to sign, effectively granting 27 days. (*Id.*).

[3] Otherwise, plaintiff would have been "terminated for cause effective immediately." (Docket No. 9, Ex. 5).

[4] The complaint alleges that plaintiff was employed as Associate Dean of Basic Sciences at the Saba University School of Medicine rather than St. Matthew's University School of Medicine.

8

*Cochran v. Quest Software, Inc.*, 328 F.3d 1, 10 (1st Cir. 2003).

Plaintiff contends that "defendants did not have cause to terminate" him and therefore there was no consideration. (Pl.'s Opp. at 8). However, in Massachusetts, "where an employment contract, be it express or implied, contains no definite period of employment, it establishes employment at-will." *See Jackson v. Action for Boston Comm. Dev. Inc.*, 403 Mass. 8, 9 (1988). Because plaintiff's employment with R3 was at-will, R3 could have terminated him at any time, subject to limited exceptions not applicable here. Accordingly, because "the employee had no right to continued employment and the employer had no right to the employee's future services," R3's offer of continued employment was adequate consideration for the new agreement. *Cochran*, 328 F.3d at 10. *See also Cellular Accessories for Less, Inc. v. Trinitas LLC*, 2014 WL 4627090, at *7 (C.D. Cal. Sept. 16, 2014) ("[A]n at-will employment agreement can generally be modified by an employer at any time; the modification essentially terminates the prior agreement and creates a new, unilateral contract, which the employee accepts by continuing to [perform] . . . under the modified terms."); *Tomer v. Hollister Assocs.*, 2007 WL 2908268, at *3-4 (Mass. App. Ct. Oct. 5, 2007).

On balance, the factors overwhelmingly indicate that plaintiff knowingly and voluntarily entered into a valid release and thereby relinquished his claims.

### B. Whether the Release Was Executed Under Duress

The complaint further alleges that the release is unenforceable because plaintiff entered into the agreement under economic duress. (Compl. ¶ 37).[5] "To show economic duress (1) a party 'must show that he has been the victim of a wrongful or unlawful act or threat, and (2) such

---

[5] The complaint also alleges that the release was unconscionable. (Compl. ¶ 37). However, as plaintiff failed to address that argument in both his opposition to defendants' motion to dismiss and the motion hearing, it is deemed conceded.

9

act or threat must be one which deprives the victim of his unfettered will.'" *International Underwater Contractors, Inc. v. New Eng. Tel. & Tel. Co.*, 8 Mass. App. Ct. 340, 342 (1979) (quoting 13 WILLISTON, CONTRACTS § 1617, at 704 (3d ed.1970)). Proof of duress requires more than that a party took advantage of another's negative economic situation; it requires evidence that the accused party caused the financial difficulty to induce the contract or agreement. *Id.* (citing 13 WILLISTON, *supra*, § 1617, at 708.).

In Massachusetts, "[r]elease of a party from its contractual obligations on a claim of economic duress is 'reserved for extreme and extraordinary cases.'" *Society of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, Colorado*¸ 685 F. Supp. 2d 217, 224 (D. Mass. 2010) (quoting *Cabot Corp. v. AVX Corp.*, 448 Mass. 627, 639 (2007)). This is not one of those "extreme and extraordinary cases." The complaint fails to plead sufficient facts to support the contention that defendants caused any financial difficulty in order to induce plaintiff into accepting the release. The choice provided to plaintiff—between (1) immediate dismissal from his at-will employment or (2) acceptance of R3's allegedly non-negotiable conditions for continued employment—was neither unduly wrongful nor oppressive. That is the type of "hard bargaining" that is "not only acceptable, but indeed, desirable, in our economic system, and should not be discouraged by the courts." *Pizzeria Uno Corp. v. Pizza by Pubs, Inc.*, 2011 WL 4020845, at *5 (D. Mass. Sept. 9, 2011) (quoting *Cabot Corp.*, 448 Mass. at 639).

Even assuming that the complaint states a *prima facie* claim of economic duress, plaintiff's argument still fails. A release that was entered into under duress "is voidable, not void, and the party claiming duress must act promptly to repudiate the agreement or be deemed to have waived his right to do so." *Citizens Bank of Massachusetts v. Bishay*, 1997 WL 785596, at *12 (Mass. Sup. Ct. Nov. 24, 1997) (citing *Ismert & Associates v. New England Mut. Life Ins.*,

801 F.2d 536, 547-48 (1st Cir. 1986)). A coerced party who fails to contest the release within a reasonable time period and accepts the benefits of the agreement ratifies and affirms the release. *Id.*

Plaintiff signed the release on July 29, 2013, and was terminated the following summer. In the interim, he collected approximately $110,000 in salary for minimal or no work. He did not file suit seeking to disaffirm the release until three years later, on June 23, 2017. By accepting the release's benefits and waiting several years before filing suit, plaintiff ratified the release. *See Abbadessa v. Moore Bus. Forms, Inc.*, 987 F.2d 18, 24 (1st Cir. 1993) (finding delay of seven months by plaintiff precludes economic duress defense); *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir. 1989) (holding that plaintiff ratified a contract by accepting its benefits for months before asserting a claim of economic duress).

### C. Whether the Integration Clause Bars Recovery on the Alleged Oral Promise

The complaint further contends that defendant Rodger orally assured plaintiff that he could keep his job provided he signed the release. (Compl. ¶ 36). However, the July 1, 2013 letter contained an integration clause, which stated that the agreement superseded "all prior or contemporaneous discussions, negotiations, representations, or agreements." (Docket No. 9, Ex. 5, ¶ 11). It is well-settled that "where an agreement is unambiguous and contains an integration clause, a court must give effect to its obvious meaning." *HipSaver Co., Inc. v. J.T. Posey Co.*, 490 F. Supp. 2d 55, 63 (D. Mass. 2007) (citing *Bank v. IBM*, 145 F.3d 420, 424 (1st Cir. 1998)). "That means, of course, that an inquiring court should construe the written documents within its four corners, unfestooned with covenants the parties did not see fit to mention." *Id.* (quoting *United States v. Alegria*, 192 F.3d 179, 185 (1st Cir. 1999)). Because the terms of the July 1, 2013 letter are plain and unambiguous, the alleged oral promise may not be enforced.

### D. Whether the Release is Unenforceable as a Matter of Public Policy

Finally, plaintiff contends that the release should not be enforced as a matter of public policy because, as a purported alcoholic, he was entitled to protections under Massachusetts law. Mass. Gen. Laws ch. 151B § 1 *et seq.* It is true that releases are unenforceable as against public policy when they shield a defendant from violation of statutory duties. *See Zavras v. Capeway Rovers Motorcycle Club, Inc.*, 44 Mass. App. Ct. 17, 19 (1997) (citing *Henry v. Mansfield Beauty Academy, Inc.*, 353 Mass. 507, 511 (1968)). However, *Zavras* and *Henry* are inapposite. Both involved prospective releases for harm caused intentionally, recklessly, or with negligence. *Id.* By contrast, the July 1, 2013 letter was retrospective, releasing defendants from all claims plaintiff may have accrued in connection with his employment.

Moreover, public policy favors enforcement of releases in the employment context. The First Circuit has emphasized that "in the employment law context . . . releases provide a means of voluntary resolution of potential and actual legal disputes, and mete out a type of industrial justice." *Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d 9, 11 (1st Cir. 1997). Under this principle, "releases of past claims have been honored under the laws prohibiting race and gender discrimination . . . [and] under the ADEA, which prohibits age discrimination in employment . . . as well as under ERISA." *Id.* at 11-12 (internal citations omitted). There is no reason why this notion does not also apply to releases of claims under Massachusetts law.[6] Adopting plaintiff's position would render many such releases worthless and introduce substantial uncertainty into the labor markets.

---

[6] To the extent the complaint alleges "constructive discharge," those claims are also barred by the release. *See Rivera-Flores*, 112 F.3d at 14 ("Even if [plaintiff] had valid claims under [various] statutes, he could have waived those claims.").

## IV.     Conclusion

For the reasons stated above, defendants' motion to dismiss the complaint is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: November 9, 2017                     United States District Judge